UNITED STATES of America

v.

**Filipina NARCISO and Leonora Perez.**

**Crim. Nos. 6–80884, 7–80149.**

United States District Court,
E. D. Michigan, S. D.

Memorandum Opinion and Order Regarding Discovery Dec. 26, 1976.

Memorandum Opinion and Order Denying Defendants' Motion to Strike
Jan. 27, 1977.

Memorandum Opinion and Order Denying Defendants' Motion To Suppress Testimony of Richard Neely Feb. 11, 1977.

Memorandum Opinion and Order Granting Defendants' Motion in Limine
Feb. 11, 1977.

Memorandum Opinion and Order Granting Defendants' Motion to Strike Overt Acts Feb. 11, 1977.

Memorandum Opinion Denying Defendants' Motion to Dismiss Superseding Indictment May 18, 1977.

On Motion for New Trial Dec. 19, 1977.

Philip Van Dam, James K. Robinson, U. S. Attys., Richard L. Delonis, Richard F. Yanko, Asst. U. S. Attys., Detroit, Mich., for plaintiff.

Edward R. Stein, Ann Arbor, Mich., Laurence C. Burgess, Detroit, Mich., Thomas C. O'Brien, Michael C. Moran, Ann Arbor, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER REGARDING DISCOVERY

PHILIP PRATT, District Judge.

During the months of July and August, 1975, 35 patients at the Ann Arbor Veterans Administration Hospital suffered a total of 51 cardiopulmonary arrests. An intensive epidemiological and criminal investigation was begun to determine the cause of these unexpected events. In June, 1976 a Grand Jury in this District returned an indictment charging the defendants with five counts of murder,[1] ten counts of unlawfully mingling a poison in the food and

---

1. In violation of 18 U.S.C. § 1111:

 (a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing . . . is murder in the first degree.

 Any other murder is murder in the second degree.

 (b) Within the special maritime and territorial jurisdiction of the United States,

 Whoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto "without capital punishment", in which event he shall be sentenced to imprisonment for life;

 Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life.

18 U.S.C. § 7:

The term "special maritime and territorial jurisdiction of the United States," as used in this title, includes:

. . . (3) Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

18 U.S.C. § 2:

 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

medicine of certain patients,[2] and conspiracy to commit those offenses.[3] Before turning to the precise issues before the Court, it is appropriate to discuss some of the aspects of this case in general terms so that the rulings which follow may be put in proper perspective.

■ The indictment presents charges that, in a most dramatic way, raise difficult issues of medicine and. law. The defendants are charged with a capital crime.[4] If convicted they could be sentenced to life imprisonment. The fact that the defendants were nurses at the Veterans Hospital at the time of these arrests has contributed to the intense public interest in the case.[5] Despite the eight month time interval between the arraignment and the scheduled commencement of trial, preparation has been time consuming and highly demanding. The list of complex, novel issues is quite lengthy. For example, during the course of the exhaustive pre-indictment FBI investigation new and intricate scientific tests were developed and hypnosis was employed in the process of questioning certain hospital patients. A determination as to the legal validity of either of these investigative techniques and the appropriate presentation of the issues has required extraordinary efforts by attorneys who are not well versed in the intricacies of chemistry and psychology. Nor is the case devoid of the more common problems in a criminal case. Motions with regard to the use of possible hearsay testimony, challenges to the accuracy of certain eyewitness testimony and extensive discovery motions have already been filed. These require substantial time commitments on both sides for proper preparation and presentation.

In addition to legal issues which must be resolved prior to the trial, there is a staggering amount of potential factual information which might be elicited at the trial. An exhaustive investigation by various federal agencies, continuing for approximately ten months, preceded the indictment in this case. The Ann Arbor Veterans Administration Hospital, site of the alleged crimes, is a

2. In violation of 18 U.S.C. §§ 2, 7, see footnote 1, *supra*, 18 U.S.C. § 13:
 Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in Section 7 of this title, is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.
 and M.C.L.A. § 750.436:
 Any person who shall mingle any poison with any food, drink or medicines, with intent to kill or injure any other person, or shall willfully poison any spring, well or reservoir of water, with such intent, shall be guilty of a felony, punishable by imprisonment in the state prison for life, or any term of years.
3. In violation of the statutes cited in footnotes 1 and 2, *supra,* and 18 U.S.C. § 371:
 If two or more persons conspire either to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined no more than $10,000 or imprisoned not more than five years, or both.
4. The government argues that since the Supreme Court's decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the death penalty may not be imposed under 18 U.S.C. § 1111; therefore the statute is not a capital case. In support the government cites *U. S. v. Bolden,* 169 U.S.App.D.C. 60, 514 F.2d 1301 (1975) and *U. S. v. Freeman,* 380 F.Supp. 1004 (D.N.D.1974). The reasoning of these cases is overly simplistic. Many procedural differences exist for a defendant charged with a capital crime. *See* 18 U.S.C. §§ 3148, 3281, 3432, 3651; F.R.Cr.P. 24(b). Also Congress has not repealed the death penalty. Compare *U. S. v. Massingale,* 500 F.2d 1224 (4th Cir. 1974) (noting Congressional repeal of the death penalty in kidnapping cases). The Court is constrained to agree that: "The kinds of crimes made punishable by death are usually such as to generate revulsion in the trier of fact and, as a result, a high degree of prejudice if the trial is not conducted strictly in accord with recognized procedures, including the rules of evidence and burden of proof." *U. S. v. Watson,* 496 F.2d 1125, 1128 (4th Cir. 1973). It is for Congress, not the courts, to rewrite the definition of a capital offense.

5. The Court has already issued a general order providing for an orderly trial and the selection of jurors free of taint in light of the extreme interest evidenced in this case in the local media.

430 bed acute-care institution which had a large staff and patient population. As is typical of acute-care hospitals, many of the staff and patients were no longer easily accessible after the incidents with which we are now concerned occurred. The task of fact gathering alone is a monumental one.[6] When combined with the preparation necessary for the legal motions discussed above, some of which involve complex and novel legal issues, some idea of the difficulty of the case can be gained. Current estimates for the length of the trial run from 4–6 months. What this amounts to is what some commentators describe as a "big" criminal case, see *Developments in the Law —Discovery,* 74 Harv.L.Rev. 940, 1000 (1961), which will be very demanding for everyone involved.

■ Highly unusual cases of the type at bar are particularly appropriate for liberal discovery treatment. Numerous commentators have noted that increased pretrial discovery in criminal cases would help our trial courts achieve just decisions in a more efficient way. See, e. g., *ABA Standards Relating to Discovery and Procedure Before Trial,* Part II, (1970); *Developments, supra,* at 1053–66:

> "The belief that a criminal trial should be a balanced contest between adversaries has long been criticized as a 'sporting theory of justice' which is particularly inappropriate in light of the high stakes involved in criminal litigation . . . Insofar as the sporting theory suggests that broad disclosure is undesirable as an infringement upon the opportunity for ingenuity in the use of trial tactics, it would seem to conflict with the duty of the state's prosecutor to seek results which are in accord with the facts rather than to achieve a record of indiscriminate convictions. If the use of discovery is likely to increase the probability that verdicts will be based on the facts rather than on clever trial maneuvers, its broad use in the criminal area would be desirable." *Id.* at 1063.

Nonetheless our adversary system has traditionally afforded criminal defendants significantly less discovery than is available to a defendant in the civil law system. Damaska, *Evidentiary Barriers to Conviction and Two Models of Criminal Procedure: A Comparative Study,* 121 U.Pa.L.Rev. 506, 533–6 (1973). Yet the recognition is growing that adjustments in the "sporting theory" are necessary if the adversary system is to reach verdicts that are consistently in accord with the underlying factual realities.[7] Even the authors of the Federal Rules of Criminal Procedure recognize this, for in commenting on the text of Rule 16 they said:

> "The rule is intended to prescribe the minimum amount of discovery to which the parties are entitled. It is not intended to limit the judge's discretion to order broader discovery in appropriate cases." 62 F.R.D. 307–8 (1974).

Courts as well have, in certain limited cases of particularized need, exercised discretionary authority to order wide-ranging dis-

---

**6.** Numerous FBI agents spent months tracing possible leads all over the country. It would probably not be inaccurate to say that the government devoted tens of thousands of dollars to its investigation of the cardiopulmonary arrests at the Veterans Hospital. The government estimates that almost 750 persons were interviewed and that it will call approximately 116 fact witnesses and 36 expert witnesses to testify at trial. Government attorneys have reviewed approximately 250 of the FBI interview reports (Form 302) but have not reviewed 5 to 600 302's contained in FBI files.

**7.** As with any criminal justice system, the adversary system is subject to the conflicting tensions between desiring to minimize the number of false convictions while at the same time maximizing the number of guilty persons who are not acquitted. Discovery which falls short of violating a defendant's privilege against self-incrimination may be a step toward resolving some of these tensions. Whether one thinks discovery reduces the adversarial nature of the trial process or allows for the fullest approximation of a truth-finding device of which the adversary system is capable, the benefits are clear. *Compare* Brennan, *The Criminal Prosecution: Sporting Event or Quest for Truth,* 1963 Wash.U.L.Q. 279, *with* Goldstein, *The State and The Accused: Balance of Advantage in Criminal Procedure,* 69 Yale L.J. 1149, 1180–99 (1960).

covery. In *U. S. v. Achtenberg*, 459 F.2d 91 (8th Cir. 1972), the defendant, a student who was accused of setting fire to a campus ROTC building, requested the transcripts of Grand Jury testimony. In granting the request, the court said,

"A need for discovery because of the numerous potential witnesses and the fact that the student witnesses had scattered after the school year were asserted. Defendant's contention was that the government had superior ability through the FBI to contact possible witnesses and that the time and expense of defendant in obtaining interviews with the many prospective witnesses would be prohibitive." *Id.* at 96.

In part, the *Achtenberg* court relied on the Supreme Court's observation in *Dennis v. U. S.*, 384 U.S. 855, 873, 86 S.Ct. 1840, 1851, 16 L.Ed.2d 973 (1966) that,

"In our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact."

█ In the case at bar, there is one additional factor to consider. One of the defendants is represented by appointed counsel. In addition to bearing the cost of the trial itself and the investigation of the alleged offense, the government is responsible for much of the cost of the defense as

well under the Criminal Justice Act, 18 U.S.C. § 3006A. While this fact does not infringe on the Constitutional protections afforded a defendant in a criminal case and established law must not be ignored, it does suggest a persuasive reason for eliminating a duplication of effort and cost for which the government must pay. In short, the particular facts of this case persuade the Court that insofar as the law permits, maximum discovery should be ordered.

## DISCUSSION

The defense has filed extensive discovery motions. In an effort to facilitate the discovery process the Court conducted several conferences akin to the Omnibus Hearings used in several United States District Courts around the country, *Cf.* 37 F.R.D. 95 (1965).[8] These conferences resulted in substantial voluntary and mutual discovery.[9] There remain, however, several issues on which the parties are unable to agree. Accordingly, this opinion will resolve the discovery disputes which remain as to:

1. The discoverability of statements allegedly made by the defendants to third persons, not government agents, which are in the possession of the government;

2. The discoverability of certain FBI 302 forms; [10]

8. The concept of an omnibus hearing includes substantial voluntary discovery by both sides. The subcommittee report of the Judicial Conference recommended "that as far as possible the court attempt to make discovery at the pretrial a 'two-way street.' In other words, the government cannot be urged to reveal its entire case without cooperation on the part of the defendant in waiving foundation as to documentary evidence or otherwise cooperating to make the procedure one of mutual benefit to the parties." 37 F.R.D. at 101. The Court expects both parties to this lawsuit to continue to engage in maximum mutual and voluntary discovery of this sort.

9. Voluntary discovery by the government included, *inter alia*, statements made by the defendants to agents of the FBI, transcripts of recorded testimony before the Grand Jury, voluminous records of the Veterans Administration Hospital including 126 patient charts, floor plans, handbooks, work records, and personnel files of the defendants, documents relating to

autopsies, and scientific tests, information regarding photographic and other identifications of the defendants, hypnotic induction profiles of various hospital patients, FBI 302 forms for all individuals who will not be called as government witnesses, within the possession of the U.S. attorneys, witness lists, and polygraph printouts. The defendants have provided the government with handwriting exemplars. In case there is any doubt, all discovery previously agreed to by either side, including that listed above, shall be completed forthwith.

10. An FBI 302 is a form routinely filled out by all agents of the Federal Bureau of Investigation after interviewing a person. The government represents that these forms are the vehicle for recording information in the "overwhelming majority" of interviews. The agent interviews an individual, returns to his office and, after consulting a statement he has taken, his notes, or his memory, dictates a report summarizing the results of the conversation.

3. The discoverability of any overt acts not named in the indictment which will be relied upon at trial;

4. Whether certain FBI 302 forms never seen by the U.S. attorneys are discoverable under the dictates of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

## I.

Under the authority of F.R.Cr.P. 16(a)(1)(A) the defendants seek discovery of statements allegedly made by them to individuals not employed by the government, which are in the possession and control of government attorneys. The government asserts that such statements are manifestly beyond the purview of the rule and thus undiscoverable. The Rule in relevant portion provides,

"Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government; the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent . . ."

There is some judicial opinion in support of the defendants' position. The most detailed analysis of the problem is found in *U. S. v. Feinberg*, 371 F.Supp. 1205 (N.D.Ill. 1974); *rev'd. in part* 502 F.2d 1180 (7th Cir. 1974); *cert. denied*, 420 U.S. 926, 95 S.Ct. 1122, 43 L.Ed.2d 396 (1975). In *Feinberg* the trial judge faced the identical issue presented here and determined that the literal interpretation of the rule, and the one most consistent with its purpose, was that

"disclosure may be ordered of statements made by a defendant regardless of to whom they were made." *U. S. v. Feinberg, supra,* at 1211. Aside from the language of the rule itself, the district court's opinion notes that one of the purposes of the rule is to apprise the defendant of statements he may not always be aware of which are in the possession of the government. This approach to the problem has found favor elsewhere. *U. S. v. Walk*, 533 F.2d 417 (9th Cir. 1975) (dissenting opinion); *U. S. v. Morrison*, 43 F.R.D. 516 (N.D.Ill.1967); *U. S. v. Baker*, 262 F.Supp. 657, 671–2 (D.D.C. 1966). See also views of Representatives Holtzman and Drinan, H.R. 94–247, 1975 U.S.Code Cong. and Admin.News, 706.

The government's position finds support in *U. S. v. Walk, supra; U. S. v. Pollack*, 175 U.S.App.D.C. 227, 534 F.2d 964 (1976). These decisions read the Rule to limit such statements to those obtained by the government *directly* from the defendant and not through any third party. The rationale of these cases is (1) consistency with the Jencks Act, and (2) avoidance of the possibility of revealing statements that are too far removed from the supposed source to be reliable.

The intermediate position is that while statements made by defendants to third persons, not agents of the government, may come within the ambit of the rule, they are discoverable only as provided for by the Jencks Act, 18 U.S.C. § 3500. *U. S. v. Callahan*, 534 F.2d 763 (7th Cir. 1976); *U. S. v. Feinberg*, 502 F.2d 1180; *U. S. v. Kenny*, 462 F.2d 1205 (3rd Cir. 1972); *U. S. v. Pastor*, 419 F.Supp. 1318 (S.D.N.Y.1976); *U. S. v. Smith*, 405 F.Supp. 144 (E.D.Pa.1975); *U. S. v. Dorfman*, 53 F.R.D. 477 (S.D.N.Y. 1971), *aff'd.* 470 F.2d 246 (2d Cir. 1972). This approach is bottomed on F.R.Cr.P. 16(a)(2) which provides that "statements made by government witnesses or prospective government witnesses" may not be discovered except as provided for in the Jencks Act.[11] It is premised on the desire

11. F.R.Cr.P. 16(a)(2) reads in full, "(2) Information Not Subject to Disclosure. Except as provided in paragraphs (A), (B), and (D) of subdivision (a)(1), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made

of Congress to protect potential witnesses from threats of bribery or coercion and to protect government files against unwarranted and excessive intrusions. *U. S. v. Walk, supra; U. S. v. Feinberg*, 502 F.2d 1180, *supra.*

In *U. S. v. Wilkerson*, 456 F.2d 57 (6th Cir. 1972), *cert. denied*, 408 U.S. 926, 92 S.Ct. 2506, 33 L.Ed.2d 337 (1972), the Court of Appeals for this Circuit ruled that a statement in an FBI memorandum recording a conversation with a government witness which included a confession by the defendant was discoverable only through the Jencks Act. The court went on to say, however, that the government's answer to defendants' request for the production of any relevant statements made by the defendant was lacking in candor:

> "The better response would have been to say that the Government did have a statement from a witness who was to be called to testify, and that this statement concerned admissions made by the defendant to the witness at a previous time, but that the statement of the witness, in the Government's view, was not producible under Rule 16(a)." *U. S. v. Wilkerson, supra,* at 61.

*Accord: U. S. v. Feinberg*, 502 F.2d 1180, *supra.* See *U. S. v. Cannone*, 528 F.2d 296 (2nd Cir. 1975).

In light of the foregoing, the Court concludes that Rule 16(a)(1)(A) does encompass statements made by the defendants, regardless of to whom they were made.[12] However, the Jencks Act governs the discoverability of such statements as were made to government witnesses. As to statements made to persons not government witnesses, known to the government, those statements are discoverable. If the government is aware of any such statements not recorded on the non-witness 302 forms that have been turned over to the defense counsel, it is hereby ordered to provide those forthwith. As to such third party statements in the possession of the government of prospective witnesses, the government is ordered to provide the defense, forthwith, with

1. The fact of such a statement;

2. Whether a recordation of such statement exists in any form whatsoever;

3. The name and address of the individual to whom the statement was made; and

4. The date on which and place where the statement was made.

These orders are made under the Court's discretionary power to control discovery granted under Rule 16.[13] Should the government present valid written reasons, an appropriate protective order will be issued.

## II.

The major area of contention between the parties concerns the discoverability of the FBI 302 forms. There are three categories of 302 forms with which the Court is concerned: (1) 302's in the possession of government attorneys relating to government witnesses; (2) 302's relating to individuals whom the government does not intend to call; and (3) 302's in the possession of the FBI, relating to individuals not prospective government witnesses which have

by the attorney for the government or other government agents in connection with the investigation or prosecution of the case, or of statements made by government witnesses or prospective government witnesses except as provided in 18 U.S.C. § 3500."

12. The Court is also mindful of the fact that the epidemic of arrests and the ensuing investigation continued for a period of over eight months while the defendants were still employed at the Hospital and was undoubtedly the major and pervading topic of conversation. It is not unreasonable to assume that the defendants spoke to many persons, including

staff and patients, aside from others. To require them to remember such conversations or to refute them in some way would be an onerous task if their revelation is completely restricted to the time a witness is called. See also the discussion, *infra*, regarding Jencks Act material.

13. While all of this information was not specifically requested, the Court thinks it fair to construe defendants' detailed discovery requests to include a request for the information ordered turned over in this portion of the opinion.

never been seen by any U.S. attorney at all. The defense has, in effect, requested discovery of all such 302 forms in the government's possession. As indicated previously, the government has agreed to provide the defense with 302 forms in the second category. As to the other categories, the government asserts that they are not discoverable because they do not come within the parameters of the Jencks Act. This discussion will first concern itself only with 302's relating to prospective government witnesses.[14]

The Jencks Act, 18 U.S.C. § 3500, provides that no *statements* or *reports* made by prospective government witnesses in the possession of the government may be discovered until the witness completes direct examination.[15] The government claims that 302 forms are not "statements" within the meaning of the Act. The Act defines a "statement" as

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is substantially a verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement . . . ." 18 U.S.C. § 3500(e).

The government represents, and the experience of the Court confirms, that in this District the overwhelming majority of witness statements are memorialized in FBI 302 forms or their equivalent. It is usually the case that a government agent speaks with a potential witness and then returns to the office and dictates a report from either his notes or his memory. These reports are generally provided routinely at trial as Jencks material, albeit excised to delete the conclusions of the interviewing agent.

**14.** Because of the decision regarding the third category of 302's *infra*, Section III, the discoverability of these forms under the Jencks Act need not be considered.

**15.** 18 U.S.C. § 3500(a): "In any criminal prosecution brought by the United States, no statement or report in the possession of the United

The Supreme Court first construed the definition of "statement" as used in the Jencks Act in *Palermo v. U. S.*, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959). In *Palermo*, the defense sought discovery of a 600 word memorandum which summarized parts of a three and one-half hour conversation. The Supreme Court affirmed the trial court's refusal to permit discovery of the statement. In the course of holding that the report was not a "statement" within the meaning of the Jencks Act, the Court said, the Jencks Act

". . . was designed to eliminate the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral recital. Quoting out of context is one of the most frequent and powerful modes of misquotation. We think it consistent with this legislative history, and with the generally restrictive terms of the statutory provision, to require that summaries of an oral statement which [1] evidence substantial selection of material, or [2] which were prepared after the interview without the aid of complete notes and hence rest on the memory of the agent, are not to be produced." 360 U.S. at 352–3, 79 S.Ct. at 1225.

The Court noted that,

"In expounding this standard we do not wish to create the impression of a 'delusive exactness.' The possible permutations of fact and circumstance are myriad. Trial courts will be guided by the indicated standard, informed by fidelity to the congressional purpose we have outlined." 360 U.S. at 353, 79 S.Ct. at 1225.

Thus, *Palermo* provides the Court with a general standard which it must apply to the facts of the case before it.

States which was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case."

The Court has the obligation to inquire into the circumstances of the making of these statements to determine if they come within Jencks. *Goldberg v. U. S.*, 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976); *Campbell v. U. S.*, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961). The focus of the inquiry has been variously characterized, but it is clear that the inquiry depends on "the good sense and experience of trial judges" subject to appellate review. *U. S. v. Stephens*, 492 F.2d 1367 (6th Cir. 1974). Generally, the Court must determine if the contents of the 302 were read to and approved by the potential witness, were signed by him or was a contemporaneously recorded, substantially verbatim recital. *Campbell v. U. S., supra.* In more general terms, Justice Stevens said that the inquiry should be directed to determining whether the circumstances are such that it would be fair to permit either party to use the statement at trial to refresh recollection or impeach credibility. *Goldberg v. U. S., supra*, 425 U.S. at 114, 96 S.Ct. 1338 (concurring opinion).[16] When *Campbell* came to the Supreme Court for the second time, *Campbell v. U. S.*, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963), the majority held that a statement copied from notes which had been read to and approved by a government witness came within the definition of "statement" provided by 18 U.S.C. § 3500(e)(1). In upholding the trial court's determination that the oral reading of the notes was for the witnesses' approval and that the interview report was an accurate copy of the then destroyed notes, the Supreme Court said,

"The district judge was entitled to infer that an agent of the Federal Bureau of Investigation of some 15 years' experience would record a potential witness' statement with sufficient accuracy as to obviate any need for the courts to consider whether it would be 'grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own.' *Palermo v. United States, supra*, 360 U.S. at 350,

79 S.Ct. 1217." *Campbell v. U. S.*, 373 U.S. at 495, 83 S.Ct. at 1361.

Given these general guidelines, the Court is of the opinion that in the case at bar the 302 forms relating to potential government witnesses presumptively come within the Jencks Act as either statements approved by witnesses or substantially verbatim recital of such statements. After viewing numerous such statements in other cases, as well as some of the records and investigative techniques utilized by the FBI in this case, the Court is convinced that it would be a rare instance when the reports would either

"(1) evidence substantial selection of material, or

(2) which were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent . . ." *Palermo v. U. S., supra*, 360 U.S. at 353, 79 S.Ct. at 1225.

Thus, the *Palermo* standard for prohibiting production is not normally met. Given the expected number of witnesses in this case (well in excess of 100), and the normally thorough practice of FBI agents in interviewing, this presumptive approach is the most feasible. Were the Court to hold hearings into the discoverability of each and every 302 form involved, the already severe docket problems of this Court would become completely unmanageable. This decision also comports with the Congressional purpose to promote, rather than hinder, discovery. The Court will, however, be vigilant to protect the rights of the government and its witnesses. In particular cases of real need, the government may present a 302 form together with a request for a protective order which will be granted if the interests of justice so dictate. The Court will also insure, and all attorneys in the case will be expected to assist in this undertaking, that examination of witnesses will not be sidetracked unnecessarily into inquiries using the words of FBI agents,

---

**16.** Justice Frankfurter's exceedingly narrow construction of § 3500(e)(2), *Campbell v. U. S.*, 365 U.S. at 105, 81 S.Ct. 421 (concurring) did not find favor with the majority.

instead of the witnesses themselves. To decide otherwise would, however, make it too easy for the government to immunize from discovery material that Congress clearly intended to be made available to a defendant, merely by varying the technique of interrogation. The Court is concerned that the rights of defendants may be restricted unnecessarily by a reliance on form over substance. *U. S. v. Lewis,* 167 U.S. App.D.C. 232, 236, 511 F.2d 798, 802 (1972); *Cf. U. S. v. Morrison, supra,* 43 F.R.D. at 519.

 The government next argues that if the 302 statements are found to come within the Jencks Act, they are made expressly discoverable only *after* the witness has finished testifying on direct examination. The statute does so provide. 18 U.S.C. § 3500(a). The statute also provides that,

"Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial." 18 U.S.C. § 3500(c).

Thus, in view of the complexity of the case and the large number of witnesses, strict adherence to the schedule imposed by the Jencks Act can be expected to lengthen the trial considerably beyond its currently projected four to six month length. Needless to say, the recesses occasioned by delayed production of Jencks Act material, caused by the necessity of giving defense counsel time to assess the 302s so that adequate assistance of counsel can be afforded, will seriously hamper the efficient, orderly and fair conduct of the trial. The subject of the trial will be difficult enough for the parties, the Court and jurors to assimilate without the added hindrance of numerous delays.

Courts have long recognized that they have inherent power not limited by statute or rule to insure that due process of law is provided and that criminal trials are fair

and efficient. *U. S. v. Jackson,* 508 F.2d 1001 (7th Cir. 1975); *U. S. v. Cammisano,* 413 F.Supp. 886 (W.D.Mo.1976); *U. S. v. Germain,* 411 F.Supp. 719 (S.D.Ohio 1975); *U. S. v. Winchester,* 407 F.Supp. 261 (D.Del. 1975). Such power has traditionally been used sparingly. However, this case presents the Court with a truly extraordinary situation. It has been recognized that delays in the trial process because of repeated recesses can interfere with the fair administration of criminal justice. *U. S. v. Goldberg,* 336 F.Supp. 1 (E.D.Pa.1971). More significantly, denial of the information requested here, because of an overly strict adherence to the Jencks Act raises potential deprivations of due process and effective assistance of counsel. See *Palermo v. U. S.,* 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (Brennan J., concurring); *U. S. v. Moceri,* 359 F.Supp. 431 (N.D.Ohio 1973). Both of these problems present themselves in this case in ways that are much more immediate than in any of the reported cases this Court has examined.

It is axiomatic that when fundamental constitutional guarantees are involved, the statutes of Congress must give way to the enforcement of the constitutional right. In *U. S. v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the Supreme Court held that a presumptive privilege "fundamental to the operation of government and inextricably rooted in the separation of powers under the Constitution

. . . must be considered in light of our historic commitment to the rule of law. This is nowhere more profoundly manifest than in our view that 'the twofold aim [of criminal justice] is that guilt shall not escape or innocence suffer.' *Berger v. United States,* 295 U.S. [78] at 88, 55 S.Ct. 629, 79 L.Ed. 1314. We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The

very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence." 418 U.S. at 708–9, 94 S.Ct. at 3108.

While the Chief Justice was referring in *Nixon* to the necessity of producing evidence at trial, the principle is the same: when two principles of law conflict with one another the criminal justice system demands that the principle favoring greater discovery in favor of the accused must prevail, particularly where, as here, the principle favoring disclosure is of constitutional origin.

Upon consideration, the interests of due process of law, effective assistance of counsel and the fair and efficient conduct of criminal trials require that in the very particular facts of this case, the time restrictions of the Jencks Act be overridden. It is to be stressed that this ruling is limited in nature and is compelled by the constitutional considerations referred to. Therefore, the government will be required to turn over to the defendants by January 10, 1977 FBI 302 forms relating to the anticipated testimony of potential government witnesses. Any requests for protective orders must be filed with the Court by that date in lieu of production to the defense. It is expected that all defense counsel will cooperate with the Court to insure an orderly, fair trial within the parameters set forth above.

amined them, that no *Brady* material exists in this last category of 302 forms. *Brady* is emphatically a duty on the prosecutor to disclose evidence. No authority has been presented to the Court that agents of the FBI, who are not attorneys nor officers of the Court, are legally competent nor that the prosecutorial duty is delegable to them. Here the defense has made particularized requests for *Brady* material. As observed in *U. S. v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), "if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge." The *Agurs* court noted that a prudent prosecutor will resolve doubt in favor of disclosure.

In view of the nature of the request, and considering the fact that the U. S. attorneys in charge of this case have consistently refused to examine this material themselves, the Court will order that it be made available to defense counsel for their examination. In view of the government's assertion that none of this material is relevant, there can be no likely damage to the government's case. Nor in view of the assertion of the government should the Court be compelled to sift through this huge mass of material. An appropriate protective order can easily be drafted to protect the privacy of the persons interviewed.

### III.

The defendants have requested production of all FBI 302 forms in the possession of the government which have never been examined by government counsel. The government responds that 50–60 per cent of the reports collected by the FBI in their investigation of this case fall within this category. They assert that in accordance with its statutory and professional responsibility the FBI has turned over to the U. S. Attorney's office all relevant reports. While the government accepts and even embraces the dictates of *Brady v. Maryland, supra*, it asserts, without having ex-

### IV.

Finally, the government declines to identify, in response to a request in a bill of particulars, the overt acts to be relied upon by the government at trial which are not named in the indictment. More specifically, the defendants seek to discover which, if any, of the other 36 respiratory arrests which occurred during the alleged conspiracy period will be relied upon. A district court has broad discretion to compel or decline to compel answers to bills of particular. *Will v. U. S.*, 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967); *Wong Tai v. U. S.*, 273 U.S. 77, 47 S.Ct. 300,

71 L.Ed. 545 (1927); F.R.Cr.P. 7(f). As indicated while the indictment charges 15 respiratory arrests, in actuality 51 occurred at the Hospital during the relevant period. The medical records relating to the 15 charged arrests are voluminous. There is no reason to doubt that the medical records of other patients suffering such arrests will be less so. In order to be effective, defense counsel need to know which, if any, of the other 36 arrests they must concern themselves with and prepare for at trial. In view of the possible delays at trial if the defense is surprised, and the fact that investigation of all 36 other arrests would impose undue costs on the defense and the government[17] the Court will require the government to provide the defense with a list of the names of patients suffering arrests which the government will prove at trial, including the date and time of the alleged arrest.

The foregoing determinations, it should be emphasized, are reached with particular regard to the facts of this unusual case. It is the Court's considered judgment that the discovery ordered here must take place if a fair and expeditions trial is to be had.

### MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION TO STRIKE

The above named defendants in this criminal action have moved to strike the non-murder, poisoning counts[1] of the indictment against them and the overt acts related to such counts.[2] These counts charge the defendants with mingling poison and conspiring to mingle poison with the food or medicine of certain persons with intent to injure them in violation of the Michigan criminal law, M.C.L.A. 750.436, and the federal Assimilative Crimes Act, 18 U.S.C. § 13. It is the defendants' contention that such acts may be brought as a criminal violation under the federal assault statute, 18 U.S.C. § 113 (under one or more of its subsections) and therefore, by the very terms of the Assimilative Crimes Act, the federal offense must be charged and the state provisions are inapplicable. The government resists such a motion, relying primarily on the thesis that even if these acts could be charged under the federal assault statute, they are better described by and fit more precisely within the terms of the state statute, and may be charged pursuant to the Assimilative Crimes Act.

### DISCUSSION

As an initial precept, the Court must reject the government's contention that these acts could be charged under *either* the state poisoning statute or the federal assault statute and that the prosecution has discretion to choose the statute which best suits its theory and strategy of the case.

The Assimilative Crimes Act provides: "Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title, is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment." (Emphasis added).

The government would read this underscored language to indicate the Congressional intention that the Assimilative Crimes Act would apply unless a statute of Congress expressly forbade, in legal terms, the precise act at issue. Thus, under the government's view, as long as the state statute brought to bear through the Assimilative Crimes Act presents a "different theory" than an arguably relevant federal statute, an indictment under the state statute is permissible. *Accord: Fields v. U. S.,* 438

---

17. As noted previously, counsel for one of the defendants is appointed.

1. Counts 1 (¶ 1) 2, 3, 4, 5, 7, 8, 12, 13, 14 and 15 of the Indictment.

2. Paragraphs 1, 2, 3, 5, 6 and 7 of the Overt Acts listed in the Indictment.

F.2d 205 (2nd Cir. 1971); *cert. denied*, 403 U.S. 907, 91 S.Ct. 2214, 29 L.Ed.2d 684 (1971). *Shirley v. U. S.* 404 F.Supp. 675 (E.D.Tenn.1975); *U. S. v. Chapman*, 321 F.Supp. 767 (E.D.Va.1971); *U. S. v. Jones*, 244 F.Supp. 181 (S.D.N.Y.1965); *aff'd. on other grounds*, 365 F.2d 675 (2d Cir. 1966). The defendants, on the other hand, contend that the plain meaning of the statute is that as long as *any* enactment of Congress prohibits the acts charged under state law and the Assimilative Crimes Act, a federal court is jurisdictionally limited only to the federal statute. Thus, in the defendants' view, if the "generic" conduct charged in the indictment is prohibited by an Act of Congress, the government may proceed only under the federal statute. *Accord: U. S. v. Butler*, 541 F.2d 730 (8th Cir. 1976); *U. S. v. Big Crow*, 523 F.2d 955 (8th Cir. 1975); *cert. denied*, 424 U.S. 920, 96 S.Ct. 1126, 47 L.Ed.2d 327 (1976); *U. S. v. Word*, 519 F.2d 612 (8th Cir. 1975); *cert. denied*, 423 U.S. 934, 96 S.Ct. 290, 46 L.Ed.2d 265 (1976); *U. S. v. Olvera*, 488 F.2d 607 (5th Cir. 1973); *cert. denied*, 416 U.S. 917, 94 S.Ct. 1625, 40 L.Ed.2d 119 (1974); *U. S. v. Patmore*, 475 F.2d 752 (10th Cir. 1973); *U. S. v. Robison*, 376 F.Supp. 1024 (D.Hawaii 1974).

The Supreme Court's few decisions interpreting the Assimilative Crimes Act give no definitive answer to the question posed. *See* Note, Federal Assimilative Crimes Act, 70 Harv.L.Rev. 685, 692 (1957). Most recently, the Court held that the Assimilative Crimes Act is constitutional insofar as it makes state laws enacted after the 1948 codification of 18 U.S.C. § 13 applicable to federal reservations. *U. S. v. Sharpnack*, 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958). Since it was not faced with the precise question before the Court now, it is not surprising that there is little guidance in that opinion. The Court merely observed that:

> "Congress thereby made it clear that, with the exception of the enlarged list of offenses specifically proscribed by it, the federal offenses in each enclave were to be identical with those proscribed by the state in which the enclave was situated." 355 U.S. at 290, 78 S.Ct. at 294. See

*Franklin v. U. S.*, 216 U.S. 559, 30 S.Ct. 434, 54 L.Ed. 615 (1910).

Some indication of what was intended by "offenses specifically proscribed" is found in *Williams v. U. S.*, 327 U.S. 711, 66 S.Ct. 778, 90 L.Ed. 962 (1946). In *Williams* a person had been convicted of statutory rape committed on an Indian reservation. Arizona law made the age of consent 18, federal law, 16. The Court held that a conviction under the Arizona statute and the Assimilative Crimes Act could not be had where the victim was between the ages of 16 and 18 because several federal statutes governed the "precise acts" of the defendant and the Court would not countenance the redefinition and enlargement of such federal statute as fornication, adultery, and rape. In a footnote, the Court elucidated its reasoning in terms applicable to the case at bar.

> "Arizona's definition of rape and the punishment that Arizona prescribed for its commission differ from those relating either to rape or carnal knowledge under the Federal Criminal Code. These differences well illustrate the confusing variation from the definition of a federal crime and from provision for its punishment which would have to be considered if indictments were permitted under the Assimilative Crimes Act for every act committed within a federal enclave and which might come within a State's enlargement of the same offense." 327 U.S. at fn. 11, 66 S.Ct. at fn. 11, p. 781.

The legislative history of the Assimilative Crimes Act is consistent with this restrictive view of the Act's reach. Originally the Act was passed as Section 3 of the Act of 1825 to fill voids in the then extremely skeletal Federal Criminal Code. Justice Story, author of the Act said of it

> "The criminal code of the United States is singularly defective and inefficient . . . . Few, very few, of the practical crimes (if I may so say) are now punishable by statutes, and if the courts have no general common-law jurisdiction (which is a vexed question), they are wholly dispunishable. The state courts have no jurisdiction of crimes committed on the high

seas, or in places ceded to the United States. Rapes, arsons, batteries, and a host of other crimes may in these places be now committed with impunity. . . These are cases where the United States have an exclusive local jurisdiction. And can it be less fit that the Government should have power to protect itself in all other places where it exercises a legitimate authority? That Congress has power to provide for all crimes against the United States is incontestible." Quoted in *U. S. v. Press Publishing Co.*, 219 U.S. 1, 12, 31 S.Ct. 212, 215, 55 L.Ed. 65 (1910).

Times have changed considerably, since Justice Story's day. The Federal Criminal Code has expanded greatly. Indeed, unlike the early 19th century, Congress now has provided specific statutes dealing with assaults. 18 U.S.C. § 113. In commenting on the relationship between federally defined sex crimes and the Assimilative Crimes Act in *Williams v. U. S., supra*, the Supreme Court said:

"The interesting legislative history of the Assimilative Crimes Act discloses nothing to indicate that, after Congress has once defined a penal offense, it has authorized such definition to be enlarged by the application to it of a State's definition of it. *It has not even been suggested that a conflicting State definition could give a narrower scope to the offense than that given by Congress.*[3] We believe that, similarly, a conflicting State definition does not enlarge the scope of the offense defined by Congress. The Assimilative Crimes Act has a natural place to fill through its supplementation of the Federal Criminal Code without giving it the added effect of modifying or repealing existing provisions of the Federal Code." 327 U.S. at 718, 66 S.Ct. at 782. (Emphasis supplied).

The reasoning the government would have the Court adopt is best exemplified by the case of *Fields v. U. S., supra*. In *Fields* the Second Circuit Court of Appeals upheld the conviction of a man who was accused of shooting with intent to kill, wound and maim under the Assimilative Crimes Act and an Ohio statute. Noting that the government could have proceeded under the federal assault statute, the court nonetheless upheld the conviction saying

"where the state statute proved a theory essentially different from that provided in the federal statute, the government can proceed under either statute . . what the government may not do is proceed under the state statute when the precise act is prohibited by a federal statute." *Fields v. U. S., supra* at 207–8.

The difference the *Fields* court found was that federal law prohibited assaults while Ohio law prohibited certain batteries, thus fitting the facts of the case "more precisely."

■ This approach does violence to both the plain wording and the purpose of the Assimilative Crimes Act. The Act plainly is not operative when "any enactment of Congress" speaks to the conduct charged. The legislative history, dating back to the very beginnings of the Act, shows that it was intended to be interstitial in character. State crimes were to be assimilated when *nothing* in the federal criminal code spoke to the allegedly criminal conduct. The fact that the federal criminal code is now more extensive than formerly does not change this legislative purpose. Should it so desire, Congress could easily delete the phrase in the Act that refers to "any enactment" and replace with words that clearly adopt the construction the government urges here. Until it does so, the Court is persuaded that *U. S. v. Butler, supra*, and the cases therein are correct. If the generic conduct with which a defendant is charged is prohibited by *any* act of Congress, a federal court is without jurisdiction to entertain a charge under the Assimilative Crimes Act. Were it otherwise, the Act would simply be a device enabling prosecutors a wider choice of possible charges than that provided in

---

**3.** The defendants contend that this is the precise case before the Court. The validity of this characterization will be discussed *infra*.

the federal criminal code, a policy decision not entrusted to the courts.

■ For the reasons stated above the Court cannot accept the government's primary argument in opposing this motion. This, however, does not end the inquiry. For while the defense assumes and the government concedes that the acts of poisoning as charged under this indictment constitute a federal assault, this Court can accept such an assumption uncritically only at its peril. The coverage of the federal assault statute is a question of law which is not subject to stipulation of the parties, but rather must be decided by the Court.

The issue at hand is whether it was the intent of Congress that any of the provisions of the federal assault statute should apply to an act of poisoning, particularly under the proofs and theory which the government intends to present in the present case. Unfortunately there is a dearth of legislative history relating the intent of Congress (if any intent was manifested) when that section was passed. The Court is, therefore, relegated to the task of construing the intent of the legislature with little historical assistance.

Some guidance was given in *U. S. v. Turley*, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430, where the Court said:

"We recognize that where a federal criminal statute uses a common-law term of established meaning without defining it, the general practice is to give that term its common-law meaning." 352 U.S. at 411, 77 S.Ct. at 399.

But the Court in that case went on to conclude that the term "stolen" *had* no accepted common-law meaning. It then stated:

"Freed from a common-law meaning, we should give 'stolen' the meaning consistent with the context in which it appears. . . . It is, therefore, appropriate to consider the purpose of the Act and to gain what light we can from the legislative history." 352 U.S. at 413, 77 S.Ct. at 400.

In this case the defense contends ·that "poisoning" has uniformly been held to constitute an assault or assault and battery at common law,[4] citing several state decisions in support of this contention. Although not cited by the defendants, the Court also notes that 6A C.J.S. *Assault and Battery* § 70 states that:

"administering poison or any other harmful drug or substance to a person, with intent to inflict injury, amounts to an assault and battery."

For several reasons, however, this Court is not persuaded by this argument. In the first instance the cited case law can be countered with other state decisions to the contrary. *See People v. Sanford*, 65 Mich. App. 101, 237 N.W.2d 201 (1975); *Madden v. State*, 1 Kan. 340 (1862). The statement in C.J.S. is supported by case law from only three states, all mentioned by defendant.

Secondly the older cited cases in several instances conflict with the present legal view within the respective states. Thus, while *Carr v. State*, 135 Ind. 1, 34 N.E. 533 (1893) supports the view that "an assault is involved in the unlawful infliction of an injury by administering poison," the state has an explicit poisoning statute, Ind.Stat. § 35–1–57–1, very similar in form to that of Michigan.

■ This fact leads to the final reason for the Court's conclusion, namely that whatever the scope of "assault" under the criminal "common law," the criminal common law has almost universally been discarded by or subsumed under state statutory criminal codifications, which control both the scope and nature of criminal acts and their punishment.[5] To the extent that state criminal codes and their periodic revision now represent the evolution of the criminal common law, one can find no uniform treatment of the criminal act of administering poison. A survey of state criminal law in 40 of the 50 states reveals three separate

---

4. Defendants' supplemental brief, page 2.

5. It is not logical that Congress intended to apply the common law meaning of assault when the states have discarded the same.

approaches to criminalizing the act of poisoning. Some states have separate poisoning statutes, apart and distinct from assault statutes; others have assault and assault and battery statutes, which specifically mention poisoning under a certain degree of the crime, (i. e., aggravated assault); in the last group of states there is no explicit mention of poisoning in the criminal code and it is presumed (or made clear) that the act is covered by the assault provision. There is no clear majority among these groups to indicate the prevailing view regarding the nature of the crime of poisoning.

The Court therefore, is left with the conviction that, as in *Turley, supra*, there is either no clear common law rule including poisoning within the concept of assault, or if such did at one time exist, it no longer has any application in reality. It then must turn to other indications of legislative intent, including the general context of the federal criminal statutes.

Although it is recognized "that in the absence of a plain indication of an intent to incorporate diverse state laws into a federal criminal statute, the meaning of the federal statute should not be dependent on state law," *United States v. Turley, supra, Jerome v. United States*, 318 U.S. 101, 63 S.Ct. 483, 87 L.Ed. 640 (1943), this does not mean that state views should be totally ignored. The very existence of the Assimilative Crimes Act witnesses Congress' awareness of pertinent state criminal codes and their applicability in federal actions. Looking at the state codes, one does find a fairly common thread that the act of wilfully poisoning another person must be treated as a serious felony and not merely as a misdemeanor. Therefore, some states explicitly or implicitly encompass this act within the felony of "aggravated assault," or "assault with a dangerous weapon;" others, as indicated above, have separate felony provisions on poisoning. No state statute or recent decision has been found which

punishes one for administering poison with intent to injure as a mere misdemeanor (i. e., simple assault) with little or no expectations of confinement in the sentence. Yet the defendants here would contend that the charged act of administering a drug to precipitate respiratory arrests can come within § 113(e): "simple assault (a misdemeanor), by fine of not more than $300 or imprisonment for not more than three months . . ."

The context of the federal criminal code under other prosecutable actions indicates that Congress did intend that the act of poisoning merit more serious consequences. Thus, under 18 U.S.C. § 1111(a), any "murder perpetrated by poison" is described as a "willful, deliberate, malicious and premeditated killing" for which a convicted defendant "shall suffer death" (unless the jury qualifies the sentence).[6] It is considered equivalent to felony murder in seriousness, while any other murder is considered to be "murder in the second degree," punishable by imprisonment "for any term of years . . ." This Court believes it would have been inconsistent to elevate murder by poisoning to first degree murder yet provide the poisoning with intent to injure be considered a misdemeanor only. For these reasons this Court concludes that it was not Congress' intent to include the administration of poisoning with intent to injure within the scope of § 113(e).

Equally clearly, the charged conduct is not comprehended by § 113(a) (assault with intent to commit murder); by § 113(b) (assault with intent to commit any felony except murder or rape) or by § 113(d) (assault by striking, beating or wounding). This leaves only § 113(c) as a potential federal assault charge for these actions.

Section 113(c) refers to "assault with a dangerous weapon, with intent to do bodily harm . . ." The Bill of Particulars filed in this action by the government states that the defendants' conduct relevant

---

**6.** While this type of sentence was held to be unconstitutional in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), it nevertheless reflects Congress' intent in punishing one convicted of murder by poisoning.

to the so-called "poisoning counts" of the indictment consisted of injecting a muscle relaxant drug into the intravenous tubing of hospital patients, using a syringe. The issue, therefore, is whether this specifically charged action would constitute an "assault with a dangerous weapon" under federal law.

It is recognized that it is the device's latent capability, coupled with the manner of its use, which is determinative of whether an object can be characterized as a dangerous weapon. *U. S. v. Johnson*, 324 F.2d 264 (4th Cir. 1963). Under such an expansive concept it is manifestly conceivable that a syringe or hypodermic needle could be used against the person of another as a "dangerous weapon." It seems to this Court much more questionable when the syringe is injected, not directly into the person of another, but rather into a piece of tubing which is in turn connected to the patient. A syringe used for injecting is clearly not a dangerous weapon per se; but rather such a classification depends on what is being injected. In the traditional "dangerous weapon-assault" case, the dangerous weapon produces the injury. As charged here the syringe was merely a vehicle for effecting the entry of the muscle relaxant drug into the intravenous tubing. It is unclear at this stage whether the government intends to prove syringe injection piercing the wall of the tubing or injection through a disattached end of the tubing. The Court queries whether, if the latter, an eyedropper might not effect the same result. If so, would use of an eyedropper causing the same result make *it* a "dangerous weapon?" Clearly it is the "poison," (the muscle relaxant in this case) which causes the injury. However, no federal case has been cited in which poison, per se, is considered to be a "dangerous weapon."

The state views are conflicting in this regard. Some state laws implicitly include the use of poisoning within their "assault with a deadly (or dangerous) weapon" provision. *See* Ga.Code § 26–1302; La.Rev. Stat.Ann. § 14:33.1, § 14:34; Me.Rev.Stat. Tit. 17–A § 208, § 209; N.C.Gen.Stat. § 14–31. The majority of states, however, as mentioned above, have specific poisoning statutes or refer explicitly to poisoning as an example of "aggravated assault."

Considering the lack of any express legislative intent, the absence of federal decisions on this issue, the lack of any clear indication that either the use of a syringe or the use of poison itself comprises a "dangerous weapon" within the meaning of § 113(c), the conflicting views of the several states and the availability of the Assimilative Crimes Act, this Court concludes, that as a matter of law, the specific acts charged do not constitute an "assault with a dangerous weapon" under the federal criminal code and the charge of the state poisoning counts pursuant to the Assimilative Crimes Act is, therefore, proper and correct.

Accordingly, defendants' motion to strike the state poison counts is denied.

IT IS SO ORDERED.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS TESTIMONY OF RICHARD NEELY

On the night of July 30, 1975, while a patient at the Ann Arbor Veterans Administration Hospital, Richard Neely suffered a respiratory arrest from which he subsequently recovered. He was questioned about the events occurring before the arrest by agents of the Federal Bureau of Investigation on August 20, 1975 and again on October 21, 1975. During both of those interviews Mr. Neely stated that he had no memory of any events just prior to the arrest. He viewed a group of several photographs, which did not include a picture of defendant Perez, at the second interview.

On December 16 and 17, 1975, Mr. Neely voluntarily submitted to interrogation while in an hypnotic state. On December 16, during a session lasting about one hour Mr. Neely narrated certain events he believed occurred the night of his respiratory arrest, and described in a vague way two individuals he believed were by his bedside that night but made no identification. Later, the night of December 16, while not in a

hypnotic trance, Mr. Neely was visited by an FBI agent who encouraged him to tell everything he knew so that the perpetrators of crime could be brought to justice. The next day, during another hour-long hypnotic session, Mr. Neely again recounted certain events and described, in a vague way, certain individuals he felt were at his bedside just before the arrest. At the end of the session, after coming out of the hypnotic state, Mr. Neely was shown a group of photographs which did include the picture of defendant Perez. While he stated that he recognized Mrs. Perez as one of his nurses, he did not make any identification of an individual who he believed had been in his room immediately prior to the arrest.

On January 9, 1976, while a patient at the hospital, Mr. Neely spontaneously told FBI agents that he knew who the individual in his room was. The agents again showed Mr. Neely the photographs exhibited to him on December 17. He immediately and unqualifiedly selected the photograph of defendant Perez.

In addition, Neely had several conversations with others in which he appeared to display a lack of memory of the pertinent events or the identification of persons other than the defendants. Thus, during the course of the hypnotic sessions he referred to a Caucasian nurse and a Mexican male employee being in his room immediately before the arrest. On December 17, 1975, after the hypnotic session, he identified a person who is not shown to have any connection with this case as one of the nurses who harmed him after he had been told she was a Filipino.

Pursuant to a court order, Mr. Neely's deposition was taken in early October, 1976.[1] At the deposition, while under oath, Mr. Neely stated that he had known from the time of the arrest that it was Mrs. Perez who was in his room immediately prior to his arrest, but that he purposely did not tell the FBI about her in order to protect her. He testified that he had even gone so far as to pass over her picture knowingly without comment on three occasions when FBI agents displayed it to him for purposes of identification. He stated that he began to doubt his decision to say nothing about Mrs. Perez' presence in his room during his conversation with the FBI agent the night of December 16, 1975. He testified at the deposition that he finally changed his mind on January 9, 1976, at which time he immediately informed the FBI of the true facts. Mr.. Neely stated that inasmuch as he remembered the events of the night in question all along, the hypnotic session had no effect on his memory.

Count I, paragraph 8, and Count VI of the Superseding Indictment allege that the defendants unlawfully poisoned Richard Neely on July 30, 1975. The defendants have moved to suppress all testimony by Richard Neely which purports to identify defendant Perez as the person present at his bedside just prior to his respiratory arrest. As grounds therefor the defendants assert that the pretrial investigative procedures employed by the FBI denied the defendants due process of law, relying on *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). The government responds that the photographic arrays presented to Mr. Neely were not violative of *Simmons* and that defendants' attacks on the procedures employed are really attacks on Mr. Neely's credibility which must be weighed by the jury as the trier of the facts.

The defendants' motion raises perhaps the most unusual legal issues in this extremely complicated criminal case. There was not just one photographic identification in this case, but three. Overlaid on the question of whether one, or all, of the photographic displays were unduly suggestive is the fact that between the first and second photographic displays, the witness was placed under hypnosis for two separate

---

1. The deposition was ordered by the Court on September 17, 1976, pursuant to F.R.Cr.P. 15. The terms and conditions were delineated by Court order dated September 30, 1976. Those orders adequately explain the need for this somewhat unusual procedure. The deposition was transcribed and recorded on videotape.

one-hour sessions and questioned by federal agents familiar with the government's investigation while in a trance state. Most unusual, however, is the fact that because of the deposition the Court has before it the entire testimony of Mr. Neely in advance of trial. Of necessity, as what will follow makes clear, the Court must not only scrutinize the identification procedures to determine if they violated any constitutional command, but must also examine the testimony of the witness Neely as a whole to determine in advance of trial, whether it must be stricken in its entirety.

## I.

In the briefs and at oral argument on the motion, both parties analyzed the issue, initially at least, in terms of the two-pronged test of the suggestiveness of the photographic array and the resultant likelihood of irreparable misidentification as applied by the Courts of Appeals in the wake of *Simmons v. United States, supra.* E. g., *United States v. Sutherland,* 428 F.2d 1152 (5th Cir. 1970). While there are indeed differences between the picture of defendant Perez and the other photographs shown Mr. Neely, the cases discussing the issue of when a suggestive photographic display leads to an irreparable likelihood of misidentification are inapposite. Such cases involve situations where a crime had been committed by a person whose identity is unknown to the witness. E. g., *United States v. Jennings,* 528 F.2d 222 (6th Cir. 1975); *United States v. Scott,* 518 F.2d 261 (6th Cir. 1975); *United States v. Clark,* 499 F.2d 889 (6th Cir. 1974); *United States v. Cunningham,* 423 F.2d 1269 (4th Cir. 1970) (all bank robberies); *United States ex rel. Phipps v. Follette,* 428 F.2d 912 (2d Cir. 1970) (robbery). In the instant case the crime charged is of such a nature that it is not likely that Mr. Neely perceived that

anything of a criminal nature was occurring immediately preceding his respiratory arrest. In addition, Mr. Neely had appreciable contact preceding the alleged criminal act with the individual whom he ultimately identified. At the time of the arrest, he knew Mrs. Perez and had known her for a period of time as one of the nurses who cared for him. Consequently, the photographic display, even if suggestive, cannot be said to have fixed in Mr. Neely's mind the image of a person which had not been there before. Instead it was a vehicle that enabled Mr. Neely to attach a name to a person he previously knew and recognized but could not identify by name.[2]

Once the focus of the inquiry shifts from the narrow confines of the propriety of the photographic display[3] to the constitutionality of the whole course of the interrogations conducted by the FBI of Mr. Neely, the issue becomes more intricate and complex. The Supreme Court has stated its concern that eyewitness identifications be those of the witness, not the product of governmental suggestion—intentional or unintentional, subtle or overt. *United States v. Wade,* 388 U.S. 218, 229, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). See *Simmons v. United States, supra; Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The standard the Supreme Court has prescribed for excluding identification testimony due to undue governmental suggestion is that the movant show that the specific events leading to the identification were "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States, supra,* 390 U.S. at 384, 88 S.Ct. at 971. In so ruling the Supreme Court noted that the utilization of cross examination in exposing the potential for error in the case can substantially lessen

---

2. The deposition reflects the fact that Mr. Neely had a great deal of difficulty naming individuals he clearly knew. Mr. Neely gave well-known nurses, attorneys and FBI agents nicknames in place of their true names which he either would or could not remember.

3. The Court has reference here to the set of pictures displayed to Mr. Neely on December 17 and again on January 9 at which latter time he made an identification.

the likelihood that a conviction will occur based on a misidentification.[4] *Id.*

Each side argues vigorously and has submitted testimony to show that the circumstances of this case do, or do not, give rise to a "very substantial likelihood of irreparable misidentification." In addition to the facts outlined above, three experts testified concerning the issues presented by this motion.[5] Dr. Martin Orne, testifying as an expert in hypnosis on behalf of the defense, examined the tapes of Mr. Neely's hypnotic interrogation to determine whether Mr. Neely's memory could have been influenced by suggestions made during that session. He concluded that there were significant, unconscious cues and suggestions communicated to Mr. Neely by the FBI agents conducting the interrogation. As a basis for this opinion Dr. Orne pointed to the agents' interest in only certain parts of Mr. Neely's narrative. For example, he states that as a professional observer he felt that the FBI was interested in a Filipino woman and a single room. That interest led them in subtle, unintentional ways to communicate to Mr. Neely that they were not interested in a black man and a 20-bed room—subjects which Mr. Neely recalled under hypnosis. By communicating to Mr. Neely that interest, Mr. Neely was encouraged to provide an acceptable "memory" in response to questions asking him to imagine "who could have done this to you." This form of the inquiry—instead of "who did you see"—in Dr. Orne's opinion prompted Mr. Neely to fabricate a memory from his imagination in response to the context of the hypnotic session. Briefly stated, Dr. Orne's explanation of the context of hypnosis is that for individuals, like Mr. Neely, who are subject to light trances, the communicated belief that the hypnotic experience will in fact cause certain results, leads to a strong pressure to provide validation and achieve the

experience's objective—in this case a memory. Dr. Orne's conclusion is that Mr. Neely's testimony is at least in part the product not of his own memory, but of fantasy formulated in response to subtle cues of the interviewers.

Dr. Herbert Spiegel testified as an expert in hypnosis on behalf of the government. Dr. Spiegel is the physician who conducted the hypnotic experience with Mr. Neely in December, 1975. He did not review the videotape of these sessions except as they were played in part in open court. Dr. Spiegel testified that hypnotism is a state of great attentive/receptive concentration. He stated that different individuals have different and fixed abilities to go into this trance state. Mr. Neely, in his opinion, is a person of low hypnotizability, does not have a rich fantasy life, but instead exercises his critical faculties before reaching conclusions, and it follows that he is not unduly subject to suggestion while in the hypnotic state. Dr. Spiegel was greatly impressed with the skill of the FBI agents at maintaining neutrality in the interrogation. In his opinion there were no subtle or overt suggestions made during the hypnotic interview that would not have been present in any kind of normal, daily social interaction. Since Mr. Neely was not, in his opinion, unduly receptive to suggestion, there was no danger that Mr. Neely's statements and memories were not his own.

The defense also presented the testimony of Dr. Dennis Walsh, a psychiatrist. Dr. Walsh interviewed Mr. Neely to determine Mr. Neely's psychiatric state. He found a terminally ill patient who has been an alcoholic for many years.[6] He diagnosed Mr. Neely as having borderline personality organization and memory problems which are manifested in recent memory deficits. Dr. Walsh stated that Mr. Neely tends to per-

---

**4.** Unlike other reported cases the Court in this matter has had the benefit of reviewing the witness' testimony on cross-examination.

**5.** A hospital technician, a physician and a former patient testified about their contacts with and observations of Mr. Neely. The Court finds that their testimony adds nothing beyond

that of the experts which would be helpful in resolving the legal issue now before the Court.

**6.** Mr. Neely testified at the deposition that he consumed between 15 and 25 bottles of beer daily for over 25 years preceding his hospitalization in July of 1975.

ceive people in absolutes—either all good or all bad. He also considered Mr. Neely to be a suggestible individual. One particular aspect of this suggestibility that emerged during the hypnotic interviews, according to Dr. Walsh, is that Mr. Neely, who idealizes the FBI as the embodiment of the good, felt tremendous pressure to please the agents by helping them in their investigation.[7] All of these factors lead Dr. Walsh to conclude that Mr. Neely's memory is not a true memory but rather fragments of actual memory and fantasy blended together in response to Mr. Neely's felt need to be helpful to the FBI.

The expert testimony presented to the Court conflicts in important ways. There is no real agreement as to the precise nature of hypnosis, the extent of Mr. Neely's susceptibility to suggestion or the suggestiveness of the interview itself. There is, however, agreement among the experts concerning the possible conclusions the Court could reach about Mr. Neely's testimony. The possibilities are:

1. Mr. Neely's statement that he knew all along who had been in his room prior to the arrest but for private reasons had not told the FBI could be true. The hypnotic experience could have had no effect on Mr. Neely at all.

2. Mr. Neely was affected by the hypnotic experience. The hypnotic experience allowed Mr. Neely to delve into his memory and retrieve actually perceived memories that had been forgotten or repressed. If so, Mr. Neely is incorrect that he knew all along, but correct when he relates factual events.

3. Mr. Neely was affected by the hypnotic experience. Because of his own personality and the nature of the questioning, Mr. Neely fabricated a memory composed partly of real memories and partly of fantasy. If so, Mr. Neely is incorrect both as to his continual memory and as to the actual events he recounts.

Each of the experts agrees that *each* of the three alternatives listed above are possible.[8] The defense experts discount the probability of the first two alternatives and believe, for reasons discussed earlier, that Mr. Neely's memory is the product of undue suggestion during the hypnotic interview and that it cannot be treated as reflecting real memories of actual events. The government expert discounts alternatives one and three and believes that the hypnotic experience was beneficial, that it was not unduly suggestive to Mr. Neely and that in fact Mr. Neely suffered a traumatic neurosis at the time of his respiratory arrest. The hypnosis enabled him to gradually begin to recapture fragments of his memory in a way that led him to believe—as a part of a necessary human personality defense mechanism—that he had never forgotten anything at all.[9]

The Court necessarily considers each of these alternatives. It has viewed the videotapes of the hypnotic session and the deposition. Mr. Neely testifies as to one state of facts (alternative one above). The experts testify that any alternative is possible, including Mr. Neely's deposition testimony, but that one or the other theory is more probable. Weighing the testimony and these opinions the Court cannot conclude that the hypnotic interrogation session together with the photographic array creates a "very substantial likelihood of irreparable misidentification." *Simmons v. United States, supra,* 390 U.S. at 384, 88 S.Ct. at 971. The Court recognizes that there is a possibility of misidentification in these circumstances.[10] But that possibility

---

7. Dr. Ging's notation in the medical file that Mr. Neely felt disgusted with himself for his failure to remember more is, to some extent, consistent with the analysis of Dr. Walsh.

8. The experts all agree that Mr. Neely is not lying about the existence in his own mind of the memory which he now testifies he has.

9. FRE 607 permits a party to impeach its own witness. The Court sees no impediment under this rule to allowing the government to impeach part of Mr. Neely's testimony by expert psychiatric testimony.

10. It is noted that even in photographic and line-up identification cases which are found not to be impermissibly suggestive, inquiry is permitted into such matters as discrepancies in

does not measure up to the standard for exclusion set forth by the Supreme Court. *Simmons* imposes a heavy burden on a party seeking to exclude testimony from trial. The defendants here have failed to meet this burden. On these facts where the probabilities are closely in equipoise, the Court will not remove from the jury the function of finding the facts.

It is crucial to the understanding of the analysis above that we do not oversimplify, a danger that is enhanced by the nature and timing of the presentation of this issue and the foregoing analogizing of line-up and photograph identification procedures illustrated in *Simmons* and its progeny. Particular care should be taken that the Neely matter is not removed for scientific examination out of context and by the application of scientific tests of validity vis a vis legal tests of credibility. Thus, the additional testimony of witnesses such as Gauss and Pangle may be seen as factual support of the theory of defense experts, but does not, thereby, destroy the other two alternatives that all experts agreed could be accepted, particularly if other proofs are presented that tend to corroborate Neely's testimony.[11] Some proofs of that nature are already in the record, e. g., Mrs. Perez was a nurse who was known to Neely and had access and opportunity to his bedside; while it can be argued that Neely formed a composite of a "Nancy," it does not necessarily follow that he formed a composite of Mrs. Perez.

It is prudent then to recognize the differences between identification of a person under the *Simmons* principles and the relation of events by a witness. The former involves impermissibly suggestive procedures leading to the identification of an unknown person in a controlled setting (by design or not) that has a high potential for error. The testing of that situation is simple and discrete and recognizes the weakness of adversarial procedures, such as cross-examination to relieve the danger. The relation of events, on the other hand, depends on many factors, e. g., the ability to observe, memory, interest, mental condition, probability and corroboration. Consequently, the resolution of that type of factual situation has traditionally been the function of the jury and relies on the strength of the adversarial process. Thus, we are led to the following issue.

## II.

■ Even though the Court has determined that Mr. Neely's testimony is not, as a matter of law, the product of unduly suggestive pretrial investigative techniques, there remains the question of whether his testimony is so incredible that it must be stricken. It is a well accepted general proposition of law that a verdict cannot be based "on evidence which cannot possibly be true, is inherently unbelievable, or is opposed to natural laws." *Born v. Osendorf*, 329 F.2d 669, 672 (8th Cir. 1964). See *Southern Pacific Co. v. Matthews*, 335 F.2d 924 (5th Cir. 1964), *cert. denied*, 379 U.S. 970, 85 S.Ct. 668, 13 L.Ed.2d 562 (1965); *Geigy Chemical Corp. v. Allen*, 224 F.2d 110 (5th Cir. 1955) (Florida law). *Barbieri v. E. M. Young Co.*, 82 R.I. 382, 110 A.2d 263 (1954). Most commonly this rule is applied when a physically, verifiable fact directly contradicts crucial testimony necessary to sustain a verdict. *Solomon Dehydrating Co. v. Guyton*, 294 F.2d 439 (8th Cir. 1961), *cert. denied*, 368 U.S. 929, 82 S.Ct. 366, 7 L.Ed.2d 192 (1961). *Grant v. Cia Anonima Venezolana de Navegacion*, 228 F.Supp. 232 (E.D.La.1964), *aff'd*, 343 F.2d 757 (5th Cir. 1965); *Watkins v. Continental Can Co.*, 225 F.Supp. 449 (M.D.N.C.1963), *vacated*, 332 F.2d 423 (4th Cir. 1964); *Modla v. United*

---

prior statements of description, prior misidentifications and other factors which tend to show the witness's in court identification is erroneous.

11. It is of interest to note that Dr. Orne, one of defendants' experts, relies on the validity of his testing of suggestibility on corroboration by outside facts; thus, if a subject under hypnosis states a fact that is later found to be true by independent investigation, the probability that the statement was not "suggested" is increased. In that respect, at least, the methods of the psychiatrist-hypnotist and the trier of fact are identical.

*States,* 151 F.Supp. 198 (D.N.J.1957). For example, in *Southern Pacific Co. v. Matthews, supra,* the court held that the testimony of the plaintiff that he looked to the left and right three times as he approached a railroad crossing where an accident occurred but was unable to see the oncoming train was simply incredible because the crossing was in fact constructed so that a person exercising reasonable care would have seen the train. The rule applies in criminal, as well as civil cases. *Wood v. United States,* 342 F.2d 708 (8th Cir. 1965).

The power to disregard testimony because of its inherent lack of believability is one that has been used sparingly. *Peters v. Fitzpatrick,* 310 F.2d 704 (7th Cir. 1962). The courts have held that:

> "Unless in the light of the circumstances the testimony is so inherently improbable and impossible of belief as in effect to constitute no evidence at all, it may not be disregarded in determining the sufficiency of the evidence to support the judgment." *Hobart v. Hobart Estate Co.,* 26 Cal.2d 412, 159 P.2d 958, 966 (1945).

This is a determination that is not normally made by the court. See *United States v. Jobin,* 535 F.2d 154, 156 (1st Cir. 1976); *Dudley v. United States,* 428 F.2d 1196, 1202 (9th Cir. 1970); *Urban Redevelopment Corp. v. C. I. R.,* 294 F.2d 328 (4th Cir. 1961). When the testimony is capable of different interpretations, the evidence should go to the jury for its consideration. *Norton v. Gordon Foods, Inc.,* 458 F.2d 1071 (6th Cir. 1972) (Kentucky law). Where, however, the court is not arbitrary and comes to a reasoned determination that a witness's testimony is indisputedly incredible as a matter of law it must be disregarded. *Holland v. Allied Structural Steel, Inc.,* 539 F.2d 476, 479–83 (5th Cir. 1976); *Yip Mie Jork v. Dulles,* 237 F.2d 383 (9th Cir. 1956).

Because of the peculiar circumstances of the case at bar the Court is called upon to perform a normal function in an abnormal procedural context. As indicated previously, Mr. Neely's deposition was taken in advance of trial for possible presentation at trial. The Court is not now being asked to weigh the sufficiency of the evidence supporting the submission of the case to a jury or the jury verdict. Rather, the defendants ask the Court in advance of the submission of the government's proofs to find that Mr. Neely's testimony is so inherently improbable and incredible that it ought not to be placed before the jury. Were this a situation where Mr. Neely testified to observations which he could not possibly have made because of some incontestably demonstrable physical fact,[12] the Court might be disposed to grant the defendants' request. However, that is not the case here. At the pretrial evidentiary hearings the defendants offered evidence that Mr. Neely suffered from alcoholism, memory lapses, mental instability and had previously lied on numerous occasions—all of which, it could be argued, impeached Mr. Neely's credibility as a percipient witness. None of the facts presented by the defense however justify the Court in taking the drastic step of excluding Mr. Neely's testimony from the trial. In advance of the government's proofs the Court cannot know what, if any, corroboration for Mr. Neely's testimony will emerge at trial. Moreover, courts are always reluctant, except in truly compelling cases, to interfere with the jury's historical role to find the facts and assess credibility. In evaluating the credibility of a prosecution witness who the defense challenged as unbelievable, the Court of Appeals for the Fifth Circuit set forth what this Court believes to be the applicable law in a case of this nature.

> "One of the oldest established rules of Anglo-American jurisprudence is that the jury is the arbiter of credibility of witnesses. As the Supreme Court stated in *Hoffa v. United States,* 385 U.S. 293, 311, 87 S.Ct. 405 [408], 418, 17 L.Ed.2d 374, 387 (1966),

---

**12.** The testimony of nurse Pangle as to the positioning of the intravenous apparatus does not rise to this level. It contradicts the testimony of Neely, but does not create a physical impossibility.

The established safeguards of an Anglo-American legal system leave the veracity of a witness to be detected by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury.

"The trial judge cannot arrogate to himself this power of the jury simply because he finds a witness unbelievable. Under our system of jurisprudence a properly instructed jury of citizens decides whether witnesses are credible. . . .

"Defendant bases his argument that there are situations wherein the court can properly ignore testimony of certain witnesses in determining sufficiency of the evidence on a passage in our opinion in *Tillery v. United States*, 411 F.2d 644 (5th Cir. 1966). There, this court stated,

> In determining whether there is substantial evidence in cases where a conviction rests upon the uncorroborated testimony of an accomplice, the general rule is that the uncorroborated testimony of an accomplice may support a conviction if it is not incredible or otherwise unsubstantial on its face.

"We believe that for the testimony to be incredible it must be unbelievable on its face. The fact that Lipsky has consistently lied in the past, engaged in various criminal activities, thought that his testimony would benefit him, and showed elements of mental instability does not make his testimony incredible. Lipsky's testimony on direct is quite plausible. This is not a case where a witness testifies to facts that he physically could not have possibly observed or events that could not have occurred under the laws of nature. To be sure Lipsky was thoroughly impeached on cross-examination, but one cannot say that his testimony could not have been believed by a reasonable jury.

*United States v. Cravero*, 530 F.2d 666, 670 (5th Cir. 1976). (Citations and footnotes omitted).

Mr. Neely's testimony is not so implausible that it could not be true. It is up to the jury, aided by the advocacy of counsel, to determine Mr. Neely's credibility.

## III.

The Court notes that its rulings here go only to the admissibility of Mr. Neely's testimony as a matter of law. This opinion expresses no view as to the credibility or weight that a jury should attach to Mr. Neely's testimony. The record in this case reflects that a thorough and effective cross-examination of Mr. Neely was conducted. In order to aid the jury in its function to determine the facts the Court will exercise its powers to see that the factors raised by the pretrial events discussed herein are presented to the jury in an intelligible fashion. FRE 611(a).

The defendants' motion to suppress is therefore denied. The parties are ordered to attend a pretrial conference in chambers at an appropriate time to settle upon the identity and order of witnesses who will testify regarding Mr. Neely's credibility.

IT IS SO ORDERED.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION IN LIMINE

The defendants have moved in advance of trial to exclude from evidence a note written by John McCrery—currently deceased but who is the alleged victim of Counts 1 (¶ 13) and 8 of the Superseding Indictment—which implicates the defendant Narciso. Relying on F.R.Cr.P. 12(a) and (b) and FRE 104(a) the defendants seek pretrial resolution of their claim that the note is inadmissible hearsay. The government concedes the note to be hearsay within the meaning of FRE 802, but denies that it is inadmissible. Since resolution of the dispute would be both time-consuming and potentially disruptive of the trial process, a hearing was scheduled to develop fully the factual circumstances surrounding the making of the note. *Cf.* FRE 804(b)(5) (last sentence).

The facts, in summary, as they appeared during the evidentiary hearings are: On August 15, 1975 at 4:30 p. m., while a patient in the Ann Arbor Veterans Hospi-

tal's cardiac care unit, McCrery suffered a respiratory arrest. Approximately 6:30 p. m. that same day, in response to questions from his attending physician as to whether he had been given an injection and, if so, by whom, McCrery wrote the letters "PIA" on a Doctor's Progress Note form.

The government contends that the note falls within several recognized hearsay exceptions. The defendants deny this and claim that even if admissible as an exception, the note must be excluded as a violation of the defendants' Sixth Amendment right to confrontation. The exceptions originally urged by the government fall into four general categories, however at oral argument the government conceded that reliance would be placed on only three exceptions to the hearsay rule, 803(1), (2) and (4). These exceptions and their applicability to the facts before the Court are considered below.

I.

The government seeks to overcome the lack of trustworthiness the law traditionally ascribes to hearsay statements by claiming that the circumstances surrounding the making of the note in issue preclude defects in memory and the opportunity for calculated misstatements.[1] It argues that both FRE 803(1) and (2) are applicable exceptions covering the note.

FRE 803(1) is the "present sense impression" exception. It provides:

"A statement describing or explaining an event or condition made while the declarant was perceiving the event or immediately thereafter is not excluded as hearsay."

"The underlying theory of Exception 803(1) is that the substantial contemporaneity of event and statement negative the likelihood of deliberate or conscious misrepresentation." Adv.Comm.Notes. These statements are found to be exceptionally trustworthy because the fact that they are *simultaneous* with the event eradicates possible memory deficiencies and fabrication. *Houston Oxygen Co. v. Davis*, 139 Tex. 1, 5–7, 161 S.W.2d 474, 476–7 (1942). Comment, *Hearsay Under the Proposed Federal Rules: A Discretionary Approach*, 15 Wayne L.Rev. 1077, 1116–7 (1969). The exception is thought to be most appropriate when the declaration in question is made before the declarant is aware that something startling would happen, so that the distortion brought on by excitement would be avoided. Weinstein and Berger, *Weinstein's Evidence*, 803–74 (1975); Slough, *Res Gestae*, 2 Kan.L.Rev. 746, 766 (1954). Moreover, it should be a statement "describing" or "explaining" the event to come within the rule.

A similar exception to the hearsay rule is found in FRE 803(2)—the "excited utterance" exception. It provides that a hearsay statement will not be excluded if it is:

"A statement relating to a startling event or condition made while the declarant was under stress of excitement caused by the event or condition."

While exceptions (1) and (2) overlap somewhat, see Adv.Comm.Notes,

"The theory of Exception (2) is simply that circumstances may produce a condition of excitement which temporarily

---

1. In a recent criminal case the Supreme Court outlined its interpretation of the purposes of the hearsay rule.

"The hearsay rule, which has long been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to triers of fact. Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's

word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury. *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). A number of exceptions have developed over the years to allow admission of hearsay statements made under circumstances that tend to assure reliability and thereby compensate for the absence of the oath and opportunity for cross-examination." *Chambers v. Mississippi*, 410 U.S. 284, 298–99, 93 S.Ct. 1038, 1047, 35 L.Ed.2d 297 (1973).

stills the capacity of reflection and precludes utterances free of conscious fabrication. 6 Wigmore § 1747, p. 135. Spontaneity is the key factor in each instance though arrived at by somewhat different routes." *Id.*

In order to come within the rule there must be a startling event or condition and a statement made by a person who was under the stress of excitement both while perceiving the event and when the statement was made. *Murphy Auto Parts Co. v. Ball,* 101 U.S.App.D.C. 416, 419–20, 249 F.2d 508, 511–12 (1957), *cert. denied,* 355 U.S. 932, 78 S.Ct. 413, 2 L.Ed.2d 415 (1958).

Traditionally, the distinction between an "excited utterance" and a "present sense impression" has not been as precise as the authors of the Federal Rules of Evidence have made it. Cases dealing with problems analogous to the one presented here show an interesting and somewhat instructive variation of approaches and results. In *Foster v. Thornton,* 125 Fla. 699, 170 So. 459 (1936), a witness was permitted to testify about statements the deceased made to her husband and doctor about her physical condition during a period of semi-consciousness in the two weeks prior to her death. The court found that the statements were relevant in an action for malpractice and were made immediately on regaining consciousness, were an outgrowth of the relevant transaction, explained it and were corroborated by medical evidence. Without intensive analysis the court admitted the evidence noting that the voluntary, spontaneous and explanatory nature of the statements were evidence of trustworthiness. In *Puls v. Grand Lodge A. O. U. W.,* 13 N.D. 559, 102 N.W. 165 (1904), two witnesses were permitted to testify in a suit for proceeds of a life insurance policy that during the last 24 hours of his life, the deceased stated he was in great pain and had taken some unspecified type of horse medicine. The court held that the closeness in time to the onset of the pain, together with the degree of suffering combined to render the hearsay statement reliable. Some courts have refused to admit like testimony because the statement offered was not

shown to have been *immediately* connected to the event leading to illness. *Commonwealth v. Griffith,* 149 Ky. 405, 149 S.W. 825 (1912); *Hall v. State,* 132 Ind. 317, 31 N.E. 536 (1892).

Spontaneity has been an important factor for courts which have declined to admit testimony about the statement of a deceased individual in a criminal prosecution. In *State v. Bussey,* 162 La. 393, 110 So. 626 (1926) a manslaughter conviction was reversed in which two nurses had been permitted to relate a five year old child's statement that "My mother made me eat soap on toast bread" in response to the question "What did you eat this time." The child had been admitted on February 12 at 5:30 p. m. and the statement was made the *next* night. The court noted that the statement was not spontaneous, but was made calmly and deliberately in response to an ordinary question some time after the onset of illness. The Louisiana courts have expressly declined to liberalize the hearsay rules in cases of poisoning. *State v. Labat,* 226 La. 201, 75 So.2d 333 (1954).

In *State v. Sanford,* 44 N.M. 66, 97 P.2d 915 (1939) the court reached a result similar to that in *Bussey.* Sanford was charged with murdering his wife by giving her a poisoned cup of coffee at 5:30 a. m. Statements made at 6:00 a. m. to a neighbor were admitted as being clearly excited, but statements made three to three and one-half hours later, after treatment by a doctor including the administration of a sedative, when the declarant's respiration and pulse were normal, were excluded as being not made under the stress of an immediate and terrifying occurrence. In *State v. Thompson,* 132 Mo. 301, 34 S.W. 31 (1896), however, the court permitted a witness to testify as to the deceased's statement about the origin of a poisoned lunch where it was part of an extended discussion between the two about their mutual symptoms.

While none of these cases treated the problem before them in the terms supplied by the Federal Rules, it would appear that both "present sense impression" (*Fos-*

ter, Hall, Griffith and Thompson ) and "excited utterances" (Puls, Bussey and Sanford ) were in these courts' minds. The conflicting outcomes within each category highlight the fact that the trial court has the obligation to examine the facts of each case carefully to determine whether the offered statement comes within one of the exceptions. State v. Gunthorpe, 81 N.M. 515, 469 P.2d 160 (1970); State v. Leming, 217 La. 257, 46 So.2d 262 (1950). In doing so, the court must consider both the trustworthiness of the offered declaration, Guthrie v. U. S., 92 U.S.App.D.C. 361, 207 F.2d 19 (1953), and the motivations, both conscious and sub-conscious, for fabrication. People v. Fain, 174 Cal.App.2d 856, 345 P.2d 305 (1959) (Ct.App.). The Fourth Circuit has pointed the court in a reasonable direction for its factual inquiry in this case. In Chestnut v. Ford Motor Co., 445 F.2d 967, 973 (4th Cir. 1971), the plaintiff in a tort suit testified at trial that he had total amnesia for a period from five minutes before the accident to five days after. The accident occurred at roughly 1:00 a. m., plaintiff was found unconscious at 7:00 a. m. and was questioned by his doctor at 9:00 p. m. that night. The Court of Appeals held that it lacked enough facts to determine whether the statement reported by the doctor was admissible as an "excited utterance." It directed the trial court on remand to inquire into whether the plaintiff had sufficiently gained his reflective powers to possibly fabricate a statement between the time of the accident and his statement to the doctor.

The case before the Court is surely a far cry from the classic situation of an excited utterance where a victim, lying bleeding immediately after a violent wound screams an accusation and a plea for help in the same breath. See U. S. v. Edmonds, 63 F.Supp. 968, 971–3 (D.D.C.1946). State v. Drosos, 253 Iowa 1152, 114 N.W.3d 526 (1962). The testimony of McCrery's attending physician, Dr. Lucy Goodenday, indicates that she noticed the onset of his arrest while attending to another patient in the Coronary Care Unit, at approximately 4:30 p. m. in the afternoon of August 15, 1975, and that at that time McCrery was alert but was not able to speak. His breathing became shallower and then stopped, at which time Dr. Goodenday commenced resuscitation procedures. An emergency medical team appeared in response to her call for help. McCrery was intubated [2] and then connected to a respirator. During the respiratory arrest McCrery also suffered a short period of heart arrhythmia and thereafter went into ventricular fibrillation for approximately 15 seconds. Electrical defibrillation (shock treatment) was employed to counteract that condition and within a few seconds McCrery's heart pattern returned to normal. After intubation was completed McCrery appeared, at least to Dr. Goodenday, to be "quite stable." Lidocine, atropine and neostigmine were subsequently administered. Throughout this procedure while McCrery was not moving, he gave Dr. Goodenday no reason to believe that he was not conscious. He later indicated to the doctor that he was conscious and awake throughout the entire resuscitation.

After intubation had been completed, McCrery's condition had stabilized and the above described drugs were administered to combat further heart rhythm disturbances, to enhance heart rate and vagal activity. Dr. Goodenday stayed for a period to observe McCrery. At that point he seemed to be conscious, had his eyes open and was attentive to his surroundings.

Dr. Goodenday then made rounds on the fifth floor of the hospital and approximately two hours later at about 6:30 p. m. returned to McCrery's room. At that time he appeared responsive, conscious, had a normal pulse and heart rate and appeared generally comfortable and normal. Dr. Goodenday began by explaining what had happened to him, "that he had stopped breathing for some reason and we had put a tube

---

2. Intubation is the insertion of a breathing tube through a patient's mouth into the lungs which renders speech impossible.

in this throat to make sure that he would be breathing all right."

Dr. Goodenday testified that McCrery understood what she was saying and appeared "somewhat concerned but not overly concerned when I prepped him and started to talk to him."

Dr. Goodenday stated that her motivation for talking to him was "to find out whether or not he had received any medications" as his chart did not indicate that any had been administered prior to the arrest. She first asked him whether he was aware of what had happened and he nodded "yes." She asked him whether he was awake during the entire resuscitation and he nodded "yes." She then asked him if he had received any medication before it all started and again he indicated he had. She asked him if it was given by mouth or through the vein and he indicated by hand gestures that it was administered through the intravenous tubing. Dr. Goodenday then asked who gave it to him, to which he signified a desire for pencil and paper and used them to make the note which is the subject of this inquiry.

 Viewing the totality of the circumstances surrounding the making of this note by McCrery, it is clear to this Court that neither 803(1) or (2) are applicable exceptions to the hearsay rule. As stated in Weinstein and Berger, *supra*, at ¶ 803(1)[01],

"Underlying Rule 803(1) is the assumption that statements of perception substantially contemporaneous with an event are highly trustworthy because: (1) the statement being simultaneous with the event there is no memory problem; (2) there is little or nor time for calculated misstatement; and (3) the statement is usually made to one who has equal opportunity to observe and check misstatements."

All of these requirements are lacking in the present case. The statement was not made while the event or condition was being perceived by the declarant or even "immediately thereafter" but rather some two hours later. As was correctly argued by the de-

fendants, the applicability of this exception hinges on an absence of time for the declarant to reflect on what happened. The testimony adduced during the hearing indicates that not only was McCrery conscious for part or all of the resuscitation procedure (and certainly after the intubation) and thus had time to think about what was happening to him, before any questions were asked of him by Dr. Goodenday, but he was "prepped" or readied for her inquiries, by an explanation of what had happened to him. McCrery not only had time to reflect on what had transpired, he was intentionally encouraged to reflect on those events before answering. Finally, Dr. Goodenday could in no way corroborate the truth of what McCrery was indicating since she was not present before the inception of his arrest.

These same considerations (i. e., lack of reflective capacity) are relevant to the exception of an excited utterance under 803(2) and preclude its application. That exception also requires that the utterance be made under the excitement and stress of the event provoking the statement and which the statement describes. In this case there was insufficient evidence to indicate that McCrery was excited or under particular nervous stress either when the event occurred or when he made his statement to Dr. Goodenday. The Court finds that McCrery did have the capacity to reflect on what had transpired, that this capacity was clearly manifested to Dr. Goodenday and that the presence of such reflection must negate the assumption of reliability of the statement made under 803(1) and (2).

## II.

 The government also asserts that the "PIA" note is admissible under FRE 803(4)—statements made for purposes of medical diagnosis or treatment. That rule would admit:

"[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or ex-

ternal source thereof insofar as reasonably pertinent to diagnosis or treatment." The rationale of the rule is that statements made to physicians for purposes of diagnosis and treatment are exceptionally trustworthy since the declarant has a strong motive to tell the truth in order to receive proper care. Moreover, no other way of determining subjective symptoms has yet been devised. Weinstein, *supra* at 803–123.

The rule is limited to facts related which are "reasonably pertinent to diagnosis or treatment;" it has never been held to apply to accusations of personal fault, either in a civil or criminal context. Thus, the commentators have said that "a party's statement that he was struck by an automobile would qualify but not his statement that the car was driven through a red light." Adv.Comm.Notes. More relevant to this matter, it is stated that a statement by a patient that he was shot would be admissible, but a statement that he was shot by a white man would not. Comment, *supra* at 1147. Each case must, of course, rest on its own facts, but the test is whether a doctor would rely on the facts contained therein solely for treatment of the patient's specific condition. *Brown v. Seaboard Airline R. Co.*, 434 F.2d 1101 (5th Cir. 1970); *Felice v. Long Island Railroad*, 426 F.2d 192 (2d Cir. 1970), *cert. denied* 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970); *Stewart v. Baltimore and Ohio R. Co.*, 137 F.2d 527 (2d Cir. 1943); *Walker v. Prudential Ins. Co.*, 127 F.2d 938 (5th Cir. 1942).

Although the rule in the abstract is simple enough to grasp, application of that rule to the facts as elucidated above in Part I is considerably more difficult. The government argues that these questions were asked of Mr. McCrery for purposes of medical diagnosis and treatment and this argument is certainly supported by the testimony of Dr. Goodenday who indicated that her motivation for questioning McCrery subsequent to his recovery from the arrest was to discover (1) if any medication had been administered to him and (2) if so, who did it. Dr. Goodenday indicated that it would be necessary to find out who administered the medication to find out what it was and thus what further medical treatment would be required.[3]

Yet while the doctor's motive was further diagnosis, the underlying assumption of the rule requires the Court to inquire as to the *declarant's* motivation for giving the information. If his motive is to disclose the information to aid in his own diagnosis and treatment, this, it is assumed, guarantees the statement's trustworthiness. However, if the declarant makes the statement while under the impression that he is being asked to indicate "who was responsible" for what happened, his response may very well be accusatory in nature and any inherent reliability of such a statement is thereby destroyed. In this instance it is not clear that Dr. Goodenday communicated to McCrery that she wanted to know who had administered the injection to find out what the medication was. Once he indicated that he had indeed been given an injection, she merely asked him who gave it to him. Dr. Goodenday herself admitted that the possibility of someone deliberately injecting a muscle relaxant was being considered by the staff. Moreover, the McCrery arrest was one of the last of a series of arrests which began on July 18 and the record discloses that rumors of these arrests and the possibility that they were deliberately induced were prevalent among both the staff and patients.

Based on the entirety of this record this Court is not convinced that McCrery's response to Dr. Goodenday's questions was motivated solely by a desire to assist her in later diagnosis and treatment. Absent such assurance the government may not rely on the hearsay exception in FRE 803(4).

In this Court's opinion, the McCrery note is more closely identified with

3. It should be noted however that this note was not subsequently placed in McCrery's file nor was any similar recordation of it for filing with his records made. Rather, the note was given to Dr. Goodenday's superiors and ultimately to those administrative officials of the hospital responsible for the investigation then underway.

the type of statement covered by Rule 804(b)(2) of the Proposed Rules—a Statement of Recent Perception. That exception would have read:

"A statement, not in response to the instigation of a person engaged in investigating, litigating, or settling a claim, which narrates, describes, or explains an event or condition recently perceived by the declarant, made in good faith, not in contemplation of pending or anticipated litigation in which he was interested, and while his recollection was clear [is not excluded by the hearsay rule if the declarant is unavailable as a witness]."[4]

The Supreme Court promulgated this exception among its Proposed Rules, but it met vociferous opposition in Congress which concluded that Rule 804(b)(2) created "a new and unwarranted hearsay exception of great breadth," without "sufficient guarantees of trustworthiness to justify admissibility."[5] Therefore, Congress deliberately deleted that exception from the rules of evidence which it eventually approved. It is manifest that this Court is prohibited from allowing into evidence hearsay testimony under a different guise when it is best characterized as a hearsay statement under Rule 804(b)(2) and Congress has clearly directed the exclusion of such hearsay in federal courts.

It is not enough, however, to merely "slot" testimony into convenient or arguably fitting exceptions, particularly when dealing with a capital case. This Court knows of no requirement that it must adhere blindly to a rule of evidence, which is by its nature arbitrary, when there is danger that the very purposes of the Rules of Evidence would be abrogated. The framers of the Rules recognized the responsibility of the Court to supervise the introduction of testimony to assure a fair trial (Rule 102,

FRE). Thus, for example, Rule 403, FRE, provides that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury," etc. It is in this atmosphere that the proffered evidence must be analyzed.

In the consideration of the "PIA" note a critical element is that it is not possible to determine from the note itself who is meant by "PIA." In order to make a correlation of person to name (if it is a name) it is necessary to rely on other testimony. It is apparent that defendant Narciso was known to her fellow employees by the nickname of "PI," but it is not apparent that McCrery knew her by that nickname and that "PIA" was his version of "PI." The next inquiry, then, is whether by "PIA" he meant defendant Narciso, an identification of a person, as opposed to an identification of a name. In that area, the external evidence is conflicting, to say the least. Subsequent identifications and recantations present an extremely muddled picture. The contradictions are major and are evident both before the open heart surgery undergone by McCrery and after. In short, the introduction of the "PIA" note is not the end, but the beginning of extensive, external testimony as to its meaning and its trustworthiness.

That this dilemma is recognized by the government is evident from its announcement in the Supplemental Brief that it wishes to introduce not only the "PIA" note but also a second note of August 16, 1975; an identification at a "show-up" on August 16, 1975, and subsequent statements identifying defendant Narciso.

 It must be borne in mind that the exceptions to the hearsay rules developed

---

4. It is noted that such language clearly would bar admission of the second McCrery note of August 16, 1975, which was made in response to queries from a special agent of the FBI. Nor can that statement, made a day after McCrery's arrest, possibly be considered an excited utterance under Rule 803(2), for the same reasons stated above relative to the first

McCrery note. This second note is therefore also held to be inadmissible as hearsay not within any legitimate and recognized exception to the rule.

5. Report of Committee on the Judiciary, H.R. 93rd Congress, 1st Session, Federal Rules of Evidence, No. 93–650, p. 6 (1973).

on a principle of balancing probabilities—that is, that experience has taught that certain hearsay declarations have a high degree of reliability built in, and that the great probability is that they reflect the truth. An added feature of reliability is that, absent the declarant, the hearsay witness may be examined or other evidence introduced to contest the reliability. It is this latter feature that the government suggests is available here to assure reliability. However, in the circumstances of this case, glib reference to the right of cross-examination of the hearsay witness is hardly a solution nor does it offer an effective substitute for the cross-examination of the declarant. The cross-examination of a single hearsay witness as to the circumstances surrounding the declaration is a far cry from what is necessary here for a full explanation and exposition of the truth. In the case at bar, in order to determine the accuracy of the observations leading to the declaration, the meaning of the declarant and his credibility it is necessary to examine many witnesses; he spoke to and gave contradictory statements to over eight witnesses; he was hypnotized and his hypnotic session videotaped; he may or may not have suffered brain damage which affected his memory; he may or may not have triggered a heart monitor when identifying one of the defendants; in brief the presentation of evidence relating to these factual matters in the hopes of establishing the meaning and probity of the "PIA" note would result in a trial within a trial. The prejudicial effect,[6] the confusion and the potential for misleading would be natural and probable consequences of such an inquiry. While searching cross-examination may be required whenever the credibility of a testifying witness is attacked (subject, of course, to the control of the court in accordance with established rules regarding impeachment, corollary attacks, etc.) at least that witness is available and the jury has the opportunity to apply the traditional tests of credibility in a perceivable frame of reference and context. Such safeguards are not available in this case without an impermissible restriction on the scope of cross-examination and the presentation of contradictory or corroborative testimony.

### III.

Although the opinion, *supra*, regarding the applicability of any exception to the hearsay rule to this note should be determinative of the issue, the Court feels constrained to discuss briefly some of the constitutional considerations argued by the parties. The defendants forcefully contend that even if the McCrery note arguably fell within one or more federally recognized exceptions to the hearsay rule, nevertheless it must be excluded to protect the constitutional rights of the defendants to confrontation, citing *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *Brookhart v. Janis*, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966); *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *Roberts v. Russell*, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968); *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); and *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). The government, however, argues that while confrontation rights certainly must be protected, the Supreme Court has never held that the admission of hearsay which falls under a traditional exception is unconstitutional as a deprivation of that right. *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).

Initially the Court is concerned about the underlying assumption of defendants' argument, that a hearsay statement could conceivably fall within a legitimate hearsay exception under the Federal Rules of Evidence yet *by itself* violate a constitutional right of the defendants. If such an assumption were true it would indeed be an indictment of the Federal Rules of Evidence as promulgated by the Supreme Court and approved by Congress.

---

**6.** The prejudicial effect of the "PIA" note needs little amplification. The "voice from the grave" effect "is in and of" itself a dramatic and emotional trigger.

Certainly *Dutton v. Evans, supra,* speaks to the problem. The rules of evidence and the scope of the Confrontation Clause are not coterminous. The federal courts have never held that a traditional dying declaration is a violation of the confrontation clause for lack of an opportunity to cross-examine the declarant, or that a valid business record is constitutionally defective as evidence because it is not amenable to cross-examination. Indeed Justice Harlan, in his concurring opinion in *Dutton, supra,* suggests that rules of evidence simply cannot be measured against the inflexible constitutional strictures of the Confrontation Clause if they are meant to grow and change. He further suggests that to invoke the Confrontation Clause against an evidentiary ruling in a criminal case when this could not be done in the civil context would do violence to the long-standing concept that the rules of evidence would be equally applicable to both civil and criminal trials. Rather, Justice Harlan believes such situations should be measured against a fundamental due process standard. 400 U.S. at 97, 91 S.Ct. 210.

But regardless of whether measured against a basic right of confrontation or a fundamental due process standard, the admissibility of the note in question here and other proffered McCrery hearsay testimony is suspect. As argued by the defendants and conceded by the government, this evidence is "crucial,"—it is vital to the proofs of one or more counts charged against the defendant Narciso. It is an express assertion of a past fact, i. e., that a nurse by the name of "PIA" administered medicine to McCrery before his arrest. That this by itself does not establish criminal conduct is irrelevant. It is still inculpatory testimony. As discussed above, the note also suffers from ambiguity: it does not, in itself, lead to an identification. Rather the prosecution must resort to *further* hearsay testimony (which would not otherwise be admissible) to explain or interpret the note. The defense then must resort to even more hearsay testimony to undercut or impeach the government's interpretation of the note.[7] Here the possibility of the statement being founded upon faulty recollection is quite substantial. Contrary to the government's assertions, the record discloses numerous instances of inconsistencies and variations in McCrery's story, in his later hearsay testimony, both before and after his heart surgery. Therefore, cross-examination of the declarant as to the accuracy of the statement is not only desirable and helpful; in this situation it is absolutely necessary to protect the rights of the defendants. As McCrery is no longer available to testify and explain what he meant and to withstand the scrutiny of cross-examination, the Court is compelled to exclude his hearsay testimony from evidence at trial.[8]

For all of the above reasons, defendant Narciso's motion in limine to exclude the McCrery hearsay testimony is granted.

IT IS SO ORDERED.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO STRIKE OVERT ACTS

 The defendants herein have moved to strike paragraphs 1, 2 and 9 from Count I [1] of the Superseding Indictment filed in this case on January 31, 1977. The defense contends that the charging of these alleged overt acts violates constitutional due process and speedy trial rights and is a direct violation of paragraph 9 of the

---

7. In this regard the Court, having viewed the hypnotic interview of McCrery, foresees a potential *Bruton* conflict in such an attempt which could only lead to substantial prejudice to both defendants. See *Bruton v. U. S.,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

8. The Court must, of course, grant the defendants' oral motion to exclude the show-up identification. Testimony relating to the heart mon-

itor was admitted upon the condition that the government later present evidence to substantiate the monitor's reliability as an indicator of anxiety. The government entirely failed to connect this and the defendants' motion is granted in this matter.

1. Count I charges the defendants with conspiracy and lists 17 overt acts.

Court's January 14, 1977 Order Regarding Discovery and Continuance, which provides, "The government is prohibited from attempting to prove any episode of respiratory arrest other than those delineated in the [original] indictment." The respiratory arrests referred to in paragraphs 1, 2 and 9 of Count I of the Superseding Indictment are not included in the original indictment returned June 16, 1976. The Court's Order of January 14, 1977, was issued in part because the government had failed to comply with the Court's Order of December 23, 1976 requiring the government to inform the defense by January 10, 1977 of respiratory arrests not named in the original indictment which the government intended to prove at trial. The December 23, 1976 Opinion accompanying the Order specifically referred to the need for such disclosure to avoid surprise and trial delays.

The government asserts, in opposition to the defendant's motion, that the Court is without power to grant the relief requested because to strike any portion of the indictment would be to usurp the function of the Grand Jury. The cases the government cites in support of its position are not on point. Each of those cases deals with a situation where the rights of the defendant were jeopardized by an intrusion into the Grand Jury's province. In *Edgerton v. United States*, 143 F.2d 697 (9th Cir. 1944), the court deleted a portion of the substantive charge, about which there had been no proof at trial. The Court of Appeals for the Ninth Circuit determined that the manner of the deletion might have resulted in a case where the verdict of guilty was based on a charge different than that returned by the Grand Jury. In *Ex Parte Bain*, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), the court held that it was improper for a judge to strike part of the indictment on the motion of the government attorney.[2] Finally, *Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962) held that the government's response to a bill of particulars cannot save an indictment that is deficient on its face. None of these cases discuss the situation presented here, where the defendants may lose the benefit of a court order because of the government's resort to the Grand Jury.

The government asserts, without any attempt to explain the reasons for its delay in seeking the Superseding Indictment, that it was not its purpose to evade the earlier Order of the Court. Intention aside, the effect of the Superseding Indictment is to do just that. Previously the Court ordered that the government might not attempt to prove any but certain enumerated respiratory arrests at the trial of this case. Now, after returning to the Grand Jury, the government appears to be attempting to do what it was earlier prohibited from doing in these three particular instances. This is not a case, as in *Ex Parte Bain, supra,* where the trial court was attempting to determine what the grand jury would have done if it had had a better understanding of the litigation. Nor is this a case where the court is assisting the government to save a defective indictment as in *Russell v. United States, supra.* This is a case where the Court is simply asked to give effect to its own orders.

It seems incontestable that the Court has the power to dismiss an indictment for governmental misconduct. See *United States v. Jackson,* 508 F.2d 1001 (7th Cir. 1975). That being the case, it is equally clear that, in appropriate circumstances, the Court may strike a portion of an indictment. In this case the defense does not seek to strike a substantive count in its entirety. Rather the Court is asked to strike three of seventeen alleged overt acts in a conspiracy count. The nature of these three acts is such that they could easily be taken to be cumulative. Not to grant the defendants' motion would be to invite disrespect for the Orders of this Court, and jeopardize the

---

**2.** F.R.Cr.P. 7(d), not in existence when *Ex Parte Bain* was decided, permits striking of surplusage on the motion of the *defendant*—which evidences Congressional intent to loosen the broadly-drawn dicta in *Bain*.

right of these defendants to a speedy trial and due process of law.[3]

The defendants' motion to strike paragraphs 1, 2 and 9 of Count I of the Superseding Indictment is therefore granted.

IT IS SO ORDERED.

## MEMORANDUM OPINION DENYING DEFENDANTS' MOTION TO DISMISS SUPERSEDING INDICTMENT

Defendants have filed a detailed motion to dismiss the superseding indictment, alleging that the government's conduct of the investigation of certain breathing failures at the Ann Arbor Veterans Administration Hospital in the summer of 1975, and the resulting prosecution of the defendants violated their due process rights. In the alternative, the defendants request that the Court dismiss the indictment in the exercise of its supervisory authority to insure that justice is administered fairly in the federal judicial system. While defendants complain of government conduct in six separate areas, their basic position, reduced to its simplest terms, is that:

"the Government has followed a course of conduct calculated to produce an indictment against them, to violate their constitutional rights, and to deprive them of a fair and speedy trial." (Brief of Defendants at 1).

Because of the nature of the defendants' allegations, the Court must necessarily consider the individual assertions of improprieties and their cumulative impact and effect. The Court will initially examine each charge separately to determine whether constitutional rights have been violated and then assess the overall effect of these incidents.

## I. THE QUESTIONING

Defendant Narciso was interviewed by agents of the FBI four times between August 16, 1975 and September 19, 1975. Defendant Perez was interviewed five times during the same period. Neither defendant was arrested until June, 1976. Defendants' complaints fall into two general categories—abusive interrogation and interrogation taking place in the absence of counsel. Defendants allege that on September 19, 1975, defendant Narciso was subjected to an abusive six hour interrogation by agents of the FBI. Defendants also allege that during the same period defendant Perez was subjected to the same type of treatment, including threats that she had "better be prepared to say good-bye to her family." The government denies that any interrogation was abusive, though conceding the September 19, 1975 interview of defendant Narciso was "demanding." The government asserts that the interview was prolonged by Ms. Narciso herself and that she remained calm throughout.

On October 7, 1975 attorney Thomas C. O'Brien contacted the government to advise that he represented the defendants and requested that future contacts with them be arranged through his office. Defendants allege that despite this request the government interrogated them without their attorney's consent or presence on three occasions—December 29, 1975 (Mrs. Perez), June 16, 1976 (Ms. Narciso) and June 17, 1976 (Mrs. Perez). There is no claim that any of these contacts resulted in admissions or confessions. The government responds that on December 29, 1975 its agents served a grand jury subpoena on Mrs. Perez, a perfectly legitimate law enforcement function, and no interrogation was conducted. As to the two dates in June (the dates the defendants were arrested, respectively), the government avers that no interrogations were conducted.

Defendants assert that these contacts violated the principles of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694

---

**3.** The record amply discloses that if the counts were not stricken substantial additional preparation would be necessary for defense counsel to perform their function effectively, an adjournment would necessarily be required and the prejudice that would result is self evident.

The government did not indicate that no adjournment would be required and has not yet disclosed to the defendants the medical records pertaining to these overt acts although promising to do so.

(1966). Specifically the defendants argue that after October 7, 1975, the date on which the government was notified to arrange all interviews through retained counsel, any questioning was required to occur in the presence of counsel. Defendants conclude that these violations of *Miranda* should lead to dismissal of the indictment because the defendants' rights were violated.

■ The difficulty with this argument is that it asks the Court to do too much. In *Miranda* the Court fashioned procedures designed to protect an individual's Fifth Amendment right to be free from compulsory self-incrimination. In numerous cases the Supreme Court has recognized that the evil to be prevented is the introduction at trial of evidence secured in violation of the Fifth Amendment. E. g., *McNabb v. U. S.,* 318 U.S. 332, 347, 63 S.Ct. 608, 87 L.Ed. 819 (1943). In *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) the Supreme Court held that an interrogation in which the police failed to advise a suspect that he could have a court-appointed attorney present (in other respects the warnings prior to questioning were unobjectionable) violated the prophylactic *rules* designed to protect the Fifth Amendment privilege, not the constitutional privilege itself. In that case the defendant's confession was properly suppressed, but the Court held that investigative leads uncovered during the course of the questioning should not be suppressed. In discussing the pre-*Miranda* cases, the Court in some pertinent comments noted:

> "In state cases the Court applied the Due Process Clause of the Fourteenth Amendment, examining the circumstances of interrogation to determine whether the processes were so unfair or unreasonable as to render a subsequent confession involuntary. Where the States' action offended the standard of fundamental fairness under the Due Process Clause, the State was then deprived the right to use the resulting confession in Court." *Id.* at 441, 94 S.Ct. at 2362. (Emphasis added). (Citations omitted).

Similarly in *U. S. v. Blue,* 384 U.S. 251, 255, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510 (1966), the Court held that:

> "Even if we assume that the Government did acquire incriminating evidence in violation of the Fifth Amendment, Blue would at most be entitled to suppress the evidence and its fruits if they were sought to be used against him at trial. . . . Our numerous precedents ordering the exclusion of such illegally obtained evidence assumes implicitly that the remedy does not extend to barring the prosecution altogether. So drastic a step might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book." (Citations omitted).

■ In *Blue* the defendant was charged with tax evasion after having supplied the IRS with information in response to a civil tax lien lodged against him. The Court rejected his claim that the privilege against self-incrimination barred the prosecution. Both *Blue* and *Tucker* are factually similar to the issue at bar. In each case the Supreme Court held strictly to the position that a defendant's Fifth Amendment rights are adequately protected by excluding any *confessions.* In *Blue* the Court went so far as to hold that where Fifth Amendment violations were shown, it would be inappropriate to abort the prosecution entirely. Here the defendants assert that it is necessary to dismiss the indictment in order to protect the deterrent value of the *Miranda* rules. Yet the Supreme Court has indicated that the analysis of asserted violations of constitutional rights that might impinge on judicial integrity is inseparable from the issue of whether a specific constitutional mandate has been violated. *Michigan v. Tucker, supra* at fn. 25.

It should also be noted that with regard to the alleged interrogations conducted after notice by counsel of his representation the defendants did not raise the Sixth Amendment right to counsel doctrine articulated in *Massiah v. U. S.,* 377 U.S. 201

(1964) except obliquely at oral argument by mentioning *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). However, *Massiah* and *Brewer* do not require more than the suppression of the evidence obtained at the time of the discussion or interrogation.

█ It appears then that the Court need not resolve the factual conflict to determine which version of the interrogations, the defendants' cataclysmic account or the prosecution's entirely innocent rendition, is closer to the truth. Defendants' rights are adequately protected by the exclusion from evidence of confessions or admissions obtained in violation of the strictures of *Miranda v. Arizona, supra,* or *Massiah,* a course the defendants · deliberately chose not to pursue. In view of this determination the Court need not address the substantial issues raised by the government concerning whether the interrogations were "custodial" as that term is defined in *Miranda* or whether defendants might have effectively waived their Fifth Amendment rights.

## II. GRAND JURY PROCEEDINGS

█ Defendants allege that the prosecution engaged in numerous improprieties by manipulating the evidence presented to the grand jury. Reduced to its essence, their argument is that the prosecution withheld *Brady* material, failed to record the testimony of government-agent witnesses, improperly presented the results of polygraph examinations and relied on excessive amounts of hearsay testimony, all of which led inexorably to an indictment returned by a grand jury that could not and did not exercise its independent judgment. The defendants claim that the government counsel intentionally committed these alleged improprieties to insure that the grand jury would comply with the prosecution's wishes.

An analysis of the grand jury testimony that was recorded, however, belies the defendants' contentions that the grand jury was a mere "creature" of the prosecutor.

Grand jurors conducted extensive interrogation of witnesses, in some instances to a greater degree than did the prosecutor. On several occasions grand jurors were advised they could have additional testimony, have a witness returned or have a witness called to testify. The questions asked by the jurors reflect that they were knowledgeable about the factual aspects of the case, recognized the intricacies of the proffered testimony and were not at all reluctant to participate fully in the proceedings. Thus, while the entire grand jury proceedings were not recorded, the atmosphere indicated by the available minutes was not one of unfettered control by the prosecutor or a subjugated grand jury.

### A. Brady

█ Defendants claim that the government withheld testimony from the grand jury about statements of Mr. McCrery and Mr. Loesch which were inconsistent with their guilt. Defendants argue that this was a failure to comply with the principles of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which, in turn, constitutes an abuse of the grand jury that should lead to dismissal.

As indicated above, the Court has examined the transcript of the grand jury proceedings. The record reflects that while all statements of which the defendants complain may not have been presented to the grand jurors, the grand jury was made aware of uncertainties and inconsistencies of the statements of Mr. Loesch and Mr. McCrery. Had the grand jurors desired, they could have asked the witnesses to clear up any problems or could have refused to return indictments until such times as they were satisfied that any weaknesses were not fatal. While not determining, as the government urges, that the principles of *Brady* never apply to grand jury proceedings.[1] the Court notes that no fact which the defendants claim was withheld from the grand jury would have necessarily led to the return of a no true bill on either the Loesch or McCrery counts of the original or

---

1. Cf. *U. S. v. Gallo,* 394 F.Supp. 310 (D.Conn.1975).

superseding indictment. In the context of trial practice, the Supreme Court has indicated that it is this standard—whether the prosecution has withheld evidence that would create a reasonable doubt—that must be followed. *U. S. v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). At least one district court has adopted this approach, holding that courts should dismiss indictments returned by legally constituted grand juries only if the evidence withheld clearly negated the defendants' guilt. *U. S. v. Mandel,* 415 F.Supp. 1033 (D.Md.1976). The Court does not find that the evidence defendants claim was withheld "clearly negates" guilt. There is no requirement however that the government present all exculpatory evidence to the grand jury. *U. S. v. Y. Hata & Co., Ltd.,* 535 F.2d 508, 512 (9th Cir. 1976). *U. S. v. Mandel, supra* at 1042. Moreover, all the statements which the defendants refer to are now in their possession. There is nothing to prevent a full and fair airing of these facts before the petit jury, which must decide the issue not addressed by the grand jury—whether the defendants are innocent or guilty. The Court, therefore, finds no prosecutorial misconduct with respect to the presentation of evidence to the grand jurors about Mr. McCrery or Mr. Loesch.

### B. *Recordation*

 Defendants complain that they are unduly hampered in the preparation of their legal attacks on the grand jury proceedings because of the government's lack of recordation of grand jury testimony of federal agents. Relying on ABA standards and the Sixth Circuit pronouncement that recordation is the "better" rule, *U. S. v. Battisti,* 486 F.2d 961 (6th Cir. 1973), defendants would have the Court treat the government's failure to record all testimony presented to the grand jury as a violation of their Fifth Amendment due process rights.

It is settled law that the presence of a court reporter in the grand jury room is permissive, not mandatory, absent a previous court order to that effect. *U. S. v. Hensley,* 374 F.2d 341 (6th Cir. 1967); *U. S.*

*v. Solimine,* 536 F.2d 703, 707 (6th Cir. 1976). *U. S. v. Aloisio,* 440 F.2d 705 (7th Cir. 1971); *In re Russo,* 53 F.R.D. 564 (C.D. Cal.1971). F.R.Cr.P. 6(d). This is so notwithstanding the fact that it is "the better practice" to record all grand jury testimony. Cf. *U. S. v. Battisti, supra.* The only reported case requiring recordation of grand jury testimony in the absence of a court rule is *U. S. v. Gramolini,* 301 F.Supp. 39 (D.R.I.1969). In *Gramolini,* the judge implicitly authorized dismissal only prospectively. The decision was based on the recommendation of the ABA Special Committee on Federal Rules of Procedure that F.R.Cr.P. 6(e) be amended to require recordation. 38 F.R.D. 95, 106 (1965). *See also* 52 F.R.D. 87, 94–5 (1971). This latter recommendation was made to bring Rule 6 in line with *Dennis v. U. S.,* 384 U.S. 855, 870–2, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). Despite these recommendations, Congress has not amended Rule 6 in this manner.

Even where the government has failed to honor a legitimate prior request for recordation, dismissal has not been allowed absent a "clear indication of prejudice." *U. S. v. Thoresen,* 428 F.2d 654, 666 (9th Cir. 1970). Defendants make no such showing here. They simply state that they cannot hope to show any irregularities because of the lack of full recordation.

In view of the substantial authority in this Circuit which approves the government's practice in this case, as well as the absence of any rule in this District requiring the government to record agents' testimony, the Court must conclude that there is no Fifth Amendment violation demonstrated in the recordation proceedings followed here.

### C. *Testimony Concerning Polygraph Examinations*

 Defendants urge the Court to dismiss the indictment because they believe evidence of lie detector examinations was improperly presented to the grand jury. Defendants rely chiefly on ABA Standards, The Prosecution Function and the Defense Function § 3.5(b), 3.6(a) (1971), which rec-

ommend that prosecutors present to the grand jury only arguments and evidence which will be admissible at trial. Without commenting on the desirability of adopting these recommendations, the Court notes that they have not been incorporated into the law of this, or any other, Circuit. In fact, prosecutors have extremely broad authority to present what evidence they choose to the grand jury. An indictment returned in part on incompetent evidence is not defective. *Holt v. U. S.*, 218 U.S. 245, 247–8, 31 S.Ct. 2, 54 L.Ed. 1021 (1910). An indictment may be based solely on hearsay testimony by government agents. *Costello v. U. S.*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1955). Testimony derived from unconstitutional searches and seizures may be presented to the grand jury. *U. S. v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1973). The Supreme Court has said that:

> "An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more." *Costello v. U. S., supra*, 350 U.S. at 363, 76 S.Ct. at 409.

Likewise in this case the parties are entitled to a trial on the merits.

Defendants argue that the instant case is distinguishable from *Calandra* in that there the Court permitted the use of clearly trustworthy evidence by a grand jury that was excluded from trial to further societal interests unrelated to the search for truth. They complete the analogy by arguing that the lack of trustworthiness of polygraph results compels the Court to treat this case differently. This argument, however, fails to account for the holding in *Costello*. In approving the use of hearsay testimony the Supreme Court approved use of evidence that would not be admitted at trial because of its untrustworthy nature. It is well known that lack of trustworthiness of second-hand testimony underlies the origin and continued vitality of the hearsay rules. 5 Wigmore, *On Evidence*, § 1362 (Chadbourn Rev.1974).

Even were the Court to fashion some sort of rule with respect to the use of polygraph results in grand jury proceedings, there appears to have been no fatal prejudice here. The United States Attorney cautioned the members of the grand jury not to place undue reliance on these test results.[2] The grand jury had the benefit of live testimony by two polygraph experts who examined the charts in question prior to returning the superseding indictment. At that time there was nothing to prevent it from inquiring into any areas desired. Moreover, the Court's review of the transcript of the grand jury proceedings reveals that one of the jurors placed on the record his or her feelings that the polygraph results were not the reason the grand jury returned the indictment. It is important to keep in mind that the function of the grand jury is to make a determination of probable cause. The Supreme Court has repeatedly made clear that prosecutors have wide discretion in the manner in which they present evidence to the grand jury. It is the function of the finder of fact at trial, aided by the parties and Court in the adversary process, to determine whether the determination of probable cause ripens into a judgment of guilt beyond a reasonable doubt or acquittal. There is nothing in this record of the grand jury proceedings to suggest that the grand jury would not have returned its true bill but for the presentation of the testimony regarding polygraphs.[3]

---

**2.** The prosecutor has indicated to the Court that at the time polygraph testimony was presented to the grand jury he warned the jurors of the dangers of reliance on this testimony. The grand jury minutes demonstrate that he did in fact make this cautionary statement prior to the return of the superseding indictment.

**3.** The previous comments concerning the significance of the polygraphs in this grand jury proceedings make it unnecessary to hold factual hearings inquiring into defendants' contentions that (1) the original polygraphs employed a discredited method; (2) that the U.S. Attorney misrepresented the results and that polygraph results were improperly used to bolster

## D. *Use of Hearsay Testimony*

From the lack of any recorded testimony before the grand jury on the medical/scientific aspects of this case, the defendants infer that all such evidence was presented by hearsay testimony. In view of the serious question which exists in the trial of this matter as to whether each of the respiratory arrests charged in the indictment was a crime or a natural event, the defendants allege that this was an impermissible reliance on excessive hearsay testimony. Defendants also challenge the use of testimony flowing from hypnotically "refreshed" memory and an apparent lack of factual testimony presented to the grand jury by percipient witnesses.[4] In support of their contentions the defendants quote extensively from a line of Second Circuit cases beginning with *U. S. v. Umans*, 368 F.2d 725 (2d Cir. 1966) and most recently discussed in *U. S. v. Gallo, supra.*[5]

As the government points out the relevant test of these Second Circuit cases is found in *U. S. v. Estepa*, 471 F.2d 1132 (2d Cir. 1972). In *Estepa* the court dismissed an indictment where the sole witness before the grand jury had been a government agent whose observations of the transaction in question were limited and remote. The undercover agent who participated appreciably in the events charged as criminal was never called. The United States Attorney presenting evidence to the grand jury in that case never mentioned this limited role of the witness who testified as if he had been a participant. The Court said that the test was whether the grand jury was misled

into believing that it received first-class "merchandise" when they were actually presented "shoddy" hearsay testimony. In addition, the test requires a finding of a high probability that the grand jury would not have indicted had the percipient witness testified. In *U. S. v. Gallo, supra*, the court dismissed an indictment where the prosecutor presented a grand jury only with a transcript of previous grand jury testimony which he knew to be perjured in material part without informing the jurors of this fact. The case at bar is not comparable to these situations. The defendants' argument that the grand jury would not have returned an indictment is extremely speculative. It rests on the conjunction of a number of factors, which the Court has already determined not to have been improper. There is no "strain of falsehood" hanging over these proceedings as there was in *Gallo*. Nor is there any reason to suppose that the jurors were misled about the nature of the testimony they heard. Instead there are several very serious questions which the jury must resolve about whether certain events were crimes and, if so, whether these defendants were responsible for them. The Court is satisfied that the defendants did have the benefit of a determination of probable cause by a duly constituted unbiased grand jury. While the Court might prefer to have had the grand jury investigation conducted in a somewhat different manner, there is nothing in this record to indicate that defendants' Fifth Amendment rights were violated.[6]

---

the credibility of some grand jury witnesses. The Court does not decide the question of whether such use of polygraphs would ever compel the dismissal of an indictment. Instead the holding is restricted to ruling that even if true, under the facts of this case, the defendants have not shown the sort of deprivation of rights that requires dismissal.

4. The example of this last category of supposed abuse chosen by defendants concern a respiratory arrest of Richard Neely which has been dropped from the superseding indictment.

5. The Second Circuit has gone farther than any other in regulating the use of hearsay testimony before a grand jury.

6. The Court declines to adopt the argument of the government that simple inconvenience justifies reliance on hearsay scientific testimony in all cases. All citizens, whether scientific experts or illiterates, have an obligation to testify before the grand jury if called upon. Nor does it appear that requiring eyewitness testimony necessarily does "violence" to the traditional concept of the grand jury as an "ex parte investigation." Clearly had the jurors requested it, such eyewitness testimony should have been provided to the grand jury. Indeed had they chosen they could have refused to indict because they were not satisfied with the quality of evidence presented by the Assistant U.S. Attorney.

## III. PUBLICITY

 Defendants claim that the government violated their rights during the conduct of a press conference called to announce the arrest of the defendants on the original indictment. Defendants charge that the government facilitated the photographing of them in chains, discussed their potential motives for the crime and mentioned the existence of certain uncharged events, all in violation of 20 CFR § 50.2 (1976). Previously this Court has issued an Order requiring the Marshal to desist in this matter from his usual policy of transporting all prisoners in chains. Criminal No. 6–80884, docket entry No. 7. Neither the United States Attorney nor the FBI were responsible for placing the defendants in chains. Upon request of defense counsel, the Court entered an order rectifying the situation.

Defendants' charges of harm from government statements at the news conference are unconvincing. The purpose of curtailing comment by parties in lawsuits, particularly criminal cases, is to avoid undue publicity that might unfairly prejudice a defendant. In this matter the Court has conducted a searching individual inquiry of each prospective juror, numbering in total well over 150. Jury selection took almost four weeks to complete. Potential jurors were rigorously screened for bias, prejudice or preconceived beliefs. There is no question that the jury now sitting in this case is free of any taint. Nor does it appear, from the news clippings offered by the government that the items alleged by defendants were universally reported. The defendants' contention that government activity in this respect denied them a fair trial is without merit.

## IV. WITNESS ACCESS

 Defendants claim that a letter written by the government to its prospective witnesses on November 23, 1976 violated their due process rights by suggesting improperly how those witnesses should treat requests by defense counsel for interviews. After being advised of the letter by defense counsel, the Court immediately required that another letter be sent to each witness correcting the offensive language. This was done by government attorneys shortly thereafter. The Court indicated a willingness to entertain motions relative to any further interferences with witness contacts. The defendants have made none. The Court concludes that the matter was raised and remedied many months ago. No lasting prejudice is shown to have occurred. The defendants' rights to a fair trial have not been infringed.

## V. BRADY CLAIMS

 The defendants urge the Court to dismiss the indictment because of the government's violations of the requirements of *Brady v. Maryland, supra.* The items discussed in defendants' original brief and motion were considered by the Court in an *in camera* hearing conducted January 13, 1977. At that time the Court not only ruled on a defense motion, but ordered certain additional discovery. The Court issued an order, Cr. No. 6–80884, docket No. 60, requiring certain documents to be provided according to a timetable designed to protect the rights of the defendants. The Court considers that its earlier rulings on these subjects adequately protected the rights of the defendants.

In a supplemental brief filed in this matter the defendants bring to the Court's attention another alleged violation of *Brady v. Maryland.* On March 21, 1977, while searching for portions of a report which had apparently not been provided during the course of discovery, defense counsel discovered a qualifying addendum to the report of the University of Michigan Pharmacy Department analyzing urine and intravenous fluid samples of patients Brown, McCrery and Loesch. The defense complains that the failure of the government to provide this sort of material, which tends to suggest doubt as to the reliability of certain scientific tests showing that Pavulon was present in various fluids, is a violation of *Brady* that warrants dismissal.

The fluids in issue were offered into evidence by the government at the trial on April 11, 1977 (Tr. at 1127). The defendants argued against admission of some of these fluids on April 12 (Tr. at 1156–84). The Court received four of the exhibits and excluded two others that same day (Tr. at 1185–95). There is no contention that the defendants are unable to place all evidence casting doubt on the reliability of tests relating to these exhibits before the jury.

The Supreme Court refined the standard to be used in ruling on *Brady* questions in *U. S. v. Agurs, supra.* In that case the Court upheld the trial court's denial of a motion for new trial based on the fact that the prosecution had withheld from defense counsel the victim's criminal record which tended to show some violent behavior. The Court enunciated the proper standard as:

> "if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record." *Id.* 427 U.S. at 112, 96 S.Ct. at 2401.

This language evidences the understanding of the Supreme Court that *Brady* was designed to insure a fair trial. This approach is underlined in *U. S. v. Clark,* 538 F.2d 1236 (6th Cir. 1976) a per curiam decision which does not mention *Agurs.* In that case the court assumed that the government had not told the defense about a negative report concerning a fingerprint. The court held that where disclosure was made on the third day of trial and the matter was presented to the jury there was no abuse of due process. The clear import of these cases is that the critical due process inquiry is whether the prosecutor withholds evidence that would create a reasonable doubt in such a way that it does not come before the jury in a timely fashion.[7] Accord *U. S. v. DeMarco,* 407 F.Supp. 107 (C.D.Cal.1975). That is not the case here.

While the government is walking a thin line that risks a mistrial or other action if significant evidence is not provided the defendants until some later time, the Court finds no violation of due process in the circumstances of the case to date.

## VI. CONTINUING MISFEASANCE

Defendants contend that the government continues to frustrate the Court's order by securing a superseding indictment charging previously unalleged illegal acts, and seeking certain discovery. The Court has already ruled on these motions. Where appropriate, the government requests for discovery were denied or overt acts stricken from the indictment. Defendants' contention that their due process rights have been violated is without merit. The Court has been scrupulous both to protect the integrity of its own orders and to safeguard the rights of the accused in this case.

## VII. CUMULATIVE EFFECT

Having considered the allegations of the defendants individually, it remains to consider whether the cumulative impact of the actions defendants complain of compels the Court to dismiss the indictment either as a matter of due process or in the exercise of its inherent supervisory authority. In assessing the conduct of the prosecution in terms of due process of law, the Court is mindful of the fact that the Supreme Court has said:

> "As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941).

---

7. In *U. S. v. Clark, supra,* the trial judge had offered the defendants either a continuance or a mistrial. The defendant declined the request. On the facts of the case as they presently exist the court need not consider either of these alternatives. It is noteworthy that the probative value of the newly discovered addendum extends only to the charges involving patients Loesch, Brown, and McCrery.

The standard to turn to in determining whether the court should exercise its supervisory powers is not so clear. Numerous rationales have been advanced to explain the nature and scope of the somewhat sparingly used supervisory authority, but it is generally conceded (as defendants' brief argues) that the courts are primarily concerned with protecting "the judicial process from the stigma of illegal or unfair" government conduct. Note, *The Supervisory Power of the Federal Courts*, 76 Harv. L.Rev. 1656, 1663 (1963). See *McNabb v. U. S.*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943).[8] The Supreme Court has not announced a general rule requiring the application of the Court's supervisory authority to a wide variety of cases, preferring instead to treat each case on its particular facts. *Marshall v. U. S.*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); *Grunewald v. U. S.*, 353 U.S. 391, 424, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

While it is true that an indictment may be dismissed without regard to considerations of prejudice, prejudice to the defendants is one factor which the Court should take into account in its determination. *U. S. v. McCord*, 166 U.S.App.D.C. 1, 509 F.2d 334, 350 (1974) (en banc), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975). *U. S. v. Crow Dog*, 399 F.Supp. 228, 238 (N.D.Iowa 1975), *aff'd*, 532 F.2d 1182 (8th Cir. 1976). The Court has an obligation to tailor any remedy to the nature of the misconduct in the particular case. The more serious the violation, the more severe the remedy must be.

The reported cases granting dismissals are far different than the facts of the case at bar in its present posture. In *U. S. v. Banks*, 383 F.Supp. 389 (D.S.D.1974), *app. dismissed*, 513 F.2d 1329 (8th Cir. 1975), a defense motion to dismiss the indictment

was granted where, after an eight month trial, it had become evident that the government's continuing and patterned misconduct had reached egregious proportions and had thereby prejudiced the defendant's right to a fair trial.[9] In *U. S. v. DeMarco*, 407 F.Supp. 107 (C.D.Cal.1975) the prosecutor failed to reveal important facts, within his personal knowledge, tending to discredit the testimony of one of his witnesses who, in the court's phrase, "struck a death blow" to the defense. The court held that this illegal withholding of evidence, which prevented the court from ruling on a critical issue of law before the testimony was presented to the jury, required a dismissal. This is manifestly not the situation of the instant case. As indicated, some of the defendants' contentions, if true, are not violations of law. As to others which may have been inappropriate prosecutorial conduct, the Court has rectified any prejudicial effect. There is not now any claim that the defendants have been prevented from bringing before the jury all facts necessary to their defense.

Courts have been justifiably reluctant to employ their broad supervisory power to terminate prosecutions. Both the public and the defendants have an interest in a verdict following a fair and impartial trial.

It is only when a court can conclude that it is powerless to provide a criminal defendant with a fair trial, now or at any time in the reasonable future, should the court dismiss the case." *U. S. v. Banks*, 374 F.Supp. 321, 323 (D.S.D.1974).

The Court should conduct judicial proceedings in such a way that "only irrational or perverse" claims of denial of fundamental rights can be asserted. *Communist Party of the U. S. v. Subversive Activities Control Board*, 351 U.S. 115, 124, 76 S.Ct. 663, 100

---

**8.** The Court said: "We are not concerned with law enforcement practices except in so far as courts themselves become instruments of law enforcement." 318 U.S. at 347, 63 S.Ct. at 616. It is significant that *McNabb's* narrow holding was that an improperly obtained confession cannot be used at trial. The Supreme Court did not dismiss the indictment.

**9.** In *Banks* the prosecution not only engaged in improprieties with regard to perjured testimony, but attempted to conceal the fact that military forces were unconstitutionally involved in the government's criminal investigation.

L.Ed. 1003 (1955). The emphasis in Supreme Court opinions has been on preserving of the fairness of trials. Dismissals for prosecutorial misconduct are an exception of last resort, not the general rule.

 The Court is cognizant of its continuing duty to insure that these defendants receive a fair trial. Impermissible evidence may not be used against them. The government may not engage in unfair tactics that deny the defendants their right to a fair and impartial trial. The Court has in the past acted to preserve these rights and will continue to do so. This trial is still in its early stages. At this point the Court concludes that there is no illegality that has fatally prejudiced the defendants' rights to a fair trial. "The waters of justice," to adopt the phrase used in *U. S. v. Banks*, 383 F.Supp. at 397, "have not yet been polluted." However, as the case progresses and further evidence is presented to the jury there must be a vigilant and scrupulous effort to assure that defendants' right to a fair trial is not fatally impaired. The Court desires to bring these proceedings to their natural and orderly conclusion—a fair and impartial jury verdict. It is sincerely hoped that it will not be necessary to terminate the trial process because of the failure of the government to honor the defendants' constitutional rights.

The Court concludes that the defendants have not shown a denial of due process of law, nor does the Court believe that it would be appropriate to exercise its supervisory powers by dismissing the indictment. The defendants' motion is therefore denied.

## ON MOTION FOR NEW TRIAL

The defendants, Filipina Narciso and Leonora Perez, filed a Motion for New Trial, following their convictions by jury verdict of violations of 18 U.S.C. §§ 7, 13, 371 and M.C.L.A. § 750.436. The parties have submitted briefs and the Court heard oral

arguments on November 2, 1977. Ruling on the Motion was taken under advisement and is submitted below.

## I. THE STANDARD

"The Court on motion of a defendant may grant a new trial to [her] if required in the interest of justice." FRCrP 33.[1] Members of the Bar and the general public are probably most familiar with motions for new trial based on the ground that the verdict was against the weight of the evidence. This is an argument that is not infrequently asserted following a criminal conviction and one that these defendants have made. The law on this subject is well-developed and gives substantial guidance to this Court in its determination of the case before it.

It is generally agreed that:

"Motions for a new trial are directed to the trial court's discretion. Under its broad power, the court may weigh the evidence and consider the credibility of the witnesses. The remedy is sparingly used, the courts usually couching their decision in terms of 'exceptional cases,' *U. S. v. Pepe*, 209 F.Supp. 592, 595 (D.Del. 1962) affirmed, 339 F.2d 264 (3rd Cir. 1964), 'miscarriage of justice,' *U. S. v. Parelius*, 83 F.Supp. 617, 618 (D.Hawaii 1949) and where 'the evidence preponderates heavily against the verdict.' *U. S. v. Robinson*, 71 F.Supp. 9, 10–11 (D.D.C. 1947)." *U. S. v. Leach*, 427 F.2d 1107, 1111 (1st Cir. 1970), *cert. denied*, 400 U.S. 829, 91 S.Ct. 57, 27 L.Ed.2d 59 (1970).

Some courts go so far as to say that the trial court sits, in effect, as a 13th juror on a motion for new trial to insure that justice is done. *U. S. v. Caramandi*, 415 F.Supp. 443 (E.D.Pa.1976); *U. S. v. Phifer*, 400 F.Supp. 719 (E.D.Pa.1975), aff'd mem. 532 F.2d 748 (3rd Cir. 1976); *U. S. v. Parelius*, 83 F.Supp. 617 (D.Hawaii 1949).[2] Whether

---

1. Within seven days of the verdicts of guilt, returned July 13, 1977, the Court extended the time within which the defendants could file a motion for new trial. The motion was timely filed on September 19, 1977, Docket Entry No. 156.

2. But see *Fortenberry v. New York Life Ins. Co.*, 459 F.2d 114, 117 (6th Cir. 1972), *cert. denied*, 409 U.S. 981, 93 S.Ct. 316, 34 L.Ed.2d 245 (1972) (dissenting opinion), which states that a federal trial judge does not sit as a thirteenth juror and may not weigh credibility.

the Court conceives of itself as a thirteenth juror or strictly in judicial terms,

"[t]he power of the trial judge to set aside a verdict as against the weight of the evidence and grant a new trial is . . . a check or limitation on the jury's power to render a final and binding verdict, to the end that a miscarriage of justice does not result. However, '[c]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.' *Tennant v. Peoria & P. U. Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944); *Werthan Bag Corp. v. Agnew*, 202 F.2d 119, 122 (6th Cir. 1953). Thus, while the district judge has a duty to intervene in appropriate cases, the jury's verdict should be accepted if it is one which could reasonably have been reached. In applying these two broad principles defining the limits of court action, in granting a new trial on the weight of the evidence, the district judge must, as is generally stated, exercise his sound judicial discretion." *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir. 1967), *cert. denied, sub nom. Fain v. Duncan*, 389 U.S. 913, 88 S.Ct. 239, 19 L.Ed.2d 260 (1967).

 The standard applicable to a motion for a new trial is different from that used in determining whether a defendant is entitled to a judgment of acquittal under FRCrP 29. *U. S. v. Hurley*, 281 F.Supp. 443 (D.Conn.1968); *U. S. v. Beacon Musical Instrument Co.*, 135 F.Supp. 220 (D.Mass.1955); *U. S. v. Kelly*, 119 F.Supp. 217 (D.D.C.1954). In a motion for judgment of acquittal the court must determine whether, taking the evidence in the light most favorable to the government, the jury must have a reasonable doubt as to the guilt of the accused.[3] If no such doubt necessarily exists under that view of the evidence, the motion for judgment of acquittal must be denied. E. g., *Curley v. U. S.*, 81 U.S.App.D.C. 389, 160 F.2d 229 (1946), *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). As previously indicated, the court's power in ruling upon a motion for new trial is much broader. The reason for this distinction lies in the differing effects upon the trial process the two rulings have.

"In directing a judgment of acquittal, the Court makes a final disposition of the case. On the other hand, in setting the verdict aside the Court merely grants a new trial and submits the issues for determination by another jury. It is appropriate in the latter instance, that the Court should have wide discretion in the interest of justice." *U. S. v. Robinson, supra* at 11.

 Federal trial judges are not, however, limited in deciding motions under Rule 33, to weighing the evidence. On the contrary, the very words of the rule—"interest of justice"—mandate the broadest inquiry into the nature of the challenged proceeding.

 As the Supreme Court said in *U. S. v. Gainey*, 380 U.S. 63, 68, 85 S.Ct. 754, 758, 13 L.Ed.2d 658 (1965), "Our Constitution places in the hands of the trial judge the responsibility for safeguarding the integrity of the jury trial . . . " In the context of motions for new trial the courts have discharged this obligation by determining whether there has been a "miscarriage of justice." E. g., *U. S. v. Robinson, supra.*

---

The opinion does not challenge the trial judge's duty to determine whether the verdict is against the weight of the evidence.

**3.** In considering post-trial motions relating to the sufficiency of weight of the evidence, the Court should not treat circumstantial evidence any differently from testimonial evidence. *Watkins v. U. S.*, 564 F.2d 201, at 205 (6th Cir. 1977); *U. S. v. Carter*, 486 F.2d 1027 (6th Cir. 1973), *cert. denied*, 416 U.S. 937, 94 S.Ct. 1936,

40 L.Ed.2d 287 (1974); *U. S. v. Sutherland*, 463 F.2d 641 (5th Cir. 1972), *cert. denied*, 409 U.S. 1078, 93 S.Ct. 698, 34 L.Ed.2d 668 (1972). However, the evidence presented must still be sufficient, under the appropriate standard, to justify a verdict of guilt beyond a reasonable doubt. There are instances when circumstantial facts do not justify the inferences sought by the prosecution. *U. S. v. Wilson*, 178 F.Supp. 881 (D.D.C.1959).

Generally speaking, even a single error during the trial process could, if of sufficient magnitude, warrant a new trial. See 2 Wright, Federal Practice and Procedure: Criminal § 556 (1969). Thus, courts have held that motions for new trial could properly raise issues relating to access to witnesses, *U. S. v. Mosca*, 355 F.Supp. 267 (E.D.N.Y.1972), *aff'd*, 475 F.2d 1052 (2nd Cir. 1973), *cert. denied*, 412 U.S. 948, 93 S.Ct. 3003, 37 L.Ed.2d 1001 (1973), provision of lists of members of the jury venire, *U. S. v. Crockett*, 514 F.2d 64, 69 (5th Cir. 1975) and juror bias. *U. S. v. Wayman*, 510 F.2d 1020, 1023–4 (5th Cir. 1975), *cert. denied, sub nom. Moore v. U. S.*, 423 U.S. 846, 96 S.Ct. 84, 46 L.Ed.2d 67 (1975).[4]

■■■■ The fact that in ruling upon a motion for new trial the Court has broad powers as to the type of errors it may consider as well as the manner in which it may weigh the evidence testifies to the great significance the law attaches to fairness in our criminal justice system. The Supreme Court has consistently acted to preserve criminal trials from any error of Constitutional magnitude. In *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) the court held that proof beyond a reasonable doubt is constitutionally required in criminal trials:

> " 'This notion—basic in our law and rightly one of the boasts of a free society—is a requirement and a safeguard of due process of law in the historic procedural context of "due process." ' *Leland v. Oregon*, [343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952)] at 802–3 [72 S.Ct., at 1009] (dissenting opinion). In a similar vein, the Court said in *Brinegar v. United States*, [338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)] at 174 [69 S.Ct., at 1310], that '[g]uilt in criminal cases must be proved beyond a reasonable doubt and

by evidence confined to that which long experience in the common-law tradition, to some extent embodied in the Constitution, has crystallized into rules of evidence consistent with that standard. These rules are historically grounded rights of our system, developed to safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty and property.' " *Id.* at 362, 90 S.Ct. at 1071.[5]

On a motion for new trial the Court must review challenged trial proceedings to insure that the dictates of due process have been met. Though criminal defendants are entitled to a fair trial, but not a perfect one (because "there are no perfect trials," *Brown v. U. S.*, 411 U.S. 223, 232, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973)), the Court may not thereby abdicate its obligation to insure that fundamental fairness has been provided.

> ". . . [W]here the conduct of a trial is involved, the guarantee of the Fourteenth Amendment is not [merely] that a just result shall have been obtained, but that the result, whatever it be, shall be reached in a fair way. Procedural due process has to do with the manner of the trial; dictates that in the conduct of judicial inquiry certain fundamental rules of fairness be observed; forbids the disregard of those rules, and is not satisfied though the result is just, if the hearing was unfair." *Snyder v. Massachusetts*, 291 U.S. 97, 137, 54 S.Ct. 330, 344, 78 L.Ed. 674 (1934) (Roberts, J., dissenting).

As the only member of the judicial branch of government to be present throughout the entire trial the Court must of necessity exercise its function to assess the defendants' challenge to these proceedings with great care. As the Sixth Circuit Court of Appeals said in a case presenting a similar, but somewhat narrower issue,

---

**4.** While none of these cases granted new trials, in each the court recognized the propriety of raising the issues and ruled that no prejudice, that is, no "miscarriage of justice," had resulted.

**5.** The legal literature is replete with discussions of the historic nexus between public confidence

in our criminal justice system and a high standard of proof. See, e. g., *In re Winship, supra* at 364, 90 S.Ct. 1068; Underwood, *The Thumb on the Scales of Justice: Burdens of Persuasion in Criminal Cases*, 86 Yale L.J. 1299, n. 3 (1977).

"Trial by jury is one of the most vital elements in the administration of justice so far as the average citizen is concerned.

\* \* \* \* \* \*

"Faith in the courts and in the jury system must be maintained and it is proper that on questions such as we have here the rule should be such as to support the faith of all litigants in our judicial system and, as part thereof, trial by jury. That faith can be sustained only by keeping our judicial proceedings free from the suspicion of wrong. The question is, not whether any actual wrong resulted . . but whether [there was] created a condition from which prejudice might arise or from which the general public would suspect that the jury might be influenced to reach a verdict on the ground· of bias or prejudice." *Stone v. U. S.*, 113 F.2d 70, 77 (6th Cir. 1940).

Broadly viewed, then, the Court's inquiry on a motion for new trial such as the one in the case at bar is two-fold—did the defendants receive a fair trial and does the jury's verdict rest on evidence that meets the standards of certainty the law requires in criminal cases.

The motion filed by the defendants in this case is extremely broad. Defendants argue that (a) the verdict is against the weight of the evidence, (b) the conduct of the prosecution was prejudicial, (c) certain evidentiary rulings of the Court were erroneous, and (d) during deliberations the jury discussed matters not in evidence. Many of the defendants' claims have been considered by the Court earlier in these proceedings. This, however, does not bar further consideration. The Court has now had the opportunity to consider the course of the trial, the impact of its rulings and the conduct of all the parties in a detached, thorough manner. The daily pressures of trial management have not intruded into this deliberative process. More importantly, the Court has been able to look back on the whole proceeding with a better ability to appreciate the subtle (as well as the not so subtle) influences on the jury. Matters that seemed of great moment in the heat of the trial appear, on reflection, to have been less significant than events the ultimate effect of which were not apparent at the time of their occurrence. With the full history of these proceedings in mind, the Court is better equipped than it was at any previous time to assess the fairness of the trial and the jury's verdicts.

## THE PROOFS

The indictment in this case charged the defendants with the most sensational of crimes. The Grand Jury charged, and the government sought to prove, that the defendants, registered nurses employed in the Intensive Care Unit of the Veterans Administration Hospital in Ann Arbor, Michigan, conspired together and did in fact poison and murder various patients in that institution by injecting a powerful muscle relaxant drug, known as pavulon, into the victims' intravenous (i.v.) apparatus.[6]

The testimony in the case was complex and lengthy, extending over almost three months. The government's case-in-chief was exceptionally complicated. The government presented 89 witnesses, including 17 experts. This massive set of proofs was entirely circumstantial in nature. The government submitted no direct proofs of the defendants' guilt on any count. No witness testified that the defendants ever had pavulon in their possession. No witness stated that the defendants ever inject-

---

**6.** Defendants were originally charged in an indictment filed June 16, 1976, under Cr. No. 6–80884, with conspiracy, five counts of murder and ten counts of unlawfully mingling a poison in the food and medicine of various persons in violation of 18 U.S.C. §§ 7, 13, 371, 1111 and M.C.L.A. § 750.436. A superseding indictment alleging a conspiracy, eight counts of unlawfully mingling a poison in the food or medicine of patients and two counts of murder was returned in Cr. No. 7–80149 on January 31, 1977. With two exceptions the overt acts charged as part of the conspiracy count of the superseding indictment were identical with the substantive crimes alleged. (Three other events were listed as overt acts but stricken by the Court in February, 1977).

ed anything into the victims.[7] Nor was there any showing that the defendants were any more familiar with the drug in question than any of numerous others within the hospital. Instead the government sought to show through numerous witnesses that certain breathing failures were criminal in nature, that the defendants had the opportunity to commit these crimes, that they were present during the critical time period during which, according to expert testimony, the drug must have been injected in order to have produced the observed effect and, lastly, that this presence during the critical time period was exclusive.

With the consent of defense counsel, the government was permitted to deviate from the normal order of proof in a criminal case and began by presenting the jury with expert testimony regarding the nature and effect of muscle relaxants generally and pavulon in particular. The Court and the parties felt that this background information would greatly assist the jury in comprehending the mass of testimony to come. Consequently, the government adduced much of its expert testimony before linking pavulon directly to any of the crimes charged. Dr. Marcelle Willock, an anesthesiologist, testified at length concerning the nature and action of muscle relaxants. She described the clinical symptoms of persons who have been given each of the two broad types of muscle relaxants, succinylcholine and turbocurare, a sub-type of which is pavulon. She then testified that to produce a certain cluster of symptoms (which, it would come to pass, resembled those suffered by the patients named in the indict-

ment), it would be necessary to have injected the muscle relaxant, probably pavulon, into the intravenous tubing in a rapid, "bolus" fashion.[8] On cross-examination Dr. Willock relented somewhat and testified that it was possible for these symptoms to result from a delayed method of infusion, or for example, by placing the drug in a small intravenous bag (usually referred to as a "piggy back"). However, another expert called at the *very end* of the government's case, Dr. Francis Foldes, also testified in considerable detail about the method of injection of the drug necessary to produce the symptoms that were observed in this case. Dr. Foldes stated that in each instance a rapid bolus injection would *necessarily* have to have been given between one-and-one-half and five minutes prior to the cessation of breathing. He, too, on cross-examination relented from this absolute position somewhat. He did not agree with Dr. Willock that the method could have been different, but he did concede that it might have been possible for the injection to have taken place as much as five, or even seven minutes prior to the observation of peak symptoms. Other scientific experts testified that in their opinion tests showed the presence of pavulon in the body fluids or tissues of each victim named in the indictment. By the end of the expert testimony there seemed little doubt that many of the patients named in the indictment had received pavulon without prescription.[9]

Factual testimony concerning the movements of the defendants and others was confusing, inconsistent, and often hard to follow. Security at the hospital was lax or

---

7. Mrs. Christine Loesch, the mother of one of the alleged victims, testified that she saw defendant Perez preparing to give her son a shot in his right side. (Tr. at 4081, 4094). This is utterly inconsistent with the government's theory of the case that an injection was given through the intravenous apparatus.

8. A bolus injection is a rapid injection of a dose of a drug into a patient's bloodstream through the intravenous lines. Bolus injections are also known as "i. v. push" injections. This form of injection produces rapid effects on the patient.

9. The defendants conceded at oral argument on the motion for new trial that the proofs were

conclusive that three of the victims named in the indictment had in fact received pavulon. While the evidence *as to the other patients* was not without some doubt, the jury would certainly have been justified in inferring the existence of unauthorized pavulon in the bodies of all the patients. While there was considerable evidence to show that the record-keeping at the Ann Arbor Veterans Administration Hospital was of inconsistent quality, there was no serious claim by the defendants that pavulon had ever been prescribed to any of the relevant patients outside of the operating room.

almost non-existent. There was almost total freedom of movement for anyone dressed in conformance with hospital custom.[10] A brief review of the facts adduced at trial as to each of the counts of the indictment submitted to the jury[11] will serve to provide a basis for the discussion of the legal issues raised by this motion that follows.

The government proved that shortly before the respiratory arrest of Mark Hogan on July 29, 1975, defendant Narciso was observed by his bedside. Lula Balls, a nursing assistant in the Intensive Care/Cardiac Care Unit,[12] testified that Ms. Narciso had been with Mr. Hogan, requested that Ms. Balls watch Mr. Hogan while he ate his dinner, and left. Later, the time interval being unclear, Mr. Hogan suffered a respiratory arrest. Nobody saw Ms. Narciso with pavulon, a syringe, nor any closer to Mr. Hogan than arms length and separated by a table. No one else, however, was seen in the vicinity of Mr. Hogan's bed. Ms. Narciso admitted being by Mr. Hogan's bedside to inquire if he had finished his dinner, but denied any suggestion that she injected any medication into Mr. Hogan's intravenous equipment. Indeed, there was some question as to whether intravenous lines were actually connected to Mr. Hogan at the time.

Mr. Richard Gasmire testified that the same evening as Mr. Hogan's arrest, he came to visit his father in the Intensive Care Unit. As he approached the foot of his father's bed he observed a nurse with her back to him performing some unseen function with the intravenous tubing. Approximately one and one-half minutes after he arrived at the bedside, his father sat bolt upright and apparently stopped breathing. The nurse at the head of the bed, whom Mr. Gasmire identified as defendant Perez, turned and stood open-mouthed, doing nothing. Mr. Gasmire called for help, which was immediately forthcoming. There was testimony that Mr. Gasmire may not have accurately remembered the physician who came to his father's assistance that night. Despite admitting to being under extreme stress at that time, Mr. Gasmire adhered to his identification of Mrs. Perez. Mrs. Perez denied being at the elder Mr. Gasmire's bed during any such incident.

The government next presented testimony from Mrs. Bernice DeHate who said that on July 30, 1975, from her vantage point in her husband's room on the fifth floor, she saw Ms. Narciso walking toward the room of John Herman. Mr. Herman was found dead in his room shortly after this observation. Testimony showed that Ms. Narciso, who admittedly had visited Mrs. DeHate in her husband's room earlier in the evening with Mrs. Perez, would have had no logical explanation for her presence on the floor at that time. Ms. Narciso denied being there alone. Mr. William Miller, a patient in a room diagonally across the hall from Mr. Herman, testified that he believed Mr. Herman, who was critically ill, expired shortly before a male psychiatric patient wandered into his room. Mr. Miller testified that he did not see Ms. Narciso at any time on the

10. In one bizarre incident Mrs. Loesch testified that a man dressed in civilian clothes, who resembled a man in a green scrub suit she had seen enter her son's room shortly before his respiratory arrest, approached her furtively in the hospital lobby four days later. She ignored the approach and never saw the man again. (Tr. at 4143–4).

11. On June 8, 1977, after the close of the government's case, the Court granted in part and denied in part the defendants' motions for judgment of acquittal. The Court directed judgments of acquittal as to one count of poisoning and one count of murder in their entirety. In addition, although each defendant had been charged jointly in all counts, the Court acquitted defendant Narciso of two counts of poisoning and Mrs. Perez of one count of murder and three counts of poisoning. The net result was that the jury received one count of murder and four counts of poisoning against defendant Narciso and three counts of poisoning against defendant Perez. The Court denied the defendants' motion for judgment of acquittal on the conspiracy charge. The Court also withdrew one overt act from the consideration of the jury because it was not sustained by sufficient evidence. (Tr. at 4946–4982).

12. The Coronary Care Unit is a separate room but contained within the Intensive Care Unit perimeter and serviced by the staff of the Intensive Care Unit.

floor. The government offered no witness who ever saw Ms. Narciso in Mr. Herman's room at any time on the day of his death.[13]

Testimony then turned to the events of August 15, 1975—truly a day of horror at the Ann Arbor Veterans Administration Hospital. Within minutes three patients in close proximity to each other in the Intensive and Coronary Care Units, suffered respiratory arrests. The staff was under great strain attempting to provide treatment for these sequential medical emergencies. The first patent to suffer an arrest was Benny Blaine. Mr. Blaine was recovering from abdominal surgery. Because of a severe weight problem, the surgeons were having difficulty keeping Mr. Blaine's wound closed. The afternoon of the 15th, Mr. Blaine's sister and wife were with him, giving him a sponge bath. Their testimony varied in some particulars but each testified that Mrs. Perez was in the room and requested them to leave because the doctors were going to treat Mr. Blaine's wound. Mrs. Blaine went outside the Intensive Care Unit to make a phone call. Mrs. Barnett, Mr. Blaine's sister, stayed in the room somewhat longer. As she left the Intensive Care Unit, she bumped her head on the door. Shortly thereafter, while peering through the door window she saw hospital personnel running to her brother's room to attend to what proved to be a respiratory arrest. Pam Wilson, the day shift Intensive Care Unit nurse, testified that about five minutes before the arrest she observed Mrs. Perez talking to Dr. Bishop just outside Mr. Blaine's room. As with the other cases, nobody saw either of the defendants inject anything into the i. v. tubes or Mr. Blaine. The defendants' exclusive presence during the critical time period according to the government's theory of the case was established by Mr. Blaine's relatives, who had admittedly given statements which were inconsistent with their trial testimony when first questioned by FBI agents in February, 1976.

While emergency measures were continuing for Mr. Blaine, a call light flashed in the Coronary Care Unit. Ms. Narciso entered that Unit. John McCrery, a heart patient, was experiencing anxiety. Bonnie Weston, a nurse's aide, observed Ms. Narciso get a section of intravenous extension tubing and install it in Mr. McCrery's i. v. line. Some moments after that, Dr. Lucy Goodenday, a cardiologist who came to the Intensive Care Unit to lend assistance, observed Mr. McCrery in apparent difficulty. When she approached him his breathing was extremely shallow. She yelled to a nurse who was at the head of the bed to get an ambu bag, a hand operated device that is utilized to breathe for a patient. The nurse did not respond or react and Dr. Goodenday called again. This resulted in another staff member bringing the ambu bag. An emergency code was called and numerous people came to assist. Dr. Goodenday could not identify the unresponsive nurse by name but her description at trial resembled defendant Narciso. In an initial interview with the FBI, however, she described the nurse differently. Ms. Narciso denied being at the bedside when the code was called.

As the McCrery code was winding down, Mrs. Christine Loesch was sitting with her son, Bill, who was recovering from a self-inflicted gunshot wound. He was heavily sedated. Mrs. Loesch testified that the two defendants came into the room. She said that Ms. Narciso went to the intravenous bags and examined them while Mrs. Perez prepared to give her son a shot. She left the room for a short time at their request. When she returned her son appeared in distress and was making motions with his thumbs that she interpreted as depressing the plunger on a syringe. He suffered an arrest at that point. Her son testified that on the day of his arrest he was dozing when he felt a sharp tug on the intravenous lines. He looked up to see a man in a green suit leaving his room. At trial he was unable to identify the man. On cross-examination Mrs. Loesch testified that she had earlier

---

**13.** When Mr. Herman's death was discovered the psychiatric patient was in the room by his bedside. There was testimony that the psychiatric patient was in such a severe state of psychosis that he could not have knowingly injected a drug into another patient.

told the FBI her son had nodded answers to questions before losing consciousness in a manner that indicated he did not know his attacker but it was not one of his nurses or doctors.

When things were about under control in the Intensive Care Unit, approximately 6:30 or 7:00 p. m., Ms. Narciso needed a particular intravenous solution for one of the Intensive Care Unit patients. Rather than send a nursing assistant to obtain it, she went herself from the third floor, where the Intensive Care Unit is located, to the fifth floor where she had previously worked. Ms. Narciso testified that she asked the nurse in charge of the floor, Mrs. Feenstra, if she could borrow the solution and then walked down the hallway to check on the patients. Mrs. Feenstra did not recall any such conversation. Earline Fuller, a nursing assistant, testified that she saw Ms. Narciso in a hallway on five west, a considerable distance from where the intravenous solutions were stored. When she spoke to Mrs. Fuller, Ms. Narciso indicated that Mr. Fletcher looked ill. Mrs. Fuller, left to speak to the floor nurse about it. When she returned, Ms. Narciso had gone but it appeared Mr. Fletcher was in arrest. Ms. Narciso denied ever entering Mr. Fletcher's room or being on the fifth floor for an improper purpose. There was testimony that Ms. Narciso could have gotten the solution she wanted on the fourth floor. The government produced no witness who testified to having seen anyone enter Mr. Fletcher's room prior to his difficulty.

The government offered no evidence of motive in support of its case against the defendants.

The defense consisted primarily of the defendants, who denied any wrongdoing, and 13 character witnesses.[14] The government did not challenge the defendants' good character and did not suggest they had ever been convicted of a crime.

The jury deliberated on the matter for thirteen days. They found both defendants guilty of conspiracy. They found Ms. Nar-

ciso guilty of the poisoning of Mark Hogan, John McCrery and William Loesch. The jury found Mrs. Perez guilty of the poisoning of Charles Gasmire, Benny Blaine and William Loesch. The jurors acquitted Ms. Narciso of the poisoning of Mr. Fletcher and the murder of John Herman. It is clear from this cursory statement of the evidence that to return these verdicts the jurors had to have found beyond a reasonable doubt that pavulon was the poisoning agent in each of these cases, the injection had to have been given by rapid, bolus infusion within three minutes of breathing failure and that the defendants were the only individuals present at the patients' side within that critical time period. Only by that train of reasoning, as the Court noted in its oral opinion granting in part and denying in part defendants' motion for judgment of acquittal, could the jurors find guilt beyond a reasonable doubt.[15] This determination necessarily meant that the jurors had to weigh the credibility of the government's witnesses against that of the defendants. Despite the fact that no factual witness in this case was free from substantial attack on his or her credibility, the jurors apparently felt in their own minds that the credible evidence established guilt beyond a reasonable doubt in all but the counts involving Mr. Herman and Mr. Fletcher.

Plainly enough the case against the defendants was not overwhelming. It is fair to characterize it as very close. Before determining whether the weight of the evidence is against these verdicts, the Court will turn to its rulings and the conduct of counsel for the government to inquire whether the verdict rests upon evidence fairly presented during a trial process that comports with the requirements of due process of law.

## II. THE PROBLEMS

### A.

Apart from the complexity of the case and the circumstantial nature of the

---

**14.** Eight character witnesses testified on behalf of Ms. Narciso, four on behalf of Mrs. Perez and one on behalf of each of them.

**15.** Transcript at 4946–82.

government's proofs, this case has been marked by a variety of other problems since its inception. Throughout the pre-trial proceedings and the trial itself the government had consistently conducted itself in such a way as to make the task of defense counsel and the Court extremely difficult.

As early as five days after the return of the original indictment in this case the defendants filed a motion for a protective order because of FBI interrogation of the defendants in the absence of their counsel and because of the government's conduct at a press conference held on the day of the defendants' arrest.[16] The Court found it unnecessary to rule upon the motion because the parties stipulated that no government agent would question the defendants in the absence of counsel and that both parties would "follow the American Bar Association Standards regarding pre-trial publicity."[17] ABA Standards Relating to Fair Trial and Free Press § 1.1 (1968). That such a stipulation was necessary at the very outset of a case that promised to generate more than usual interest among members of the public was troubling to the Court.

On July 8, 1976, the Court first met with counsel to discuss scheduling and discovery. This was the first of many meetings designed to bring the parties together with the purpose of assuring an orderly and economical pre-trial process. At this time and on subsequent meetings,[18] the Court attempted to encourage the parties to adopt an omnibus discovery procedure that would assist in the efficient preparation of the case by voluntary interaction, thus eliminating the necessity to prepare, argue and rule upon voluminous discovery motions. See Tjoflat, The Omnibus Hearing, 1974 Seminars for Newly Appointed Judges. 37 FRD 95 (1965). This method proved unsuccessful and was the first indication of the intractability of the government. On September 9, 1976 the government filed its "Offer of Discovery."[19] In essence the government was willing to provide the defendants with their own prior statements, some records of the Veterans Administration Hospital, including 126 medical charts, and various but limited items of physical evidence. This offer fell far short of the omnibus discovery contemplated by the Court.

In response, the defendants were required to file extensive motions for discovery and inspection and for bills of particulars on October 7 and 8. The government filed its response to these motions in late October and early November.[20] These responses indicated substantial unwillingness to provide as much discovery as was normal in criminal cases. Yet another in-chambers status conference was held on November 9, at which time the government indicated its willingness to modify its answers to defendants' motions and afford significantly greater discovery than it had previous provided.[21] This action came more than four months after the institution of the lawsuit and less than two months prior to the date which had been set by the Court for trial. This adjustment in position still left many matters unresolved, however, and the government filed a supplemental brief concerning the discoverability of all FBI 302 forms[22] pertinent to the case and the re-

---

16. Cr. No. 6–80884, Docket Entry No. 7.

17. Cr. No. 6–80884, Docket Entry No. 13.

18. The Court held status conferences on July 8, August 19, October 12, October 26, November 9, November 26 and December 13. In addition, following hearings in mid-September the issue was discussed as well.

19. Cr. No. 6–80884, Docket Entry No. 15.

20. Cr. No. 6–80884, Docket Entry Nos. 29–31, 37.

21. Cr. No. 6–80884, Docket Entry No. 50. At this time the government agreed to provide complete witness lists, all Jencks material (18 U.S.C. § 3500) in advance of trial, greater scientific information and a count-by-count narrative of facts surrounding each allegedly criminal act. Needless to say assimilating this information so close to trial would be a demanding task for defense counsel.

22. FBI 302 forms are reports by agents of interviews with prospective witnesses. In this case, there were literally volumes of these reports in FBI files and included hundreds of witnesses

quirement of particularizing all overt acts not set forth in the indictment.[23] Also unresolved were issues concerning exculpatory material in the hands of the government as required by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)[24] and other discovery matters.

In order to facilitate the expeditious determination of the remaining discovery issues, the parties voluntarily set a schedule at an in-chambers conference held November 26. In an eight-point letter summarizing the agreement, the Court set forth deadlines for the filing of additional briefs and the completion of agreed-upon discovery. Despite the fact that strict compliance with this schedule was necessary to permit trial preparation and decision on the remaining motions prior to the early-January trial date, several remaining deadlines were not complied with by the government. The government was required to file its response to the defendants' motion to suppress the testimony of Richard Neely[25] by December 15. The response was not filed until December 28.[26] The government was required to file its response to the defend-

ants' motion to suppress the so-called "PIA" note of John McCrery by December 16. Their response was not filed until December 20.[27] In addition to the late filings of pleadings, the government failed to meet the timetable for providing certain items of discovery to the defense. The parties agreed that the government would provide the defendants with information concerning the family of muscle relaxants involved in the respiratory arrests charged in the indictment by December 17. This task was not accomplished until January 12, 1977. The government indicated it would provide the defendants with various test results.[28] This was finally accomplished on December 17—15 days behind schedule. It should be emphasized that each and every one of these deadlines was not imposed on the government by the Court, but rather was agreed upon after discussion among the parties based on the government's representations that they could comply with such a timetable. These defalcations, coming as close to the trial date as they did, severely strained the capacity of the Court and defense counsel to discharge their obliga-

---

interviewed by the FBI. The sheer number of putative witnesses was one of the reasons which prompted the Court to encourage the omnibus discovery. In this way, the defense would not be required to start from scratch to identify, for example, persons who may have been at the hospital during a two-month period over a year previously, find them and interview them. The cost in time and money would have been prohibitive.

23. Cr. No. 6–80884, Docket Entry No. 50.

24. "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland, supra* at 87, 83 S.Ct. at 1196.

25. The Neely count was extremely time and cost consuming. Video tapes of his hypnotic sessions and his testimony were presented. Psychiatrists and other witnesses testified as to his competency and to the influence of hypnosis. Many days were expended in preparation, hearings, arguments and research. The Court found the testimony producible at trial. The government dismissed the count and no further mention was made of Mr. Neely.

26. Cr. No. 6–80884, Docket Entry No. 36.

27. Cr. No. 6–80884, Docket Entry No. 52.

28. Even as to the scientific reports the government agreed early on to provide, the submission was not without shortcomings. For example, the government furnished the defense with a report from the Pharmacology Department of the University of Michigan Hospital. This report from a prestigious institution included a finding of muscle relaxant drugs in certain specimens. It also included a mention of an addendum which was not attached to the copy given the defense. After continued and persistent efforts over an appreciable length of time, the government produced the addendum. That addendum included significant admissions that the University experts conducted only a quantitative screening analysis and that the same findings, utilizing the tests administered, could result from chemicals contained in such items as the mouth-wash given to each patient at the Veterans Administration Hospital. In the interim, of course, the defense was led on a merry chase down the wrong alley.

tions.[29] The difficulty of preparing to argue pretrial motions, conduct evidentiary hearings, engaging in discovery, and preparing for trial, all at the same time, is manifest. The government's fault in this regard is especially heavy because its delays were primarily responsible for the fact that the defense discovery motions, originally filed in early October, had not been decided as of mid-December, nor had voluntary discovery been completed by that time—approximately two weeks prior to the start of trial.

On December 23, 1976, the Court filed a Memorandum Opinion which reviewed the nature of the case and decided the remaining discovery issues. The Court found that "the particular facts of this case persuade the Court that insofar as the law permits, maximum discovery should be ordered."[30] In a separate Order filed the same day, the government was required to complete all remaining voluntary discovery within one week, list all persons within the government's knowledge to whom the defendants made statements about the subject matter of the litigation, supply the defendants all FBI 302 forms concerning statements made by potential government witnesses by January 10, 1977, list all overt acts not charged in the indictment that the government intended to prove at trial by January 10, 1977,[31] and make available to the defense all FBI 302 forms which had not, for some inexplicable reason, been examined by the attorneys for the government.[32] The government's reaction to this Memorandum Opinion and Order was to result in further delay and further difficulty in the conduct of the lawsuit.

At an in-chambers conference held on December 28, 1976, shortly after the Memorandum Opinion and Order regarding discovery was served upon the parties, the government altered a position it had held for approximately three months. After refusing to acknowledge that their obligations to make the defense aware of exculpatory material under *Brady v. Maryland, supra,* included the examination of material within the government's possession but which the United States Attorney's Office had not seen and did not intend to utilize, and contemporaneously declining to permit defense counsel to examine this material, the government suddenly changed its position after the Court's ruling. Less than a week after the Order requiring that the material be made available to counsel for the defense, the government inquired if the Court would be amenable to modifying its order to permit the United States Attorney's Office to examine the FBI's files for *Brady* material. The Court indicated its unwillingness to do so because the government's offer was too little, too late. The government's actions at this meeting not only pointed up the unnecessary nature of delays in fulfilling the requirements of *Brady,* but indicated, as well, something of the nature of the government's consistent reluctance to engage in the kind of wideranging discovery that the Court had from the beginning advised it felt was not only appropriate but mandated in a case of this nature.[33]

---

**29.** In December, 1976 the Court fully intended to hold hearings on the remaining motions requiring *the taking of evidence on January 4, 1977.* Following the completion of these motions and rulings thereon, the Court intended to begin trial after no more than one week's recess. *The parties were aware of the Court's desire in this respect.*

**30.** Cr. No. 6–80884, Docket Entry No. 53 at 7. See also Footnote 22, *supra,* regarding FBI 302 forms.

**31.** The propriety of this provision is evident when one remembers that there were approximately 51 suspicious respiratory arrests in a two month period at the hospital.

**32.** Cr. No. 6–80884, Docket Entry No. 60.

**33.** The Court has in prior Memorandum Opinions given its reasons for this attitude. One additional example will illustrate the need for pre-trial discovery. An FBI chemist testified that it required five months of his time to develop a test for finding pavulon in human tissues which had been treated with embalming fluid. This testing method was related to the defense after the trial had begun. Had the defense been required to duplicate the procedure it is not inconceivable that trial would have been delayed a like amount of time. The cost was not revealed.

This, however, turned out to be the least of the difficulties to emerge before the trial of this case began. January 10, 1977 came and went without the government serving on the defendants a list of overt acts that were not included in the indictment, but which the government intended to prove at trial. As a result of the numerous in-chambers conferences, the Court understood that the government would seek to prove few, if any such instances, the reference being to "about six or eight." Early in January, the Court was informed by counsel for the government that they would seek to prove 24 additional respiratory arrests which were not charged in the indictment under the principle of similar conduct. (Rule 404(b) FRE). The impact of this revelation, less than a month before the rescheduled trial date of February 1, 1977, cannot be overstated. Suddenly the government had sought to more than double the number of respiratory arrests the defendants had to prepare to meet. Examination of the medical records of these additional respiratory arrests, not to mention factual investigation surrounding the circumstances of the arrests, would significantly delay the trial process. The Court indicated its displeasure with this approach. While no list of uncharged criminal acts was ever served on defendants, as will be seen, the difficulty was not over.

On January 12, 1977, during the course of an evidentiary hearing on defendants' pretrial motions, it became clear that certain information ordered discovered had not been provided to the defendants in accordance with the Court's Order of December 23. The Court went into an in-camera session to consider the Motions to Dismiss filed by the defendants.[34] The in-camera evidentiary hearing disclosed that in providing two 302 forms, one dated September 22,

1975 and the other December 1, 1975, the government deleted six paragraphs of the former and two paragraphs of the latter. In the December 1 form the deletions were made in such a way that the copy provided the Court and the defense appeared to contain no deletions.[35] These deletions were admittedly relevant to the issue of validity of an identification made by John McCrery, named as a victim in the indictment. More importantly, the deletions were admittedly information which the government was *required* to disclose to the defendants under the dictates of *Brady v. Maryland, supra.*[36] In fact, the government deleted information that was inconsistent with the identification by Mr. McCrery of defendant Narciso which was the very subject of the motion about which the Court was then hearing testimony. A clearer example of *Brady* material could scarcely be imagined. In addition, the government conceded that it had not even made a *Brady* review as late as November, 1976 when the defendants' motion to suppress the identification testimony of John McCrery was filed.[37] Instead of providing defense counsel with all *Brady* material, as was its duty, the government indicated its intention to bring all the facts out in the open—in public proceedings without first giving defense counsel an opportunity to review the material to which they were constitutionally entitled.[38]

■. This justification the government appears to offer for the deletion of exculpatory material under *Brady* is strange indeed. The argument is that it did not intend to suppress the material permanently but rather to bring it out at the time of the hearing. The purpose of this is obvious: the government could choose the time and manner of revealing exculpatory evidence and thus lessen any adverse impact on its own case. Thus, rather than the defense

---

**34.** The Order of Suppression concerning the in-camera hearing January 13, 1977 is hereby vacated.

**35.** The comparison between original and photocopy resulted by happenstance not by government revelation. It showed that two of the last three paragraphs had been deleted and the last paragraph moved up so that no deletion was

apparent on the photocopy. The deleted material was favorable to the defense.

**36.** Hearing of January 13, 1977 at 1003.

**37.** *Id.* at 1015.

**38.** *Id.* at 1016.

confronting a witness with a prior inconsistent statement or impeaching evidence, the government would bring it out on direct examination. This argument fails completely to recognize the constitutional right of a defendant to such material beforehand in order to permit further investigation (which the government may have pursued reluctantly, if at all), and to prepare for a full exposition. This is particularly so when the information is controlled by the government or worse, as here, the witness had died. It is a tactic that subverts the trial from a search for the truth to a game of five card stud poker. The Court found the government's explanation of the deletions and their failure to provide *Brady* material in a timely fashion "incredible and incomprehensible." The Court concluded the deletions were "purposeful, but not malicious." [39]

There was more to this story however. The United States Attorney admitted, on the record, that the government had not only failed to comply with the Court's order of December 23, 1976, but also failed to notify the defendants of its inability to comply. [40] In addition, it quickly became clear that neither Assistant United States Attorney working on the case bothered to read a comprehensive, four-page letter sent by defense counsel to the government on December 13, 1976 until the deletions came to light on January 12, 1977. Had counsel for the government read this letter they would have found that numerous 302 forms provided the defendants appeared to be incomplete in one respect or another. Item 3 of that letter referred specifically to the 302 forms concerning the interview of John McCrery which should have alerted counsel for the government of the problem. Had the government responded forthrightly to this letter, or reviewed the deleted materials with their *Brady* obligation in mind no suspicion of purposeful withholding of evidence could have arisen and no trial delay would have been necessary.

In response to the defendants' Motion to Dismiss the indictment on the grounds that the government's conduct was violative of the defendants' trial and constitutional rights, the government represented that it would *henceforth* comply with all reasonable discovery dates. [41] Indeed, at an in-chambers conference held shortly thereafter, the government represented that it was adopting an "open-file" policy to eliminate the possibility of any further defalcations in discovery.

At the January 13 hearing the Court declined to grant the defendants' Motion to Dismiss because it felt that "there was no malicious attempt or any subversive attempt on the part of the government and because we are at the pre-trial stage, I think the remedy of dismissal would be overly harsh, and I would propose that it can be corrected before trial." [42] The Court did, however, issue a 14-point Order on the next day which, *inter alia*, adjourned the trial date of February 1 and hearings on pre-trial motions, ordered substantial additional discovery to be completed forthwith, and prohibited the government "from attempting to prove any episode of respiratory arrest other than those delineated in the indictment. [43]

The Court's hope that discovery and other preliminary, nonsubstantive matters had been resolved was to prove short-lived and illusory. On January 31, 1977 the government secured a superseding indictment from the Grand Jury. This indictment, while narrowing the issues somewhat, also included allegations that three respiratory arrests *not* mentioned in the original indictment were overt acts of the conspiracy count. The defendants filed a motion to

---

**39.** *Id.* at 1032.

**40.** *Id.* at 1020.

**41.** *Id.* at 1025–6 (Statement of U.S. Attorney).

**42.** Id. at 1036.

**43.** Cr. No. 6–80884, Docket Entry No. 60. Much of the discovery, it was noted in the Order, had finally been completed on January 13.

strike those three acts.[44] The Court found that the inclusion of these three previously uncharged overt acts was in effect an effort to evade the Court's Orders of December 23, 1976 and January 14, 1977.[45] Under the facts previously described the Court was compelled to grant the defendants' motion to strike both to effectuate its own Orders and to prevent further trial delays that would have been necessitated by discovery proceedings concerning these previously irrelevant and unmentioned events.

The superseding indictment takes on added significance as to the government's strategy and as to its own preparation for trial. The original indictment was handed down on June 16, 1976, after ten months of intense investigation. Yet, some seven months after the original indictment and less than 30 days before trial, the government returned to the Grand Jury and using only the hearsay testimony of FBI agents regarding evidence in hand at the time of the original indictment, proceeded to amend its charges in the manner reflected in the two indictments. If the purpose was to throw the defense and the Court off balance and to require additional research, preparation, argument and rulings on yet more motions, it had a fair amount of success. The Court is not aware, however, of any legal justification for such a tactic.

Insuring that discovery was had in a timely fashion and in a meaningful manner was not the only problem confronting the Court in its management of the pre-trial phase of this case. On November 23, 1976 the government had sent many of its prospective witnesses a letter outlining pre-trial procedures and seeking the witnesses' assistance in coordinating trial preparation. The letter went on to discuss the possibility that government witnesses might be contacted by defense counsel for interviews. The letter carried within it the clear implication that prospective witnesses should *not* speak with defense counsel and explicitly requested that witnesses contact the government attorneys before consenting to any such interview.[46] The Court found the letter to be improper and ill-advised. Witnesses do not belong to any party to a lawsuit and this is particularly so in a criminal case where a defendant is forced to compete with the vast resources of federal investigatory agencies and must necessarily overcome a natural reluctance of a witness to speak to the defense after an indictment has issued charging a criminal offense. To have that task and that reluctance exacerbated by a letter from a high government official is extremely unfair. Even to a witness who is perfectly willing to discuss his observations the implication that the defense is not to be trusted[47] would have a psychological impact that would influence his attitude and perhaps even his eventual testimony. Specifically the Court indicated its concern that the letter suggested that conditions should be imposed on granting interviews. The Court requested counsel for the government to refrain from sending similar letters to prospective witnesses and for a corrective letter to be sent to witness-

---

44. Cr. No. 6–80884, Docket Entry No. 68.

45. Docket Entry No. 5

46. The offensive portion of the letter sent to the prospective witnesses reads:

"Prior to trial you may be contacted by attorneys, investigators, representatives or agents of the defendants, Filipina Narciso and Leonora Perez. Any such contact is not, in itself, improper. As a government witness, you are entitled to speak with anyone you wish to speak to. The office of the United States Attorney does not wish to discourage you from doing so. However, you are under no duty or obligation to do so, and you may refuse to do so. Furthermore, you may condition any agreement to discuss the case upon the requirement that a United States Attorney be present at the interview.

"It is requested that you alert us to any such requests *prior to granting an interview*. Our advice to you will necessarily vary depending upon the nature of the testimony in question. It is emphatically recommended that you not consent to a recording of any such interview unless you are provided with an exact duplication of that recording." (Letter of November 23, 1976 to Doris Ellen Clark). (Original emphasis).

47. That implication is the obvious one to be drawn from the "emphatic" recommendation that the witness require an "exact duplication" of any recording of the interview.

es previously addressed. On December 17, counsel for the government submitted a letter to the Court which, among other things, advised witnesses that they were in fact free to speak with defense counsel without condition or prior permission of the government attorneys.[48] While this letter was designed and attempted to cure any misunderstanding that might have been created by the original letter, it could not recapture the three weeks during which prospective witnesses had only the government's slanted advice upon which to base their response to defense requests for interviews nor to mitigate the unfavorable impression the first letter may have made.

Difficulties in the conduct of the case did not abate once jury selection began on March 1, 1977. In early December the government had provided the defendants with a list of 36 prospective *expert* witnesses it might call.[49] These witnesses covered a variety of areas of expertise. A week later the government sent the defendants a list of 259 persons it interviewed in connection with the case, including expert witnesses. This letter indicated that 121 of these were potential trial witnesses.[50] Counsel agreed among themselves that the government would provide a witness list.[51] On March 25, 1977, 24 days after jury selection had begun and only three days before opening arguments were to commence, the government served defense counsel with a supplemental list which omitted many witnesses noted on the December lists and added 19 who had not previously been listed. Defendants moved to prohibit the testimony of all previously undisclosed witnesses.[52] The Court denied the motion in a Memorandum Opinion and Order on April 1.[53] The Court did, however, impose certain conditions on the production and testimony of the challenged witnesses to eliminate the appearance of surprise and permit the defense ample time to prepare for cross-examination. Thereafter, the government filed three additional motions seeking to add 17 witnesses to its trial list.[54] The Court granted these motions in part, adhering to the same standards and safeguards set forth in the April 1 Memorandum Opinion and Order.[55]

The defendants argue that the government's continual addition of extra names to its witness list after trial had begun, amounting, in sum, to 36 previously unnamed individuals, violates both due process and the requirements of 18 U.S.C. § 3432 relating to witness lists in capital cases. The Court has thoroughly reviewed the applicable law in its April 1 Memorandum Opinion and Order and does not now intend to reiterate that decision. The Court would merely note in the context of this discussion that while there was nothing patently illegal or improper in and of itself about adding witnesses in this case after the trial had started (so long, of course, as adequate opportunity to prepare to meet the testimony was provided the defense), the addition of so many witnesses during the first two months of the trial put an added strain on the resources of defense counsel. Clearly the extensive in-chambers

---

**48.** The corrective letter sent to all prospective witnesses and submitted to the Court on December 17, 1976 stated, in pertinent part:

"Further clarification has been requested relative to pre-trial interviews with defense attorneys. We wish to repeat: it is perfectly proper for such interviews to be conducted. For defense counsel to provide adequate assistance to their clients, it is often desirable for them to familiarize themselves with the expected testimony of witnesses. Moreover, you need feel no obligation to seek our approval before engaging in such discussions. Witnesses do not "belong" to either party; they are free to speak with anyone they desire."

**49.** Letter of Philip Van Dam to Edward Stein, December 10, 1976.

**50.** Letter of Richard Delonis to defense counsel, December 17, 1976.

**51.** The nature of the agreement was noted in the Court's Memorandum Opinion and Order Regarding Discovery, *supra* at fn. 30, at note 9.

**52.** Docket Entry No. 36.

**53.** Docket Entry No. 32.

**54.** Docket Entry Nos. 53, 65 and 81.

**55.** Docket Entry No. 72; Tr. at 2546–7; 2603.

conferences engaged in by the Court with the parties were designed to avoid, insofar as possible, surprise at trial so as to enable the parties to direct their energies to trying the case, rather than engaging in hasty, last-minute investigations. The extent and nature of many of the witnesses added during the trial, particularly Dr. Francis Foldes, indicate that the government was not fully prepared at the time testimony in the case began. Moreover, the Court is mindful that evidence that extends beyond the bounds of discovery can materially alter defense strategy in a way that makes the presentation of an effective defense impossible. See *U. S. v. Lewis*, 167 U.S.App.D.C. 232, 511 F.2d 798, 803 (1975); *U. S. v. Kelly*, 420 F.2d 26, 29 (2nd Cir. 1969); *U. S. v. Padrone*, 406 F.2d 560 (2nd Cir. 1969). In *Kelly* the prosecution did not disclose certain test results to the defendants until trial, despite the fact that defendants had previously filed a discovery motion directed to all scientific reports. The defense requested a one-month continuance to conduct their own tests. The trial court denied the request. Despite the fact that the government's case was strong, the Court of Appeals held that this was error because "the course of the government smacks too much of a trial by ambush, in violation of the spirit of the rules." 420 F.2d at 29. In the case at bar, the Court was able to minimize the element of lack of preparation evident in *Kelly*. It was not, however, able to insure that the government's changing witness list did not unfairly undermine the defense strategy. While the prejudice here is not as substantial as that in *Lewis* or *Padrone* (where there had been no request by the defense) which concerned the government's failure to disclose a defendant's statement, the Court cannot help but note that the highly fluid witness list, which both added witnesses the defendants had not been able to prepare for prior to trial and deleted prospective witnesses whose expected trial testimony the defendants had spent substantial time preparing for,[56] added an extra burden to these already demanding proceedings.

The discussion to this point has dealt with the pre-trial phase and while the Court has delineated some specific examples to illustrate improper conduct, it should be borne in mind that during the pre-trial period there was the on-going, normal, or as normal as was possible in this complex case, investigation, research and planning for trial. In other words, the incidents related, and others, were superimposed on the already difficult tasks of pre-trial and trial preparation. The added burdens, especially in their cumulative effect, cannot be overstated but, at the same time, this cumulative effect was not readily apparent. As the incidents and the issues they created arose they were considered curable and were administered the judicial medication that treated the symptoms, primarily additional and detailed orders of discovery. However, the cause and its consequences were not, it can now be seen in retrospect, appreciably relieved.

### B.

The remaining difficulties in the case arose largely because of the misconduct or improper remarks of the Assistant United States Attorney in charge of the case. On May 30, 1977, as the government neared completion of its case-in-chief the Court and the parties awoke to a prominently featured and headlined page-three article in the Detroit Free Press titled "VA Prosecutor: 'Women are Guilty' ".[57] The

---

**56.** For example, Dr. Jeoffrey K. Stross who was on the government's December list of experts and who had done extensive research into the suspicious breathing failures at the Ann Arbor Veterans Administration Hospital, see Stross, Shasby and Harlan, *An Epidemic of Mysterious Cardiopulmonary Arrests*, 295 N.E. J.Med. 1107 (1976), was expected to testify but never did. The defendants represent that they spent considerable time examining the work of Dr. Stross in anticipation of meeting his testimony. Since he never appeared as a witness, much of this preparation was wasted and could have been more profitably spent in other forms of preparation.

**57.** Page three of the Detroit Free Press is the "second" front page and follows a front-page layout.

article discussed a statement made during the course of an interview by Assistant United States Attorney Richard Yanko that irrespective of the jury's verdict in this case, he believed the defendants to be guilty. The next day the Court conducted an in-chambers hearing at which Mr. Yanko admitted that he made the statements attributed to him in the news article.[58] The Court found that the comments violated the American Bar Association Standards, ABA Standards Relating to the Prosecution Function and the Defense Function, § 5.8(b) (1971), ABA Standards Relating to Fair Trial and Free Press, § 2.1(6) (1968), and the Rules of the Department of Justice, 28 CFR §§ 50.2(b)(2), 50.2(b)(5), 50.2(b)(6)(vi). The Court did not note at that time, but does now, that this conduct also is a violation of Disciplinary Rule 7–106(C)(4) of the Code of Professional Responsibility. In addition, the comments violated the stipulation entered into by the government back in July, 1976, that it would be governed by the ABA Standards.[59]

The Court's primary concern at the time was to ascertain whether any of the members of the jury had come into contact with this prejudicial statement. The jurors were not sequestered during the trial. Each afternoon, after a warning by the Court to avoid all sources of information about the case, the jury was released and allowed to return home. While all jurors had been warned not to read newspapers or watch television news or listen to radio news broadcasts, it was certainly possible that one or more jury members had inadvertently heard of the prosecutor's remarks. The Court and counsel were concerned that if inquiry was made of the jury en masse, the jurors might not be totally candid with the Court for whatever reason. (Cf. *U. S. v. Coast of Maine Lobster Co., Inc.*, 538 F.2d 899 (1st Cir. 1976) where not until the fourth formulation of the question to the

jury as a whole did first one juror, and then six or seven others, acknowledge having seen the article about which the Court was making inquiry.) On the other hand, if individual inquiry were made the juror's curiosity might be stimulated unduly. The Court, with the concurrence of counsel, finally decided to question the jury en masse.[60] No member of the jury responded affirmatively to the Court's general and necessarily guarded questions concerning contact with newspaper articles about the case over the preceding weekend.

In their motion for new trial the defendants argue that it was error for the Court to fail, *sua sponte*, to make inquiry of each juror individually. The government argues in response that the remarks were not prejudicial, the defendants waived any objection to the group poll conducted of the jury and, in any event, the Court was fully empowered to conduct the inquiry as it did. All these arguments miss the central point. The trial court is invested with considerable latitude in the conduct of mid-trial proceedings to ferret out any jury contact with impermissible publicity. Even the First Circuit, upon which defendants rely, has adopted a rule that does not require a court, *sua sponte*, to make individual inquiry in cases of this sort.

"We leave to the sound discretion of the district court whether its initial inquiry into exposure to pre-trial publicity should be to the jurors collectively, as permitted in *Margoles v. U. S.*, 407 F.2d 727, 735 (7th Cir.), *cert. denied*, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969), or individually. We decline to adopt a hard-and-fast rule that the *initial* inquiry must be conducted on an individual basis. Nonetheless, there will undoubtedly be situations where individual inquiry will be the preferred course from the outset, just as in less sensitive situations collec-

---

**58.** Transcript of Proceedings May 31, 1977 at 5. The Order of Suppression as to these proceedings is hereby vacated.

**59.** The major bases of the principle upon which the standards, codes and rules insofar as they

apply to prosecutors are two: the interpretation of non-evidentiary matter before a jury and the weight of the personal belief of a high government law enforcement official.

**60.** Proceedings of May 31, 1977 at 6–11.

tive inquiry will be more economical of time and less distracting." *U. S. v. Perrotta,* 553 F.2d 247, at fn. 6 (1st Cir. 1977). (Original Emphasis).

The government's position that the remarks were not prejudicial is likewise lacking in merit. This is not a case, like *U. S. v. Medlin,* 353 F.2d 789 (6th Cir. 1965), *cert. denied,* 384 U.S. 973, 86 S.Ct. 1860, 16 L.Ed.2d 683 (1966) upon which the government relies, where the Court approved a prosecutorial argument as to what the *facts* properly before the jury showed. See also *Orebo v. U. S.,* 293 F.2d 747 (9th Cir. 1961). On the contrary, the remarks of the prosecutor here were explicit that irrespective of any showing in open court the defendants were guilty. This raises the gravest dangers that defendants may be tried on the vaguest and most irrefutable rumor. In fact, the very beginning of the article obliquely suggests that the prosecutor based his remarks on evidence that could not be presented to the jury.[61]

. As all parties recognized at the time of the May 31 hearing, counsel for the government had erred in a manner that presented the Court with a Hobson's choice. The Court could either inquire of the jury as a whole, risking the possibility that the jurors, because of embarrassment or self-induced peer pressure, would not respond candidly, or could inquire of the jury individually and perhaps incite a curiosity that would motivate one or more of the jurors to investigate this tantalizing provocation. It must be remembered that these two unsavory alternatives were presented to the Court *solely* because of the government's misconduct. There can be no argument that the statements of the prosecutor were made in response to some provocative words of defense counsel. As in *Briggs v. U. S.,* 221 F.2d 636, 639 (6th Cir. 1955), "Any prejudice to the [defendants] that existed at that time was not caused by any act of [theirs]." The point is not whether there was any waiver of objections, but that the Court, the jury, the defendants and indeed

the public should never have been faced with the problem in the first place. The finding of misconduct is incontrovertible. The actual impact on the trial process cannot be determined at this time. The government may not now come before the Court and argue that defendants' acquiescence in the Court's failure to impose a "cure" that may well have been as bad as the "disease" places the issue beyond the reach of judicial power. The prosecutor's remarks were improper, inexcusable and violated not only professional standards and codes but the rules of the government itself. The Court with the assistance of the parties attempted to do what it could to preserve the essential fairness of the trial. While the comments, if not actually conveyed to the jury, would not necessarily constitute sufficient grounds for reversal, the public statement by the prosecutor of his personal belief in the guilt of the accused is yet another instance in which the conduct of the government made the trial of this case difficult and fraught with risks. Unfortunately, an inquiry of a more specific nature shortly after trial could hardly cure the appearance of unfairness nor insure complete candor.

The improper remarks of government counsel were not limited to statements to the press. Counsel made several significant errors in his presentation to the jury. On June 9, 1977 defendant Narciso took the stand in her own behalf. It was a moment of high drama. As in many cases, the testimony of the defendants here was "crucial, perhaps pivotal." *U. S. v. Dow,* 457 F.2d 246, 248 (7th Cir. 1972). Because of the inconsistent nature of much of the factual testimony the government had presented, it was expected that the defendants' rendition of the facts and, most importantly, their credibility would be significant factors in the jury's determination of the case. Ms. Narciso finished her direct testimony that same day. Counsel for the government began his cross-examination, but did not fin-

---

**61.** The second paragraph of the article says: " 'These two women are guilty. Whether they'll be found guilty or not is another ques- tion,' said Yanko, the Assistant U. S. Attorney in charge of prosecuting the nurses."

ish. The next day, June 10, 1977, the prosecutor engaged in a series of questions which the Court ruled were objectionable. On seven separate occasions the prosecutor confronted defendant Narciso with statements by other witnesses which apparently were inconsistent with her testimony, and asked her to state whether the other witnesses were lying.[62] On six of those occasions the defendants objected to the prosecutor's practice of seeking that sort of characterization.[63] The Court sustained each of those objections. As the transcript indicates, these objectionable questions were not isolated in time so as to justify the inference that the prosecutor merely slipped occasionally during the course of an exceedingly long trial. Compare *Morton Butler Timber Co. v. U. S.*, 91 F.2d 884, 890 (6th Cir. 1937). Instead, whether intentional or not, the result of his continued failure to phrase his questions in a proper manner was to plant in the minds of the jurors the suggestion that either the defendant or the other witness was a perjurer. Cf. *U. S. v. Rudolph*, 403 F.2d 805, 807 (6th Cir. 1968). By using this method, the prosecutor implied to the jury that differences in the testimony of the defendant and any other witness could only be the result of lying and not because of misrecollection, failure of recollection or other innocent reason. It also attempted to place the defendant in the untenable position of calling another witness a liar or a perjurer or floundering on an analysis no person, or machine, has yet successfully accomplished. It is, of course, the function of the jury to examine conflicting facts brought out in the trial process and determine where the truth lies and this may be done, and usually is, without a finding of perjury. See, e. g., *U. S. v.*

*Dennett*, 551 F.2d 261 (10th Cir. 1977); *Johnson v. U. S.*, 138 U.S.App.D.C. 174, 426 F.2d 651, 655 (1970) (en banc), *cert. dismissed*, 401 U.S. 846, 91 S.Ct. 1258, 28 L.Ed.2d 523 (1971); *U. S. v. Creek*, 403 F.2d 220 (6th Cir. 1968); *U. S. v. Antonelli Fireworks Co.*, 155 F.2d 631, 635 (2nd Cir. 1946), *cert. denied*, 329 U.S. 792, 67 S.Ct. 49, 91 L.Ed. 640 (1946). Of equal importance was the fact that here the prosecutor consistently failed to conform his conduct to the Court's rulings at a critical time during the trial. See *U. S. v. Dunn*, 299 F.2d 548, 556 (6th Cir. 1962). Again the prejudice to the defendant is plain, although difficult to quantify. *Belton v. U. S.*, 104 U.S.App.D.C. 81, 259 F.2d 811 (1958) (en banc); *U. S. v. Perlstein*, 120 F.2d 276 (3rd Cir. 1941), *cert. denied*, 316 U.S. 678, 62 S.Ct. 1106, 86 L.Ed. 1752 (1942); *Pierce v. U. S.*, 86 F.2d 949 (6th Cir. 1936).[64]

The prosecutor's rebuttal argument contained several improprieties. During the course of discussing an argument put forward by the defendants that perhaps a medical student who was present at one of Mr. Hogan's respiratory arrests should have been investigated, the prosecutor mentioned that a medical student was present at Mr. Hogan's death on August 15, 1975. He went on to say that this incident was totally irrelevant to the offenses charged by the government.

> "There is no charge here for Mr. Hogan on the 15th. There is no medical student in the courtroom here to defend himself. *The Government hasn't even been allowed to present evidence as to any other event.*"[65]

The defendants, who did not object to this comment at the time it was made, rightly argue that it went too far. As already

---

**62.** Transcript at 5202–3; 5206–7; 5213; 5218–9; 5225–7; 5238 and 5306–7.

**63.** Transcript at 5203; 5213; 5218; 5225; 5238 and 5307.

**64.** The government would distinguish these cases by arguing that in *Belton, Perlstein* and *Pierce* the error resulted from the presentation to the jury of inadmissible evidence, whereas in the case at bar the error merely involved the jury being exposed to an objectionable charac-

terization of evidence which the jury could properly consider. As in *Pierce*, however, this "was clearly a case where the misconduct of the prosecutors was neither slight nor confined to a single instance, but so pronounced and persistent that the cumulative effect upon the jury cannot be disregarded as inconsequential." *Pierce v. U. S., supra* at 953.

**65.** Transcript at 6508. (Emphasis supplied.)

noted the government was prohibited by Court Order and by its own decision from proving any incident of respiratory arrest not charged in the indictment. By this comment the government implied strongly that evidence of the defendants' guilt existed which was not presented. That implication was both contrary to the Court's Order and the law. See *U. S. v. Lamerson,* 457 F.2d 371 (5th Cir. 1972); *U. S. v. Grossman,* 400 F.2d 951 (4th Cir. 1968), *cert. denied,* 393 U.S. 982, 89 S.Ct. 453, 21 L.Ed.2d 443 (1968). As the government implicitly concedes in its brief in opposition to the defendants' motion for a new trial, an advocate may argue to the jury only on the basis of evidence presented in open court. See, e. g., *Greenberg v. U. S.,* 280 F.2d 472 (1st Cir. 1960).

▪ Near the end of his rebuttal argument the prosecutor made comments that, fairly interpreted, implied that the defendants had some duty to bring forth evidence of their innocence. In the course of discussing the testimony of Dr. Lucy Goodenday the prosecutor referred to the fact that Dr. Goodenday had been hypnotized. He states:

> "Mr. Stein made further references to the hypnotism and indicated that there were video tapes of this event. And Mr. Stein indicated that he had seen them, seen the video tapes of those events, and why didn't you see them.
>
> "Well, let's turn that around. If there was anything improper about the video tape that Mr. Stein saw you might think that he would have brought it in the courtroom." [66]

Defense counsel promptly objected and the Court sustained the objection. The Court offered the curative instruction that:

> "There is no question, ladies and gentlemen, that the defense is not required to produce any witnesses or any testimony, and I will instruct you on that further when I give you the charge this after-

noon. You will disregard that remark from the prosecutor." [67]

A few moments later, at the very end of his rebuttal argument the prosecutor again argued in a fashion that implied the defendants had some obligation to bring forth a defense. In conjunction with his earlier remarks about the defendants' failure to bring forth the video tapes of the hypnosis session this comment was particularly inappropriate. These were the prosecutor's *very last* words to the jury:

> "Ladies and gentlemen, you have heard the Defense. What is the Defense based on facts? When I was in law school I had a prof who had a favorite saying and the first or the second week of the course he threw out the saying to all the students Nemo Dat, Qui Non Habet. And the first time that we heard that saying we all kind of perked up, but nobody could even repeat it, much less know what it meant. It was a catchy little phrase and this prof had a way of repeating it, Nemo Dat, Qui Non Habet, and eventually everybody sort of picked it up, say it in your sleep, and then this prof who liked this catchy phrase had a way of sort of stretching the meaning of it, take it out of context a little bit just so he could use this catchy phrase. And this catchy phrase perhaps is appropriate at this moment, because it refers to what the Defense is. Nemo Dat, Qui Non Habet. He who hath not, cannot give." [68]

Had the prosecutor argued to the jury that all the facts in the case proved the defendants guilty beyond a reasonable doubt there would have been no impropriety. Indeed, that is the prosecutor's duty. But he did not do this. Instead, the tenor of the entire rebuttal argument was that the defendants' arguments and facts in support were worthless. The implication contained in his language is inescapable, though subtle: the jury should consider what he believed to be

**66.** Transcript at 6554.

**67.** Transcript at 6555. A further instruction was given to the same effect when the Court gave the jury final instructions. The final in-

structions did not make specific reference to this offensive remark.

**68.** Transcript at 6578–9.

the defendants' failure to prove themselves innocent. Cf. *U. S. v. Alfonso-Perez*, 535 F.2d 1362, 1366–7 (2nd Cir. 1976).

The most egregious error in closing argument, in the Court's opinion, was the prosecutor's final remarks in his opening presentation to the jury. The prosecutor argued that there were 44 reasons justifying conviction in this case. He very carefully and properly discussed what he felt to be 43 factual circumstances proving guilt beyond a reasonable doubt. For his forty-fourth reason however, the prosecutor stepped beyond the bounds of proper argument. He stated:

"The 44th reason, ladies and gentlemen, is more powerful than any of the previous 43. The 44th reason cannot be found within the transcripts of this trial. If you hunted for it, you wouldn't find it. The 44th reason is more powerful than any other singular reason. The 44th reason, ladies and gentlemen, is the combination of the first 43. What are the odds, ladies and gentlemen, what is the chance, what is the probability that these Defendants have engaged in these activities and that all these factors that are incriminating could exist and the Defendants would still nevertheless be innocent." [69]

The prosecutor should have known that this invitation to the jury to engage in a speculative combination of the charges, which courted the danger that the presumption of innocence would be diluted, was not permissible. In discussing with counsel the voir dire questions to be asked the prospective jurors, counsel agreed and the Court was emphatic that individual jurors indicate a willingness to consider each charge separately.[70] At an in-chambers conference prior to closing argument the proposed jury instructions were discussed at great length and agreed to by the parties so that they would know in advance the nature of the Court's instructions. The purpose of this prior discussion, of course, was to enable counsel to tailor their arguments so as to avoid error. The prosecutor knew that the Court was planning to instruct the jury that:

"You will notice that in this indictment a separate crime or offense is charged against one or both of the defendants in each count. Each charge and the evidence pertaining to it must be considered separately. You may not consider evidence introduced as to one count in arriving at a verdict on any other count."

There can be no doubt that this line of argument was improper and in direct conflict with the announced intention of the Court.

Before considering whether these prosecutorial improprieties require the grant of a new trial, either singly or together, there is one final episode the Court must note. In response to the Court's request at an in-chambers conference held on November 2, 1977, the two Assistant U. S. Attorneys who conducted the trial of this matter indicated that they had had a two-hour or longer luncheon meeting with the foreman of the jury and one other juror a few weeks after the jury returned its verdict. During this discussion the former jurors and the prosecutors talked about the nature of the case, the course of the jury's deliberations, and other topics of mutual interest related to the case. In mid-September one of these same jurors called the United States Attorney from the jury foreman's home to report unusual phone calls the foreman had received. An agent of the FBI went to the house the next day and made inquiry, but did not discuss the case. In late August another juror called to ask the prosecutor's opinion about her talking with the press. After being informed of an apparent agreement among the jurors not to talk with representatives of the news media, the Assistant U. S. Attorney indicated that she

**69.** Transcript at 6349–50.

**70.** The Court asked each prospective juror: "Do you feel that the serious nature of these charges, taken together with the fact that the indictment charges 10 counts against these two defendants, might make it difficult for you to render a fair and impartial verdict separately as to each defendant and each particular count in the indictment?"

was free to speak with anyone she desired or not to speak with anyone about the case. None of these contacts were reported to the Court until its own inquiry at the time of arguments on the post-trial motions. At the time of each of these contacts the attorney for the government knew that the defendants had made formal post-trial motions and planned to file extensive briefs. It appears that the prosecution did not know the precise grounds of the motions until they were filed on September 19, 1977.

■ For many years the law has disfavored lawyer contact with jurors after the conclusion of litigation. The courts have long been concerned that by inquiring into the merits of the jury's deliberations, an area outside the permissible scope of a motion for new trial, see FRE 606(b), lawyers would unduly harass jurors and create needless issues for post-trial litigation. The Fourth Circuit condemned the practice in no uncertain terms.

"He who makes studied inquiries of jurors as to what occurred there acts at his peril, lest he be held as acting in obstruction of the administration of justice. Much of such conversation and inquiry may be idle curiosity, and harmless, but a searching or pointed examination of jurors in behalf of a party to a trial is to be emphatically condemned. It is up to the courts to protect jurors from it." *Rakes v. U. S.,* 169 F.2d 739, 745–6 (4th Cir. 1948), *cert. denied,* 335 U.S. 826, 69 S.Ct. 51, 93 L.Ed. 380 (1948).

See also *O'Rear v. Fruehauf,* 554 F.2d 1304 (5th Cir. 1977); *Commonwealth v. Patrick,* 416 Pa. 437, 206 A.2d 295 (1964). Courts which have upheld the power of the trial court to prohibit post-trial contact between jurors and attorneys have done so to (a) avoid harassment of jurors, thereby encouraging freedom of discussion in the jury room, (b) reduce the number of meritless post-trial motions, (c) eliminate a significant source of jury tampering, and (d) increase the certainty of verdicts. *Miller v. U. S.,* 403 F.2d 77 (2nd Cir. 1968). *Stephens v. City of Dayton, Tenn.,* 474 F.2d 997 (6th Cir. 1973); *U. S. v. Crosby,* 294 F.2d 928

(2nd Cir. 1961), *cert. denied, sub·nom., Mittleman v. U. S.,* 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962); *Bryson v. U. S.,* 238 F.2d 657 (9th Cir. 1956), *cert. denied,* 355 U.S. 817, 78 S.Ct. 20, 2 L.Ed.2d 34 (1957). Several courts have approved the practice of requiring attorneys to petition the Court before contacting any juror. *U. S. v. Riley,* 544 F.2d 237 (5th Cir. 1976), *cert. denied,* 430 U.S. 932, 97 S.Ct. 1554, 51 L.Ed.2d 777 (1977); *U. S. v. Brasco,* 385 F.Supp. 966 (S.D.N.Y.1974), *aff'd.* 516 F.2d 816 (2nd Cir. 1975), *cert. denied,* 423 U.S. 860, 96 S.Ct. 116, 46 L.Ed.2d 88 (1975); *Beanland v. Chicago, R. I. & Pac. R. R. Co.,* 345 F.Supp. 227· (W.D.Mo.1972). In fact, some jurisdictions have a standing policy to the effect that all attorney-juror contact must be strictly regulated by the court. *U. S. v. Winters,* 434 F.Supp. 1181 (N.D.Ind.1977); see *Womble v. J. C. Penney Co.,* 47 F.R.D. 350 (E.D. Tenn.1969); *aff'd.* 431 F.2d 985 (6th Cir. 1970) (Tenn.); *U. S. v. Miller, supra,* (New Jersey); *Hildebrand v. Mueller,* 202 Kan. 506, 449 P.2d 587 (1969).

■ In the circumstances of the present case, the proper approach for the Court is far from clear. The Court made no order explicitly prohibiting counsel from any contact with the jurors. It was perhaps shortsighted, in view of what has been discussed previously, to have assumed that counsel for the government would refrain from meeting with the jury until after the case left the jurisdiction of this Court and no further record would be needed. Apart from not violating any Court order counsel's conduct does not clearly constitute a breach of ethics. As noted in *U. S. v. Driscoll,* 276 F.Supp. 333, 338 (S.D.N.Y. 1967), the rulings of the American Bar Association are somewhat ambiguous on this issue. Ethical Consideration 7–29 makes it clear that:

"To safeguard the impartiality that is essential to the judicial process, veniremen and jurors should be protected against extraneous influences. . . . After the trial, communication by a lawyer with jurors is permitted so long as he refrains from asking questions or making

comments that tend to harass or embarrass the juror or to influence actions of the juror in future cases. Were a lawyer to be prohibited from communicating after trial with a juror, he could not ascertain if the verdict might be subject to legal challenge, in which event the invalidity of a verdict might go undetected."
While the clear implication to be drawn from the juxtaposition of the last two sentences is that lawyers should restrict communications to matters relevant to possible impeachment of the verdict, ABA Formal Opinion 319 (August 26, 1967) permits post-trial discussions with jurors for "self-education." The Court need not determine whether the attorneys for the government violated the Canons of Ethics. It is enough, in the context of this discussion, to note that the conduct of the government was extremely ill-advised. The Court had continuing jurisdiction over the case. Post-trial motions were to be filed. The motions might have, and indeed did, raise issues concerning extra-judicial material that might have come before the jurors. The government's extended discussions with two jurors makes it difficult, if not impossible, for the Court to question them free from the impact of having discussed the case with trial counsel. While the context is somewhat different, courts have noted that in post-trial interviews the questioners desire to make the jurors want to give certain answers and the jurors themselves "are always ready to be on the side of whoever asks them." *N. Pacific Ry. Co. v. Mely*, 219 F.2d 199, 202 (9th Cir. 1954). *U. S. Sanchez*, 380 F.Supp. 1260, fn. 12 (N.D. Tex.1973), *aff'd* 508 F.2d 388 (5th Cir. 1975), *cert. denied*, 423 U.S. 827, 96 S.Ct. 45, 46 L.Ed.2d 44 (1975). Were the Court to decide that any inquiry of the jury was necessary under FRE 606(b), the process would be severely hampered at least as to these two jurors, one of whom, as foreman, may well have been an extremely important witness, because of the government's imprudent conduct.

### III. THE CONCLUSION

■ In assessing whether the conduct of the prosecution requires the Court to set aside the convictions here and grant a new trial, it must be kept in mind that the government is held to a high standard in the conduct of its criminal cases. In *Berger v. U. S.*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), the prosecutor committed numerous errors in his cross-examination of the defendant and in his closing argument. Before reversing the conviction the Supreme Court stated what have come to be the guiding principles of the prosecution's duty.

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

"It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Id.* at 88, 55 S.Ct. at 632.

■ Whether a particular remark or act of the prosecutor requires a new trial depends on the degree of prejudice inherent in the comment or act and the strength of the prosecution's case. The two are inversely related: greater prejudice and a weaker case suggest the need for a new trial; less-

er prejudice during a strong case does not. Compare *Berger v. U. S., supra,* with *U. S. v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 239, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). See *U. S. v. Burse,* 531 F.2d 1151 (2nd Cir. 1976); *U. S. v. Blanton,* 520 F.2d 907, 910 (6th Cir. 1975); *U. S. v. O'Donnell,* 510 F.2d 1190 (6th Cir. 1975) (McCree, J., concurring), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975); *U. S. v. Perlstein, supra* (dissenting opinion).

This deliberative process must focus on the effect of the error on the minds of the jury, given the strength of the particular case.

" . . . [T]he question is, not were they right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting. Cf. *United States v. Socony-Vacuum Oil Co., supra,* 310 U.S. at pages 239, 242 [60 S.Ct. 811, at pages 851, 853]; *Bollenbach v. United States* [326 U.S. 607, 614; 66 S.Ct. 402, 406, 90 L.Ed. 350 (1946)].

"This must take account of what the error meant to them, not singled out and standing alone, but in relation to all else that happened. And one must judge others' reactions not by his own, but with allowance for how others might react and not be regarded generally as acting without reason." *Kotteakos v. U. S.,* 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946).

This determination is often extremely difficult as illustrated by the case of *Stewart v. U. S.,* 107 U.S.App.D.C. 159, 275 F.2d 617 (1960) (en banc), rev'd 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961). In Stewart's third trial for first degree murder and robbery the defendant took the stand. He had not done so at either of the first two trials. The defense was insanity. The prosecutor asked the defendant if he had ever taken the stand previously, though he knew that the defendant had not. In the Court of Appeals a majority of five held that the question was admissible on the issue of defendant's credibility since he appeared to be mentally ill on the stand. The four dissenters argued that the question was an impermissible attempt by the prosecutor to place before the jury suggestions which chilled the defendant's constitutional right not to testify in his own behalf. In the Supreme Court, there was again a five-four split. This time, however, the government had conceded the impropriety of the question, but argued that the error was harmless because it could not have affected the jury's verdict. The majority rejected this contention because, in its view, it was plain that the jury's awareness of previous trials would have influenced its assessment of the defendant's testimony. Justice Frankfurter writing in dissent argued that a single impermissible question once repeated did not have a significant effect in the context of the entire proceedings and, in any event, the majority's conclusion was based on excessive speculation and unjustified inference. In his view the majority's conclusion was overly technical. Justice Clark, also dissenting, similarly argued that

"in the light of the long trial, the uncontradicted evidence as to [defendant's] malingering and the fact that the question was never mentioned again during the remaining three days of the trial, the jury did not need, nor as a matter of relevancy was it able, to go through the mental gymnastics the Court supposes." 366 U.S. at 27, 81 S.Ct. at 949.

As the history of *Stewart* shows, in any particular case there may be considerable room for distinguished jurists to disagree on the effect on the jury of a prosecutorial misstatement.

█ In the case at bar the Court sees no substantial ground for disagreement. No single claim of error raised by the defendants is sufficient to require reversal. There is no dramatic moment of prosecutorial misconduct as there was in *U. S. v. Perry,* 512 F.2d 805 (6th Cir. 1975), when the prosecutor implied without any basis in fact, that the defendant was associated with the "Ma-

fia." See also *U. S. v. Love*, 534 F.2d 87 (6th Cir. 1976). But this does not end the inquiry because the Court must look to the record as a whole to determine if the defendants have received a "trial which was eminently fair and free from the taint of prosecutorial misconduct." *U. S. v. Marrero*, 516 F.2d 12, 15 (7th Cir. 1975), *cert. denied*, 423 U.S. 862, 96 S.Ct. 120, 46 L.Ed.2d 90 (1975). The Court may now look back on the entire proceedings and reflect in a more objective manner on the full impact of the government's conduct in these proceedings. The fact that the Court may at one time have taken steps in an effort to ameliorate or cure any prejudice resulting from the government's conduct does not preclude this more comprehensive review. Now that the heat of the trial process is behind the Court, it is possible to assess more accurately the state of the facts, free from the unavoidable tendency to preserve a trial in which the Court and the parties had invested considerable time. If by consistently exceeding the bounds of lawyerly propriety, the government took advantage of the Court's constant efforts to safeguard, to the limits of its energy and skill, the integrity of the trial, it will not now be heard to invoke some form of estoppel. Nor is it persuasive that in some or all of these instances the defendants did not object or move for a mistrial. As the Supreme Court recognized in *Stewart v. U. S.*, *supra*, 366 U.S. at 10, 81 S.Ct. 941, there is grave danger that reference to error in cautionary instructions or motions for mistrial may merely serve to emphasize things that are best forgotten. Accord: *Briggs v. U. S.*, *supra* ; *U. S. v. Licht*, 158 F.2d 458, 462 (2nd Cir. 1946) (dissenting opinion), *cert. denied*, 330 U.S. 824, 67 S.Ct. 863, 91 L.Ed. 1274 (1947).

▮▮▮ As must be evident by this point the government's conduct prejudiced the defendants in two significant ways: it frustrated the ability of the defense to prepare for trial effectively and it presented improper suggestions of fact and law to the jury. The government's pre-trial conduct kept the defendants continually off-balance and unable to prepare effectively for trial while trying to sift through an ever-changing mass of discovery materials that continued to be provided right up to the final weeks of and into the trial. The government's changing witness list not only made it difficult for the defense to adhere to a unified strategy throughout the trial,[71] but it made a mockery of the government's promise in January, 1977 to follow an "open-file" policy. The right to a fair trial necessarily includes within it the right, under the Federal Rules of Criminal Procedure, to adequate notice and opportunity to prepare. Of equal significance is the fact that this deplorable situation occurred because of the government's repeated failures to comply with the Court's Orders.

The failure of the government to afford timely, complete discovery assumes increased dimensions when it is coupled with the numerous instances of prosecutorial misconduct discussed above. Not only were the defendants hampered in their efforts to prepare for trial, but they had to contend as well with impermissible inferences by the prosecutor during the cross-examination of one of the defendants—surely a crucial part of a trial of this nature—and with improper argument. The government's efforts to narrow the scope of the legal dispute concerning the effect of any prosecutorial misconduct is singularly out of place in these post-trial motions. The Court has already noted that it must consider the fairness of these proceedings as a whole, not merely the propriety of any particular act standing alone. That consideration leads ineluctably to the conclusion that the cumulative effect of separate instances of prosecutorial misconduct precluded that fundamental fairness that must be afforded to a defendant

---

**71.** For example, the defendants' cross-examination of Dr. Macelle Willock might well have been substantially different had they known the government would call Dr. Francis Foldes as an expert. In light of the discussion about the nature of the proofs in the case, *supra*, the Court cannot say that a change was either unnecessary or would have been insignificant in the minds of the jury.

if our system of justice and our faith in it is to be sustained. The untainted administration of justice is an indispensable element of that system and faith.

In reaching the conclusion that the misconduct of the government did reasonably affect the deliberation of the jurors in this case the Court has in mind the fact that the government's case was not strong and was entirely circumstantial. Indeed this very jury after lengthy deliberations returned two verdicts of acquittal as to defendant Narciso. This is a further indication of the weakness of the government's case. See *U. S. v. Calvert*, 498 F.2d 409 (6th Cir. 1974). There was sufficient evidence adduced on the counts of the indictment that went to the jury to allow a jury free from the direct or indirect influence of prosecutorial misconduct in any form to return a verdict of guilt beyond a reasonable doubt.[72] But this was not such a jury. In considering the nature of the government's misconduct together with the type of circumstantial evidence presented, the Court is left with the abiding conviction that this jury's verdicts could not reasonably have been reached free of the influence of the numerous improprieties that occurred during the course of this long trial.

This Court does not mean to suggest in any fashion that the jurors in this case performed their civic obligation poorly. On the contrary, the jurors were exceptionally attentive and diligent throughout the entire trial which, including jury selection and deliberations, extended over almost four-and-one-half months. They must be commended highly for their conscientiousness and sincerity. Rather, the Court finds that the overwhelming prejudice to the defendants arising from the government's persistent misconduct prevented the jurors from receiving the case free from taint. Error need not be dramatic or immediately obvious to require a new trial in a criminal case. The insidious accretion of prosecutorial misconduct in this case "polluted the waters of justice," see *Mesarosh v. U. S.*, 352 U.S. 1, 14, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956), as surely as if the prosecutor had argued that the jurors should ignore the dictates of the Constitution. Whether the prosecutor was guilty of a single instance of egregious misconduct, or numerous instances of less serious impropriety, the question is the same: considering the strength of the government's case, can it reasonably be said that the jury was influenced by the conduct of the prosecutor. *U. S. v. Miller*, 411 F.2d 825, 832 (2nd Cir. 1969). While the Court does not believe that the government prosecuted this case in bad faith, compare *U. S. v. Banks*, 383 F.Supp. 389 (D.S.D.1974), it cannot escape the conclusion that the jury could not have based their verdict in this case on evidence presented in an atmosphere free from the intrusion of avoidable prejudice.

Certainly applicable here in overview is the following from *Stone v. U. S.*, supra at 77:

"There is no right more sacred than the right to a fair trial. There is no wrong more grievous than its negation."

The interests of justice and judicial conscience demand a new trial in this case.

---

**72.** Contemporaneously with the filing of their motion for a new trial, the defendants filed a motion for judgment of acquittal. That motion in effect, urged the Court to reconsider its ruling of June 8, 1977 granting in part and denying in part the defendants' motion for a judgment of acquittal. (Tr. at 4946–82). The Court declines to do so for the reasons stated in its oral opinion. As stated in *U. S. v. Green*, 548 F.2d 1261, 1266 (6th Cir. 1977):

"This court has long recognized that purely circumstantial evidence may be sufficient to sustain a conspiracy conviction. *United States v. Chambers*, 382 F.2d 910, 913 (6th Cir. 1967). The permissible inferences to be drawn from such evidence need not be consonant only with an hypothesis of guilt, *United States v. Luxenberg*, 374 F.2d 241, 249 (6th Cir. 1967), providing that the totality of the evidence is substantial enough to support a finding of guilt beyond a reasonable doubt."

This does not change the fact, as noted earlier, that the considerations differ in a motion for a new trial from those involved in a motion for judgment of acquittal. Because of the disposition made in this Memorandum Opinion and Order it is unnecessary for the Court to rule upon each and every contention raised by the defendants.

The defendants' motion for a new trial is therefore GRANTED.

IT IS SO ORDERED.